# EXHIBIT A

LONDON COURT OF INTERNATIONAL ARBITRATION

LCIA ARBITRATION NO. 163397

HPK MANAGEMENT D.O.O. (Republic of Serbia)

and

HPK ENGINEERING B.V. (Netherlands)

Claimants

versus

REPUBLIC OF SERBIA

and

ŽELEZARA SMEDEREVO D.O.O. (Republic of Serbia)

Respondents

**FINAL AWARD**

11 May 2018

**TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................................6
        A.      PARTIES...................................................................................................6
        B.      TRIBUNAL................................................................................................6
        C.      DISPUTE ..................................................................................................7
II.     PROCEDURAL HISTORY................................................................................8
III.    PARTIES' SUBMISSIONS................................................................................24
        A.      CLAIMANTS' SUBMISSIONS..............................................................24
        B.      RESPONDENTS' SUBMISSIONS .........................................................25
IV.     PARTIES' REQUESTS FOR RELIEF .............................................................26
        A.      CLAIMANTS' REQUEST FOR RELIEF ...............................................26
        B.      RESPONDENTS' REQUEST FOR RELIEF ..........................................28
V.      FACTS ...............................................................................................................28
        A.      BACKGROUND......................................................................................28
        B.      NEGOTIATION AND CONCLUSION OF THE MSA...........................29
        C.      PIKARO CONTRACTS ..........................................................................30
        D.      PRIVATISATION AND TERMINATION NOTICES ...........................30
VI.     TRIBUNAL'S DECISION ................................................................................31
        A.      TRIBUNAL'S JURISDICTION ..............................................................32
        B.      TERMINATION OF MSA AND TERMINATION FEE...............................34
        C.      PRIVATISATION BONUS .....................................................................35
                1.      Validity and Effect of the Second Termination Notice........................36
                2.      Breach of Clause 8.1.2 MSA.................................................................37
                        a)      Interpretation of Clause 8.1.2 MSA..............................................39
                        b)      Alleged Breaches of the RMA.......................................................41
                        c)      Deferred Payment Issue................................................................42
                                (1)      Start Date of Deferred Payment.......................................42
                                (2)      End Date of Deferred Payment.........................................43
                                (3)      Length of Deferred Payment............................................44
                                (4)      Breach of Deferred Payment............................................46
                                (5)      Material Breach................................................................48
                        d)      Credit Issue ..................................................................................50
                                (1)      Form of Credit ..................................................................50
                                (2)      Method of Calculation ....................................................52
                                (3)      Breach of Credit...............................................................56
                3.      Other Breaches of the MSA ...................................................................61

a) 120 Days Correction Period (Clause 8.1.1 MSA) ................... 62

b) Immediate Termination (Article 127 LO) ................................ 62

c) Net Working Capital (Clause 3.1.5.1 MSA) ........................... 65

d) Related Party Arrangements (Clause 4.2 MSA)...................... 67

e) Professional Insurance (Clause 2.3.7 MSA)............................ 70

f) Non-Competition (Clause 11 MSA)........................................ 71

g) Managers............................................................................... 73

h) Obstruction of Privatisation.................................................... 73

    (1) Clause 3.8.1.1 MSA in combination with Articles 63 and 64 Serbian Companies Law ........................................... 74

    (2) Waiver Letters............................................................... 75

    (3) Utility Contracts............................................................ 77

    (4) Bills of Exchange.......................................................... 79

    (5) Supply of Raw Materials ............................................. 80

    (6) Other Issues................................................................. 82

4. Amount of Privatisation Bonus ...................................................... 83

a) Literal Meaning of Clause 3.2.9 MSA....................................... 84

b) Negotiations of Clause 3.2.9 MSA ........................................... 86

c) Purpose of Clause 3.2.9 MSA ................................................... 88

d) Parties' Subsequent Conduct ................................................... 90

5. Debtor of the Privatisation Bonus ...................................................... 91

a) Joint and Several Liability of the First and Second Respondent ................................................................................................. 91

b) Independent Liability of the First Respondent ......................... 95

6. Creditor of the Privatisation Bonus ...................................................... 97

D. MANAGEMENT FEES................................................................................. 98

E. INTEREST ............................................................................................... 100

F. OTHER RELIEF REQUESTED BY THE CLAIMANTS ........................... 104

G. ARBITRATION COSTS ............................................................................ 104

VII. AWARD ......................................................................................................... 110

## TABLE OF ABBREVIATIONS AND DEFINITIONS

| | |
|---|---|
| AQ1 Report | First expert report of Abdul Sirshar Qureshi, dated 11 August 2017 |
| AQ2 Report | Second expert report of Abdul Sirshar Qureshi, dated 22 September 2017 |
| Arbitration Costs | Costs of the arbitration other than the legal or other expenses incurred by the Parties |
| ASPA | Asset Sales and Purchase Agreement (Privatisation Agreement) |
| Bidder | HPK Engineering B.V. (Netherlands) |
| BM1 | First witness statement of Boris Milosevic, dated 10 August 2017 |
| BM2 | Second witness statement of Boris Milosevic, dated 25 September 2017 |
| Case Management Conference | Case management conference, held 30 March 2017 |
| CCS | Claimants' Cost Submission |
| CF | Claimants' fact exhibits |
| CL | Claimants' legal exhibits |
| Claimants | HPK Engineering B.V. (Netherlands) & HPK Management d.o.o. (Republic of Serbia) |
| Claimants' Cost Submission | Claimants' cost submission, dated 5 February 2018 |
| Claimants' Objections | Claimants' responses and objections to the Respondents' Request to Produce, dated 24 May 2017 |
| Claimants' Post-Hearing Brief | Claimants' post-hearing brief, dated 20 December 2017 |
| Claimants' Rebuttal Witness Submission | Claimants' second witness statements of (i) Peter Kamaras, (ii) Stanislav Barica, and (iii) Pavol Vrchovinsky, and the first expert report of Frank Ilett, dated 27 September 2017 |
| Claimants' Replies | Claimants' replies to the Respondents' Objections, dated 7 June 2017 |
| Claimants' Requests to Produce | Claimants' requests to produce documents, dated 10 May 2017 |
| Claimants' Witness Submission | Claimants' first witness statements of (i) Peter Kamaras, (ii) Stanislav Barica, and (iii) Pavol Vrchovinsky, dated 16 August 2017 |
| Closing and Takeover Protocol | Parties' closing and takeover protocol, executed 22 April 2015 |
| Company | Zelezara Smederevo d.o.o. (Republic of Serbia) |

| Correction Period | "Appropriate subsequent period" under Article 127 LO that a party must provide for the debtor to perform, i.e. to correct the non-performance, before the party may terminate an agreement |
| --- | --- |
| CPHB | Claimants' Post-Hearing Brief |
| Credit | Credit of USD 20 million pursuant to Clauses 2.4 and 2.6 of the RMA |
| CSub1 | Claimants' Witness Submission |
| CSub2 | Claimants' Rebuttal Witness Submission |
| Deferred Payment | 60 days deferred payment conditions pursuant to Clauses 2.4 and 2.6 of the RMA |
| EB | Witness statement of Ernst Bode, dated 16 June 2017 |
| EUR | Euro |
| FED | US Federal Reserve Bank |
| FI Report | Expert report of Mr Frank Ilett, dated 27 September 2017 |
| First Claimant | HPK Management d.o.o. (Republic of Serbia) |
| First Respondent | Republic of Serbia |
| First Termination Notice | Respondents' termination notice to the First Claimant, dated 1 April 2016 |
| GBP | British Pounds |
| GLS | GLS Steel Distributors Ltd |
| Gross Financing Approach | Method of calculation to take into account only Pikaro's receivables under the RMA |
| Hearing | Hearing, 30 October – 3 November 2017 |
| HeSteel | HeSteel Group (China) |
| HPK | HPK Engineering B.V. (Netherlands) and HPK Management d.o.o. (Republic of Serbia) |
| In-Transit Time | Time that goods are on their way from producer to Pikaro |
| Law on Default Interest | Serbian Law on Default Interest No. 119/2012 |
| LCIA Rules | Arbitration Rules of the London Court of International Arbitration, effective 1 October 2014 |
| Legal Costs | Parties' legal or other expenses pursuant to Article 28 of the LCIA Rules |
| LO | Serbian Law of Obligations |
| Messer | Messer Tehnogas Serbia (Company's supplier of technical gas) |
| Minimum Bonus | Guaranteed minimum Privatisation Bonus of USD 10 million under Clause 3.2.9 of the MSA |

| MSA | Management Services Agreement, concluded 21 March 2015 |
| --- | --- |
| Negotiation Transcript | Transcript of the negotiation meeting, held 16 March 2016 |
| Net Financing Approach | Method of calculation of the overall financial position between Pikaro and the Company, looking at other contracts entered into between them |
| New Working Capital | Required level of net working capital of USD 80 million for the Company pursuant to Clause 3.1.5 of the MSA |
| Non-Competition | Non-competition obligations pursuant to Clause 11 of the MSA |
| NWC | New Working Capital |
| Obstruction of Privatisation | Obstruction of the privatisation and closure of the Privatisation Agreement |
| OFGR | Officers For Government Relations |
| Party/Parties | Claimants and Respondents together |
| Pikaro | Pikaro s.r.o. |
| Pikaro Sales Contract | Company and Pikaro's frame contract, pursuant to which Pikaro sold the Company's steel products to end-producers, dated 21 May 2015 |
| PK1 | First witness statement of Peter Kamaras, dated 16 August 2017 |
| PK2 | Second witness statement of Peter Kamaras, dated 27 September 2017 |
| Pre-Hearing Conference | Pre-hearing conference, held 4 October 2017 |
| Privatisation | Closure of the Privatisation Agreement and completion of the privatisation, 30 June 2016 |
| Privatisation Agreement | Asset Sales and Purchase Agreement, pursuant to which HeSteel would purchase certain assets of the Second Respondent via a newly founded company, dated 18 April 2016, |
| Procedural Order No. 1 | Tribunal's first procedural order on the procedural timetable, dated 3 April 2017 |
| Procedural Order No. 2 | Tribunal's second procedural order on document production, dated 21 June 2017 |
| Procedural Order No. 3 | Tribunal's third procedural order on hearing arrangements, dated 5 October 2017 |
| Procedural Order No. 4 | Tribunal's procedural order on post-hearing briefs, dated 8 November 2017 |
| Procedural Timetable | Procedural timetable in Appendix A of Procedural Order No. 1, dated 3 April 2017 |
| Professional Insurance | Requirement of a professional insurance indemnity pursuant to Clause 2.3.7 of the MSA |

| PV1 | First witness statement of Pavol Vrchovinsky, dated 16 August 2017 |
|---|---|
| PV2 | Second witness statement of Pavol Vrchovinsky, dated 27 September 2017 |
| RCS | Respondents' Cost Submission |
| Registrar | Registrar of the LCIA Court |
| Related Party Arrangement | Related party arrangements pursuant to Clause 4.2 of the MSA |
| Request | Claimants' request for arbitration, dated 5 August 2016 |
| Respondents | Republic of Serbia and Zelezara Smederevo d.o.o. |
| Respondents' Cost Submission | Respondents' cost submission, dated 5 February 2018 |
| Respondents' Objections | Respondents' responses and objections to the Claimants' Request to Produce, dated 24 May 2017 |
| Respondents' Post-Hearing Brief | Respondents' post-hearing brief, dated 20 December 2017 |
| Respondents' Rebuttal Witness Submission | Respondents' second witness statement of Boris Milosevic, the first witness statement of Vladan Mihailovic, and the second expert report of Abdul Sirshar Qureshi, filed 27 September 2017 |
| Respondents' Replies | Respondents' replies to the Claimants' Objections, dated 7 June 2017 |
| Respondents' Requests to Produce | Respondents' requests to produce documents, dated 10 May 2017 |
| Respondents' Witness Submission | Respondents' first witness statements of (i) Boris Milosevic and (ii) Ernst Bode, and the first expert report of Abdul Sirshar Qureshi, filed 16 August 2017 |
| Response | Respondents' response to the request for arbitration, dated 15 October 2016 |
| RF | Respondents' fact exhibits |
| RL | Respondents' legal exhibits |
| RMA | Company and Pikaro's Frame Contract of Sale concerning the purchase and supply of raw materials for the Company's steel production, dated 22 April 2015 |
| RoS | Republic of Serbia |
| RPHB | Respondents' Post-Hearing Brief |
| RSD | Serbian Dinar |
| RSub1 | Respondents' Witness Submission |
| RSub2 | Respondents' Rebuttal Witness Submission |
| SB1 | First witness statement of Stanislav Barica, dated 16 August 2017 |

| | |
|---|---|
| SB2 | Second witness statement of Stanislav Barica, dated 27 September 2017 |
| Second Claimant | HPK Engineering B.V. (Netherlands) |
| Second Respondent | Zelezara Smederevo d.o.o. (Republic of Serbia) |
| Second Termination Notice | Second Respondent's termination notice sent to Claimants, dated 25 June 2016 |
| Service Provider | HPK Management d.o.o. (Republic of Serbia) |
| SoC | Claimants's Statement of Case, dated 14 February 2017 |
| SoD | Respondents' Statement of Defence, dated 20 March 2017 |
| SoR | Claimants' Statement of Reply, dated 25 April 2017 |
| Statement of Case | Claimants' statement of case, dated 14 February 2017 |
| Statement of Defence | Respondents' statement of defence, dated 20 March 2017 |
| Statement of Reply | Claimants' statement of reply, dated 25 April 2017 |
| Tribunal | Arbitral tribunal composed of Mr Richard Jacobs QC, Prof Dr Miodrag V Orlić, and Prof Dr Maxi Scherer |
| USD | United States Dollar |
| Variable Bonus | Possible higher bonus calculated as "30% of the acquisition price of the Company' stake achieved through such privatisation procedure" |
| VAT | Value Added Tax |
| VM | Witness statement of Vladan Mihailovic, dated 19 September 2017 |

## I.    INTRODUCTION

### A.    PARTIES

1.    The first claimant in this arbitration is HPK MANAGEMENT D.O.O. (Republic of Serbia) (the "**First Claimant**" or "**Service Provider**"), DR JANKA GOMBARA 192, 21 211 Kisač, Republic of Serbia.

2.    The second claimant in this arbitration is HPK ENGINEERING B.V. (Netherlands) (the "**Second Claimant**" or "**Bidder**"), Luna Aren A, Herikerbergweg 238, 1101 CM Amsterdam, the Netherlands.

3.    The First and Second Claimants together are referred to herein as the "**Claimants**" or "**HPK**".  The Claimants are represented by Humphries Kerstetter LLP, 30 Furnival Street, London EC4A 1JQ, United Kingdom, and by Thomas Raphael QC of 20 Essex Street, 20 Essex Street London WC2R 3AL, United Kingdom.

4.    The first respondent in this arbitration is REPUBLIC OF SERBIA (the "**First Respondent**" or "**RoS**"), State Attorney of the Republic, 22-26 Nemanjina Street, 11000 Belgrade, Republic of Serbia.

5.    The second respondent in this arbitration is ZELEZARA SMEDEREVO D.O.O. (Republic of Serbia) (the "**Second Respondent**" or the "**Company**"), 6 Izletnicka Street, 11300 Smederevo, Republic of Serbia.

6.    The First and Second Respondents together are referred to herein as the "**Respondents**".  The Respondents are represented by Ms Olivera Stanimirovic, State Attorney of the Republic of Serbia; Ms Senka Mihaj, Law Office Mihaj Ilic Milanovic, Belgrade; Mr Nebojsa Andjelkovic, Law Office Andjelkovic, Belgrade; Dr Radomir Milosevic, Law Office Milosevic, Belgrade; Dr Miroslav Paunovic, Law Office Paunovic, Belgrade; Prof Dr Vladimir Pavic, Faculty of Law, University of Belgrade; and Prof Dr Dusan Popovic, Faculty of Law, University of Belgrade.

7.    The Claimants and Respondents together are referred to herein as the "**Parties**", and individually as a "**Party**".

### B.    TRIBUNAL

8.    The arbitral tribunal (the "**Tribunal**") in this arbitration is composed of:

a.      The co-arbitrator nominated by the Claimants and appointed by the LCIA Court:

Mr Richard Jacobs QC
Essex Court Chambers
24 Lincoln's Inn Fields
London WC2A 3EG, United Kingdom
Email:  rjacobs@essexcourt.com

b.      The co-arbitrator nominated by the Respondents and appointed by the LCIA Court:

Prof Dr Miodrag V Orlić
University of Belgrade
42, Knjeginje Zorke Street
11000 Belgrade, Serbia
Email:  miodragvorlic@gmail.com

c.      The presiding arbitrator selected and appointed by the LCIA Court:

Prof Dr Maxi Scherer
Wilmer Cutler Pickering Hale and Dorr LLP
49 Park Lane, London W1K 1PS, United Kingdom
Email:  maxi.scherer@wilmerhale.com

9.      None of the Parties has raised any objections regarding the constitution or jurisdiction of the Tribunal.

### C.    DISPUTE

10.     This arbitration is conducted under the Arbitration Rules of the London Court of International Arbitration, effective as of 1 October 2014 (the "**LCIA Rules**").

11.     The dispute in this arbitration relates to a management and consultancy services agreement concluded by the Parties on 21 March 2015 (the "**MSA**").[1]

12.     Pursuant to Clause 17.3 of the MSA, and as confirmed by the Parties:

a.      the seat of this arbitration is London;[2]

b.      the language of the proceedings is English;[3] and

---

[1] Management and Consultancy Services Agreement, dated 21 March 2015, Exhibit CF-3.
[2] Request, at para. 41; Response, at para. 17.
[3] Request, at para. 41; Response, at para. 14.

c.    the laws governing the dispute are the substantive laws of the Republic of Serbia.[4]

## II.    PROCEDURAL HISTORY

13.    On 5 August 2016, the registrar of the LCIA Court (the "**Registrar**") received the Claimants' request for arbitration (the "**Request**") of the same date.  In their Request, the Claimants nominated Mr Richard Jacobs QC as co-arbitrator.[5]

14.    On 15 October 2016, the Registrar received the Respondents' response to the Request (the "**Response**") of the same date.  In their Response, the Respondents nominated Prof Dr Miodrag V Orlić as co-arbitrator.[6]

15.    On 16 January 2017, the LCIA contacted Prof Dr Scherer to inform her that she had been selected by the LCIA Court as the third and presiding arbitrator in this case.

16.    On 19 January 2017, the LCIA transmitted Prof Dr Scherer's disclosure to the Parties.

17.    On 26 January 2017, the LCIA notified the Parties of the appointment of the Tribunal pursuant to Article 5 of the LCIA Rules and transmitted the file to it.

18.    On 27 January 2017, the Tribunal received the file from the LCIA, including the Request and the Response.

19.    On 1 February 2017, the Tribunal wrote to the Parties.  The Tribunal:

a.    asked the Parties to confirm that (i) all correspondence from the Tribunal to the Parties shall be sent to the Parties' representatives and per email only; and (ii) the Parties' contact details, as listed in the Tribunal's letter, are correct and, if not, to provide the Tribunal with any required corrections and amendments;

b.    directed the Claimants to file their statement of case on or before 23 February 2017 or to elect to treat the Request as their statement of case, pursuant to Article 15.2 of the LCIA Rules; and

---

[4] Request, at para. 41; Response, at para. 15.
[5] Request, at para. 43.
[6] Response, at para. 13.

    c.    drew the Parties' attention to the fact that Article 15 of the LCIA Rules requires any statements to set out in sufficient detail the facts and any contentions of law to be relied upon, and to attach all essential documents.

20.    On 2 February 2017, the Claimants confirmed that they were happy for correspondence to be sent to their legal representatives and per email only.  The Claimants further confirmed their contact details subject to two corrections (i.e. Ms Erika Saluzzo's email address and the First Claimant's registered address).

21.    On 9 February 2018, the Respondents confirmed that they were happy for correspondence to be sent to their legal representatives and per email only.  The Respondents further confirmed their contact details subject to one correction (i.e. the Second Respondent's registered address).

22.    On 14 February 2017, the Tribunal noted the Parties' correction to their contact details and suggested dates for a case management conference, requesting the Parties to confirm their availability for those dates.

23.    Also on 14 February 2017, the Claimants provided their statement of case (the "**Statement of Case**" or "**SoC**") of the same date, without exhibits.

24.    On 15 February 2017, the Tribunal acknowledged receipt of the Claimants' Statement of Case.  The Tribunal noted that the full version of the Statement of Case (including exhibits) had been dispatched in hardcopy and thus invited the Parties to inform the Tribunal when the Respondents received the hardcopy Statement of Case, in order to determine the date when the statement of defence was due according to Article 15.3 of the LCIA Rules.

25.    On 20 February 2017, the Claimants informed the Tribunal that the Statement of Case with exhibits had been delivered to the Respondents, and the Respondents confirmed the same.

26.    On 21 February 2017, the Tribunal directed the Respondents to file their statement of defence, or elect to treat their Response as their statement of defence, on or before 20 March 2017 pursuant to Article 15.3 of the LCIA Rules.

27.    On 24 February 2017, the Tribunal:

    a.     confirmed that the case management conference would take place, by telephone, on 30 March 2017, at 5 p.m. London time, at time convenient to the Parties; and

    b.     invited the Parties to provide the Tribunal, either jointly or separately, with (i) a proposed timetable for this arbitration; and (ii) any items the Parties wished to put on the agenda for the case management conference.

28.    On 14 March 2017, the Claimants provided the Tribunal with the Parties' respective proposals as to the timetable for the arbitration.

29.    On 20 March 2017, the Respondents provided their statement of defence (the "**Statement of Defence**" or "**SoD**") of the same date.

30.    On 23 March 2017, the Tribunal acknowledged receipt of the Parties' proposals regarding the timetable in this arbitration and the Respondents' Statement of Defence. The Tribunal directed the Claimants to file their statement of reply on or before 18 April 2017 pursuant to Article 15.4 of the LCIA Rules.

31.    On 24 March 2017, the Claimants and the Respondents provided further comments on the procedural timetable for this arbitration.

32.    Also on 24 March 2017, the Claimants requested an extension to file their statement of reply from 18 April to 28 April 2017.

33.    On 27 March 2017, the Respondents provided their comments on the Claimants' extension request.

34.    Also on 27 March 2017, the Tribunal:

    a.     circulated an agenda and dial-ins for the case management conference;

    b.     provided the Parties with a draft procedural order No. 1 and invited the Parties, if they wished, to provide written comments on the draft in advance of the case management conference; and

    c.     advised the Parties that it would discuss the Claimants' extension request with the Parties at the upcoming case management conference.

35.     On 28 March 2017, the Claimants and Respondents submitted comments on the draft procedural order no. 1.

36.     On 30 March 2017, the Tribunal held a case management conference (the "**Case Management Conference**"), during which the Parties discussed, among other things, the text of draft procedural order no. 1 and the procedural timetable.

37.     On 3 April 2017, the Tribunal:

    a.      provided a summary of the Case Management Conference;

    b.      issued its first procedural order (the "**Procedural Order No. 1**"), setting out the procedural timetable in Appendix A (the "**Procedural Timetable**"); and

    c.      decided to grant the Claimants' extension request.

38.     On 25 April 2017, the Claimants provided their statement of reply (the "**Statement of Reply**" or "**SoR**") of the same date.

39.     On 26 April 2017, the Tribunal acknowledged receipt of the Claimants' Statement of Reply, dated 25 April 2017, including exhibits, and reminded the Parties that the Parties' requests to produce documents would be due on 10 May 2017 according to the Procedural Timetable.

40.     On 10 May 2017, the Claimants filed their requests to produce documents (the "**Claimants' Requests to Produce**").

41.     On the same day, the Respondents filed their requests to produce documents (the "**Respondents' Requests to Produce**").

42.     On 11 May 2017, the Tribunal acknowledged receipt of the Claimants' and Respondents' Requests to Produce, dated 10 May 2017, and reminded the Parties that the Parties' voluntary document production or objections to production would be due on 24 May 2017 according to the Procedural Timetable.

43.     On 12 May 2017, the Claimants informed the Tribunal and the Respondents that the registered address of the First Claimant, was changed to: DR JANKA GOMBARA 192, 21 211 Kisač, the Republic of Serbia.

44.     On 24 May 2017, the Claimants voluntarily produced certain documents responsive to the Respondents' Requests to Produce, and filed their responses and objections to the Respondents' Request to Produce (the "**Claimants' Objections**").

45.     On the same day, the Respondents voluntarily produced certain documents responsive to the Claimants' Requests to Produce, and filed their responses and objections to the Claimants' Request to Produce (the "**Respondents' Objections**").

46.     On 25 May 2017, the Tribunal acknowledged receipt of the Parties' voluntary document production and Objections of 24 May 2017 and reminded the Parties that their replies to the Objections would be due on 7 June 2017 according to the Procedural Timetable.

47.     On 7 June 2017, the Claimants filed their replies to the Respondents' Objections (the "**Claimants' Replies**").

48.     On the same day, the Respondents filed their replies to the Claimants' Objections (the "**Respondents' Replies**").

49.     On 8 June 2017, the Tribunal acknowledged receipt of the Parties' Replies and informed them that it would render its decision on the Parties' Requests to Produce by 21 June 2017 according to the Procedural Timetable.

50.     On 21 June 2017, the Tribunal issued its second procedural order on document production (the "**Procedural Order No. 2**"), in which it decided on the Parties' Requests to Produce and ordered document production by 5 July 2017.

51.     On 29 June 2017, the Claimants wrote to the Tribunal to confirm whether the Respondents were ordered to produce certain documents listed in the Claimants' Request to Produce.

52.     On 2 July 2017, the Tribunal confirmed that according to Procedural Order No. 2, the Respondents were ordered to produce the documents listed in the Claimants' Request to Produce No. 11.

53.     On 5 July 2017, the Parties disclosed documents pursuant to Procedural Order No. 2.

54.     On 12 July 2017, the Respondents submitted an application regarding the Claimants' document production, noting the Claimants' failure "to produce a number of documents [the

Claimants] were required to produce" and "to explain why certain documents […] were not disclosed."

55.     On the same day, the Tribunal invited the Claimants to comment on the Respondents' application.

56.     On 14 July 2017, the Claimants submitted certain documents as well as their comments on the Respondents' application of 12 July 2017.

57.     On 18 and 19 July 2017, the Parties submitted further comments on the Respondents' application.

58.     Also on 19 July 2017, the Claimants submitted an application regarding the Respondents' document production.

59.     On the same day, the Tribunal wrote to the Parties: concerning the Respondents' application it noted that it would now deliberate and decide on this application and invited the Parties to refrain from any further submissions; and concerning the Claimants' application, it invited the Respondents to provide their comments on or before 21 July 2017.

60.     On 21 July 2017, the Respondents submitted their comments on the Claimants' application.

61.     On 24 July 2017, the Claimants submitted further comments on their application, referring to the Respondents' letter of 21 July 2017.

62.     On 30 July 2017, the Tribunal:

    a.     noted that the Parties had made a number of unsolicited submissions and asked the Parties to seek leave to make any submissions on the other Parties' applications/requests and to refrain from making such submissions, unless authorized by the Tribunal to do so;

    b.     concerning the Respondents' application: ordered the Claimants to produce certain documents regarding Respondents' Request to Produce No. 13 on or before 7 August 2017; and

c.      concerning the Claimants' application: noted that in light of the Parties' comments, there was no need for further action at this stage.

63.     On 7 August 2017, the Claimants' disclosed new documents in line with the Tribunal's order of 30 July 2017.

64.     On 16 August 2017, pursuant to the Procedural Timetable, the Parties filed their witness statements and expert reports with accompanying submissions and exhibits.  In particular:

a.      the Claimants filed the first witness statements of (i) Peter Kamaras, (ii) Stanislav Barica, and (iii) Pavol Vrchovinsky (all dated 16 August 2017), as well as the accompanying submission (the "**Claimants' Witness Submission**" or "**CSub1**"); and

b.      the Respondents filed the first witness statements of (i) Boris Milosevic (dated 10 August 2017) and (ii) Ernst Bode (dated 16 June 2017), and the first expert report of Abdul Sirshar Qureshi (dated 11 August 2017), as well as the accompanying submission (the "**Respondents' Witness Submission**" or "**RSub1**").

65.     On 17 June 2017, the Tribunal acknowledged receipt of the Parties' respective witness statements and expert reports, with accompanying submissions and exhibits, and reminded the Parties that pursuant to the Procedural Timetable their rebuttal witness statements and expert reports with accompanying submissions and exhibits, if any, were due on 27 September 2017.

66.     On 21 September 2017, the Tribunal wrote to the Parties regarding the arrangements for the hearing taking place during the week of 30 October 2017.  In particular, in light of the upcoming pre-hearing conference scheduled according to the Procedural Timetable, the Tribunal invited the Parties to confer regarding the arrangements for the hearing, including its length, and to inform the Tribunal, either jointly or separately, about the arrangements found.

67.     On 22 September, the Parties informed the Tribunal about certain points of their agreement and disagreement on the hearing arrangements.

68.     On 25 September 2017, the Tribunal acknowledged receipt of the Parties' correspondence and noted the points of the Parties' agreement and disagreement.  The

Tribunal invited the Parties to confer and inform the Tribunal of the additional hearing arrangements on or before 2 October 2017.

69.     On 27 September 2017, pursuant to the Procedural Timetable, the Parties filed their rebuttal witness statements and expert reports with accompanying submissions and exhibits. In particular:

> a.      the Claimants filed the second witness statements of (i) Peter Kamaras, (ii) Stanislav Barica, and (iii) Pavol Vrchovinsky, and the first expert report of Frank Ilett (all dated 27 September 2017), as well as the accompanying submission (the **"Claimants' Rebuttal Witness Submission"** or **"CSub2"**); and

> b.      the Respondents filed the second witness statement of Boris Milosevic (dated 25 September 2017), the first witness statement of Vladan Mihailovic (dated 19 September 2017), and the second expert report of Abdul Sirshar Qureshi (dated 22 September 2017), as well as the accompanying submission (the **"Respondents' Rebuttal Witness Submission"** or **"RSub2"**).

70.     On 2 October 2017, the Parties wrote to the Tribunal concerning the hearing arrangements. They provided the Tribunal with a list of issues about which they had agreed and a list of issues about which they continued to disagree.

71.     On the same day, the Tribunal acknowledged receipt of the Parties' correspondence and noted that it looked forward to further discussing the details with the Parties during the pre-hearing conference.

72.     On 4 October 2017, the pre-hearing conference in this arbitration took place (the **"Pre-Hearing Conference"**), during which the Parties and the Tribunal discussed various topics, including but not limited to hearing arrangements and post-hearing briefs.

73.     On 5 October 2017, the Tribunal issued its third procedural order on hearing arrangements (the **"Procedural Order No. 3"**) including the hearing timetable.

74.     Also on 5 October 2017, the Tribunal noted that Mr Thomas Raphael QC participated in the Pre-Hearing Conference on behalf of the Claimants. The Tribunal invited the Claimants to make a notification of an intended addition to its legal representatives pursuant

to Article 18.3 of the LCIA Rules, if needed, and request the required approval pursuant to Article 18.4 of the LCIA Rules.

75.    On the same day, the Claimants notified an intended addition to their legal representatives (Mr Thomas Raphael QC), and requested that the Tribunal approve this intended addition pursuant to Articles 18.3 and 18.4 of the LCIA Rules.

76.    Still on 5 October 2017, the Tribunal acknowledged receipt of the Claimants' letter and invited the Respondents to provide their comments, if any, by 10 October 2017.

77.    On 12 October 2017, the Tribunal noted that the Respondents had not provided any comments on the Claimants' intended additional legal representative, and in light of this, approved the addition of Mr Thomas Raphael QC to the Claimants' legal representatives pursuant to Articles 18.3 and 18.4 of the LCIA Rules.

78.    On 13 October 2017, the Claimants sought clarification concerning item 12(c) of Annex A to Procedural Order No. 3.

79.    On the same day, the Tribunal invited the Respondents to comment on the Claimants' request for clarification.

80.    Also on 13 October 2017, the Claimants wrote a second letter to the Tribunal in which they notified the Tribunal of their intended addition to their legal representatives pursuant to Article 18.3 of the LCIA Rules: Mr Branislav Marie of Marie & Mujezinovic (in cooperation with Kinstellar Belgrade).

81.    Still on the same day, the Tribunal acknowledged receipt of the Claimants' second letter and invited the Respondents to provide their comments.

82.    On 16 October 2017, the Respondents provided their comments on the Claimants' request for clarification of 13 October 2017.

83.    On 18 October 2017, the Respondents provided comment on the Claimants' requested addition to the Claimants' legal representatives and asked that the Tribunal to seek further information about a possible link between Mr Branislav Marie's law firm and the Claimants.

84.     On the same day, the Tribunal acknowledged receipt of the Respondents' letter regarding the Claimants' additional legal representative and invited the Claimants to provide their comments.

85.     Also on 18 October 2017, the Tribunal wrote to the Parties regarding various questions on hearing arrangements, including the Claimants' request for clarification of 13 October 2017.

86.     Still on 18 October 2017, the Respondents wrote regarding certain documents produced by the Claimants (exhibits CF-225 and CF-226).

87.     On 19 October 2017, the Tribunal acknowledged receipt of the Respondents' letter and invited the Claimants to provide their comments by 20 October 2017.

88.     On 20 October 2017, the Claimants wrote four letters:

     a.     the Claimants' first letter related to objections to the Respondents' rebuttal submission of 27 September 2017: according to the Claimants, the Respondents unduly included new allegations in those rebuttal submissions;

     b.     the Claimants' second letter related to the Claimants' request to add a new legal representative (Mr Maric): the Claimants provided a statement by Mr Maric, in reply to the Respondents' comments of 18 October 2017;

     c.     the Claimants' third letter related to the Respondents' queries regarding certain documents produced by the Claimants (exhibits CF-225 and CF-226): the Claimants provided information regarding these documents in reply to the Respondents' queries of 18 October 2017; and

     d.     the Claimants' fourth letter related to queries regarding certain documents in relation to exhibit RF-37 submitted with the Respondents' submission of 16 August 2017.

89.     On 21 October 2017, the Tribunal acknowledged receipt of the Claimants' four letters of 20 October 2017.  The Tribunal:

a.      concerning the Claimants' first letter (objections to the Respondents' rebuttal submission of 27 September 2017): invited the Respondents to comment on the Claimants' objections;

b.      concerning the Claimants' second letter (Claimants' additional legal representative): invited the Respondents to comment on Mr Maric's statement;

c.      concerning the Claimants' third letter (Respondents' queries regarding exhibits CF-225 and CF-226): invited the Respondents to confirm whether the information provided by the Respondents answered their queries regarding these documents; and

d.      concerning the Claimants' fourth letter (Claimants' queries regarding Respondents' exhibit RF-37): invited the Respondents to comment.

90.     On 23 October 2017, the Respondents wrote three letters:

a.      the Respondents' first letter related to the Claimants' additional legal representative;

b.      the Respondents' second letter related to their query on certain documents produced by the Claimants' (exhibits CF-225 and CF-226); and

c.      the Respondents' third letter related to the Claimants' queries regarding Respondents' exhibit RF-37.

91.     Also on 23 October 2017, pursuant to Procedural Order No. 3, Appendix A para. 3, the Parties provided the Tribunal with a list of their attendees at the upcoming hearing.

92.     On 24 October 2017, the Claimants informed the Tribunal that they withdrew their request to add Mr Maric as legal representative of the Claimants' legal team.

93.     On the same day, the Tribunal wrote to the Parties.  The Tribunal:

a.      noted that the Claimants withdrew their request to add Mr Maric as legal representative of the Claimants' legal team and, in light of this, it would not issue a decision on this point;

b.      made a decision regarding the Respondents' queries about certain documents produced by the Claimants (exhibits CF-225 and CF-226); and

c.      invited the Claimants to confirm whether the information provided by the Respondents answers their queries regarding exhibit RF-37.

94.      On 24 October 2017, the Respondent provided its comments on the Claimants' objections to the Respondents' rebuttal submission of 27 September 2017.

95.      On 25 October 2017, the Claimants wrote three letters:

a.      the Claimants' first letter contained further comments regarding their objections to the Respondents' rebuttal submission of 27 September 2017;

b.      the Claimants' second letter related to the Claimants' new request to introduce new evidence in form of exhibits CF-271-280; and

c.      the Claimants' third letter related to their queries about the Respondents' exhibit RF-37: the Claimants, based on the information provided by the Respondents, withdrew their queries on this point.

96.      On the same day, the Tribunal acknowledged receipt of the Parties' correspondence of 24 and 25 October 2017.  The Tribunal:

a.      concerning the Claimants' objections regarding the Respondents' rebuttal submission: noted that it had received the Parties' comments and was currently deliberating this point;

b.      concerning the Claimants' queries regarding Respondents' exhibit RF-37: noted that the Claimants' queries were either satisfied or withdrawn and that no decision was required on this point;

c.      further noted that with its second letter of 25 October 2017 the Claimants sought to introduce new evidence in form of exhibits CF-271 to CF-280 and thus invited the Respondents to comment on the Claimants' request.

97.      On 26 October 2017, the Claimants requested to introduce further new evidence in form of exhibit CF-281.

98.     On the same day, the Tribunal acknowledged receipt of the Claimants' letter and invited the Respondents to comment on the Claimants' request (together with the Respondents' comments on the Claimants' previous request about new evidence filed on 25 October 2017).

99.     Also on 26 October 2017, the Claimants and Respondents provided further comment on the introduction of new evidence sought by the Respondents.

100.    On 27 October 2017, the Tribunal decided on the following issues:

   a.    the Claimants' objections regarding the Respondents' rebuttal submission: the Tribunal found that it was not at present persuaded that the Respondents' rebuttal submission contained new allegations of breach, with the exception of para. 69 in relation to which the Tribunal reserved its decision, until the Respondents' position has become clear; and

   b.    the Claimants' requests to introduce new evidence: the Tribunal granted the requests to introduce exhibits CF-273-275, CF-277-278, and CF-281 to the file, and dismissed the requests otherwise.

101.    From 30 October – 3 November 2017, the hearing in the present arbitration took place at the offices of WilmerHale, 49 Park Lane, W1K 1PS London (the "**Hearing**").  Were present, at different times at the Hearing:

   a.    on behalf of the Claimants:

      i.      Mr Peter Kamaras, Mr Stanislav Barica, Mr Pavol Vrchovinsky (all also as witnesses), and Mr Richard Roman;

      ii.     Mr Kristopher Kerstetter, Mr Adam Polonsky, Ms Erika Saluzzo, and Mr Dilan Ozdemir of Humphries Kerstetter LLP, and Mr Thomas Raphael QC of 20 Essex Street Chambers as legal counsel;

      iii.    Mr Frank Ilett of Haberman Ilett LLP as expert;

      iv.     Ms Martina Thomas of City Legal as interpreter; and

   b.    on behalf of the Respondents:

> i.      Ms Olivera Stanimirovic;
>
> ii.      Ms Senka Mihaj and Mr Aleksandar Fillen of MIM Law Office, Dr
> Radomir Milosevic and Mr Filip Milosevic of Law Office Milosevic, Mr
> Nebojsa Andjelkovic of Law Office Andjelkovic, Dr Miroslav Paunovic of
> Law Office Paunovic, Prof Dr Vladimir Pavic, and Prof Dr Dusan Popovic of
> the Faculty of Law of the University of Belgrade as legal counsel;
>
> iii.      Mr Boris Milosevic, Mr Ernst Bode, and Mr Vladan Mihailovic as
> witnesses; and
>
> iv.      Mr Abdul Sirshar Qureshi as expert.

102.    On 8 November 2017, the Tribunal issued its fourth procedural order on post-hearing briefs (the "**Procedural Order No. 4**"), following the discussion with the Parties at the end of the Hearing.

103.    On 9 and 13 November 2017, the Parties exchanged correspondence concerning the inclusion of certain documents in the electronic Hearing bundle.

104.    On 22 November 2017, the Tribunal made a decision on this point and noted that it was content for these documents to be used in hardcopy only without the need to update the electronic Hearing Bundle.

105.    On 8 December 2017, the Claimants submitted additional legal exhibits CL-27 to CL-45 pursuant to para 2(d) of Procedural Order No. 4 and sought directions concerning the Parties' cost submissions.

106.    On 11 December 2017, the Tribunal:

> a.      acknowledged receipt of the Claimants' additional legal material; and
>
> b.      concerning the Parties' cost submissions, referred to para. 32 of Procedural Order No. 1 (according to which the Parties shall submit their first submissions on costs as one-page statements and shall not include supporting documents, and the Tribunal may order further submissions on costs if it deems this useful), noted that it believed the Parties' statements of costs could be submitted in early January 2018,

and invited the Parties to confer on the point, and to provide their comments, jointly or separately, by 18 December 2017.

107. Also on 11 December 2017, the Respondents submitted additional legal exhibits RL-12 to RL-16.

108. On 12 December 2017, the Respondents noted that the Claimants' additional legal exhibits CL-27 to CL-45 were only provided in the English translation and not the original Serbian.

109. On 13 December 2017, the Claimants provided the Serbian versions of previously submitted exhibits CL-27 to CL-45.

110. On 15 December 2017, the Tribunal:

    a.    thanked the Respondents for the submission of additional legal exhibits RL-12 to RL-16, and the Claimants for their production of the Serbian versions of previously submitted exhibits CL-27 to CL-45; and

    b.    invited the Parties to confer on the possible date for cost submissions and to provide their comments, jointly or separately, on or before 18 December 2017.

111. On 18 December 2017, the Claimant informed the Tribunal that the Parties had agreed on a date for the Parties' cost submission.

112. On the same day, the Tribunal, in light of the Parties' agreement, directed the Parties to submit their cost submissions in accordance with para. 32 of Procedural Order No. 1 on or before 12 January 2018. The Tribunal further directed the Parties to submit their cost submissions only to the Tribunal, who would then forward them to other side.

113. Also on 18 December 2017, the Claimants wrote a second letter, including exhibits CL-46 and CL-47.

114. On 20 December 2017, pursuant to Procedural Order No. 4, the Claimants filed their post-hearing brief, including exhibit CL-48 (the "**Claimants' Post-Hearing Brief**" or "**CPHB**") and the Respondents filed their post-hearing brief (the "**Respondents' Post-Hearing Brief**" or "**RPHB**").

115.    Also on 20 December 2017, the Respondents requested the Tribunal to declare inadmissible Claimants' exhibits CL-46 to CL-48 on the basis that they were filed after the deadline set forth in Procedural Order No. 4.

116.    On the same day, the Tribunal invited the Claimants to comment on the Respondents' request on or before the close of business on 21 December 2017.

117.    On 21 December 2017, the Claimants provided their comments on the Respondents' request to declare inadmissible exhibits CL-46 to CL-48.

118.    On 29 December 2017, the Tribunal:

    a.      referred the Parties to Procedural Order No. 4 which provided that in the Post-Hearing Briefs "the Parties shall not raise new arguments, nor submit any new documents, except for limited legal authorities, if necessary" (para. 2(c)) and set a specific deadline for the submission of any new legal authorities "as early as possible, but in any event at least 10 days before the Post-Hearing Briefs are due" (para. 2(d));

    b.      decided to admit to the record CL-46 and CL-47 since they are not new legal exhibits but merely additional English translations of exhibits RL-13 and RL-14 already provided by the Respondents;

    c.      decided not to admit to the record CL-48 since it is a new legal exhibit and, as such, was submitted after the deadline provided in Procedural Order No. 4; and

    d.      closed the proceedings, noting that no further submissions by the Parties were admissible, save for the matter of costs and unless the Tribunal decided otherwise.

119.    On 9 January 2018, the Claimants made further submissions, objecting to certain points made in the Respondents' Post-Hearing Brief as being "new arguments for breach."

120.    On 11 January 2018, the Tribunal:

    a.      reminded the Parties that it had closed the proceedings, save for the matter of costs and unless the Tribunal decided otherwise;

    b.      noted that in light of the Claimants' further submissions and objections, the Tribunal had to postpone the Parties' costs submissions and determine instead

whether re-opening the proceedings on these points was necessary, and thus invited the Respondents to comment thereon; and

c.       noted that the Claimants in their Post-Hearing Briefs at paragraph 123 had for the first time presented particulars regarding its relief on interest, thus decided to re-open the proceedings on this point and invited the Respondents to comment thereon.

121.    On 18 January 2018, the Respondents provided comments on the Claimants' objections and relief on interest.

122.    On 25 January 2018, the Tribunal:

a.       decided that the Respondents' Post-Hearing Brief did not contain new breaches which would warrant the re-opening of the proceedings, but noted, for the avoidance of doubt, that if would ignore new arguments to the extent the Parties had raised them in their Post-Hearing Briefs; and

b.       reiterated is previous procedural direction to close the proceedings, save for the matter of costs; and directed the Parties to submit their cost submissions by 5 February 2018.

123.    On 5 February 2018, the Claimants filed their cost submission (the "**Claimants' Cost Submission**" or "**CCS**") and the Respondents filed their cost submission (the "**Respondents' Cost Submission**" or "**RCS**"), respectively, to the Tribunal only.

124.    On 6 February 2018, the Tribunal acknowledged receipt of the Parties' respective Cost Submissions, dated 5 February 2018, forwarded them to the other side, and closed the proceedings.

## III.    PARTIES' SUBMISSIONS

### A.    CLAIMANTS' SUBMISSIONS

125.    In this arbitration, among other things, the Claimants filed the following submissions:

a.       Request, dated 5 August 2016;

b.       Statement of Case, dated 14 February 2017;

c.       Statement of Reply, dated 25 April 2017;

    d.      Claimants' Witness Submission, dated 16 August 2017;

    e.      Claimants' Rebuttal Witness Submission, dated 27 September 2017;

    f.      Claimants' Post-Hearing Brief, dated 20 December 2017; and

    g.      Claimant's Cost Submission, dated 5 February 2018.

126.    The Claimants' submissions were accompanied by:

    a.      Fact exhibits CF-1 to CF-270;

    b.      Legal exhibits CL-1 to CL-47;

    c.      Witness statements:

        i.      First witness statement of Peter Kamaras, dated 16 August 2017 ("**PK1**"); and second witness statement of Peter Kamaras, dated 27 September 2017 ("**PK2**");

        ii.      First witness statement of Stanislav Barica, dated 16 August 2017 ("**SB1**"); and second witness statement of Stanislav Barica, dated 27 September 2017 ("**SB2**");

        iii.      First witness statement of Pavol Vrchovinsky, dated 16 August 2017 ("**PV1**"); and second witness statement of Pavol Vrchovinsky, dated 27 September 2017 ("**PV2**"); and

    d.      Expert report of Mr Frank Ilett, dated 27 September 2017 ("**FI Report**"), including appendices A to G and exhibits 1 to 16.

## B.    RESPONDENTS' SUBMISSIONS

127.    In this arbitration, among other things, the Respondents filed the following submissions:

    a.      Response to the Request, dated 15 October 2016;

    b.      Statement of Defence, dated 20 March 2017;

    c.      Respondents' Witness Submission, dated 16 August 2017;

    d.      Respondents' Rebuttal Witness Submission, dated 27 September 2017;

    e.      Respondents' Post-Hearing brief, dated 20 December 2017; and

f.      Respondents' Cost Submission, dated 5 February 2018.

128.    The Respondents' submissions were accompanied by:

a.      Fact exhibits RF-1 to RF-52;

b.      Legal exhibits RL-1 to RL-16;

c.      Witness statements:

i.      First witness statement of Boris Milosevic, dated 10 August 2017 ("**BM1**") and second witness statement of Boris Milosevic, dated 25 September 2017 ("**BM2**");

ii.     Witness statement of Ernst Bode, dated 16 June 2017 ("**EB**");

iii.    Witness statement of Vladan Mihailovic, dated 19 September 2017 ("**VM**");

d.      Expert reports:

i.      First expert report of Abdul Sirshar Qureshi, dated 11 August 2017 ("**AQ1 Report**") including appendices A to L and exhibits 1 to 73; second expert report of Abdul Sirshar Qureshi, dated 22 September 2017 ("**AQ2 Report**") including appendices A to E and exhibits 74 to 87.

## IV.    PARTIES' REQUESTS FOR RELIEF

### A.    CLAIMANTS' REQUEST FOR RELIEF

129.    The Claimants' request for relief has changed over the course of this arbitration.

130.    In their Statement of Case, the Claimants sought the following relief:

"Declaring that the purported termination of the MSA by the Company was invalid.

Declaring that RoS and the Company are jointly liable to pay to the Service Provider the fixed part of the Management Fee pursuant to clause 3.2.5 of the MSA and the Privatisation Bonus pursuant to clause 3.2.9 of the MSA.

Ordering the Company and RoS jointly and severally to pay to the Service Provider an amount equal to 30% of the Acquisition Price plus VAT of 20% of that sum, plus interest accruing from 30 June 2016 (to be assessed) plus costs.

- 26 -

Should the Company fail to pay the Termination Fee by 16 May 2017, the Claimants will seek an additional award declaring the Company liable for and requiring the Company to pay EUR 2,040,000 plus interest (to be assessed) plus costs."[7]

131.    However, in subsequent submissions, the Claimants withdrew the relief related to the termination of the MSA and the termination fee:

"The Claimants, on reflection, accept that [the] 1 April 2016 [termination] notice was valid when given, as the privatization was under way, which is sufficient for the purposes of clause 8.4. It makes sense that it is possible to give notice in advance to take effect at the time the privatization is scheduled to complete."[8]

"Since it is accepted that the MSA was terminated on 30 June 2016, by virtue of the notice of 1 April 2016, the Claimants no longer claim the termination fee of €2.04 million."[9]

132.    In their Statement of Reply, the Claimants sought the following relief:

"The Claimants deny that the Respondents are entitled to any relief. The Claimants' claims are well founded and costs should be ordered in favour of the Claimants."[10]

133.    In the Claimants' Witness Submission, the relief was as follows:

"In conclusion, it is submitted that the Tribunal should award the Claimants €16,197,806.09 plus VAT at 20%, and RSD 100,536,504 by way of management fee for May and June 2016, in damages or debt. If the correct privatisation bonus turns out to be higher, the Claimants will claim the higher sum.

The Claimants will also claim interest on the sums due, in accordance with Serbian law. Calculations will be provided in due course.

Further or alternatively the Claimants claim declarations as appropriate as per paragraphs 160, 165, 167 and/or 168 above.

The Claimants also claim costs, including the Tribunal's expenses and the Claimants' legal costs."[11]

134.    The same relief was sought in the Claimants' Rebuttal Witness Submission[12] and Post-Hearing Brief,[13] with the following addition concerning the Claimants' relief of interest:

"Under LCIA Rules 26.4: 'The Arbitral Tribunal may order that simple or compound interest shall be paid by any party on any sum awarded at such rates as the Arbitral

---

[7] SoC, at paras 72.1-73.
[8] CSub1, at para. 20.
[9] CSub1, at para. 171.
[10] SoR, at para. 105.
[11] CSub1, at paras 173-176.
[12] CSub2, at para. 131.
[13] CPHB, at para. 123.

Tribunal decides to be appropriate (without being bound by rates of interest practised by any state court or other legal authority) in respect of any period which the Arbitral Tribunal decides to be appropriate ending not later than the date upon which the award is complied with.' HPK therefore claims an appropriate award of interest. Under MSA 5.2.1, 'the Service Provider may charge interest at the rate of the official legal default interest rate in line with the Governing Law.' As stated on the website of the National Bank of Serbia, the default interest rate is the key policy rate plus 8% and the key policy rate was 4% from 07.07.16, then 3.75% from 07.09.17, then 3.5% from 09.10.17 to date. HPK claim simple interest on all their claims at the above rates for the period 30.06.16 (30.05.16 for the May management fee), to date of payment. At 01.01.18 this will total €3,026,562 accruing at €5,317 daily thereafter. We submit such rate is the agreed rate and is appropriate. We do not know if this approach will be disputed but, if for any reason it is not accepted by the Tribunal, we submit that at the least a high commercial rate (c. 9% to reflect Serbian borrowing costs) would be appropriate and interest should then be awarded on a compound basis with quarterly rests."[14]

### B.  RESPONDENTS' REQUEST FOR RELIEF

135.    The Respondents request the following relief:

> "The Respondents request the Tribunal to (i) dismiss Claimants' Claim in its entirety as unfounded; and (ii) order the Claimants' to jointly and severally reimburse the Respondents for the full amount of their costs related to this Arbitration, including the costs of representation and other related costs."[15]

## V.  FACTS

136.    This section sets out some of the undisputed facts that constitute the framework for the present dispute. It is not an exhaustive summary of all facts. Further relevant and disputed facts are discussed in detail in the Tribunal's decision in Section VI below.

### A.  BACKGROUND

137.    The dispute relates to a steel mill in the town of Smederevo, in the central region of the Republic of Serbia, founded in 1913. From 2003 to 2012, United States Steel Corporation was the ultimate owner of the company running the steel mill.[16] In 2012, the Republic of Serbia (i.e. the First Respondent) acquired the shares in the company running the steel mill for USD 1.[17] The company was renamed Železara Smederevo D.O.O., i.e. the Second Respondent. At that time, the Company was in a difficult financing position.[18]

---

[14] CPHB, at para. 123.
[15] SoD, at para. 140; RSub1, at para. 144; RSub2, at para. 113; RPHB, at para. 132.
[16] SoD, at para. 8.
[17] SoD, at para. 8.
[18] SoD, at para. 8.

138.    In 2014, the First Respondent announced that it would privatise the Company.  It invited bids, and entered into negotiations, but ultimately the attempt to privatise the Company failed.[19]

139.    Instead, in 2015, the First Respondent decided to secure professional management services for the Company to increase the chances of a privatisation.  The Second Claimant, a Dutch company providing "management services in the steel production industry"[20] participated in, and ultimately won, the bidding process, which led to the conclusion of the MSA, as described in further detail below.  The Second Claimant specifically incorporated the First Claimant, a Serbian company, in order to provide management services to the Company.[21]

### B.    NEGOTIATION AND CONCLUSION OF THE MSA

140.    On 20 February 2015, the Second Respondent invited bids for the provision of management services on an interim basis to privatise at a later date.[22]  On 6 March 2015, the Second Claimant submitted its bid,[23] and the Parties entered into negotiations during the month of March 2016.  Among others, a negotiation meeting took place on 16 March 2016, which has been transcribed in writing (the "**Negotiation Transcript**").[24]

141.    On 21 March 2015, the Parties concluded the MSA.[25]  The MSA's ultimate purpose was to have the Company's business privatised.[26]  Recital A to the MSA provides that:

> "The RoS wishes to enter this Agreement:
>
> (a) in recognition of, and in order to secure for the Company to benefit of the Service Provider's experience and management expertise according to the terms of this Agreement;
>
> (b) in order to restructure and establish the long term viability of the Company."[27]

---

[19] SoD, at para. 10; PK1, at paras. 10-11.
[20] SoC, at para. 4.
[21] Request, at para. 13; SoC, at paras. 3-4.
[22] Public invitation for bids, dated 20 February 2015, Exhibit CF-1.
[23] PK1, at para. 15.
[24] Negotiation Transcript, Exhibit RF-17.
[25] MSA, Exhibit CF-3.
[26] SoD, at para. 11; CSub1, at para. 7.
[27] MSA, Exhibit CF-3, at Recital A.

142.    Clause 3.1.1 of the MSA stipulates that "this Agreement is to serve as an interim solution until the Company is privatized."[28]

143.    On 22 April 2015, the Parties executed the closing and takeover protocol (the "**Closing and Takeover Protocol**") and the MSA entered into force.[29]

144.    Under the MSA, the First Claimant was to manage the Company as Chief Executive Officer.[30] While the First Claimant was in charge of the daily business of the Company, its authority was subject to (i) obtaining the co-signature of the Officers For Government Relations (the "**OFGR**") appointed by the First Respondent; and (ii) the supervision by the supervisory board of the Company, with two members being appointed by the First Claimant and three members being appointed by the First Respondent.[31]

### C.    PIKARO CONTRACTS

145.    The Company concluded various contracts with Pikaro s.r.o. ("**Pikaro**"), an affiliate of the Claimants.

146.    On 22 April 2015, as part of the Closing and Takeover Protocol, the Company entered into a "Frame Contract of Sale" with Pikaro concerning the purchase and supply of raw materials for the Company's steel production (the "**RMA**").[32]

147.    On 21 May 2015, the Company and Pikaro concluded a frame contract according to which Pikaro, as an agent, would sell the Company's steel products to end-producers ("**Pikaro Sales Contract**").[33]

### D.    PRIVATISATION AND TERMINATION NOTICES

148.    At some point in 2015, the Chinese HeSteel Group ("**HeSteel**") became interested in acquiring the Second Respondent. A data room for the acquisition was started and various meetings and visits took place at the end of 2015 and beginning of 2016.

---

[28] MSA, Exhibit CF-3, at Clause 3.1.1.
[29] Closing and Takeover Protocol, dated April 2015, Exhibit CF-4.
[30] MSA, Exhibit CF-3, at Clauses 3.2.1 and 3.2.3. See also SoC, at para. 12; SoD, at para. 15.
[31] MSA, Exhibit CF-3, at Clause 3.4. See also SoC, at para. 15; SoD, at paras 14-18.
[32] Frame Contract of Sale, dated 22 April 2015, Exhibit, CF-6.
[33] Frame Contract on the Sale of Goods, dated 21 May 2015, Exhibit CF-71.

149.    On 1 April 2016, the Respondents sent a termination notice to the First Claimant, by which they sought to terminate the MSA under Clause 8.4 of the MSA on the basis that "the procedure for privatisation had begun" (the "**First Termination Notice**").[34]

150.    On 18 April 2016, HeSteel and the Second Respondent entered into a sale and purchase agreement by which HeSteel purchased certain assets of the Second Respondent via a newly founded company (the "**Privatisation Agreement**").[35]

151.    On the same day, the First Claimant issued a pro forma invoice "in anticipation of the Privatisation Bonus becoming due on completion of the Privatisation."[36]

152.    On 25 June 2016, the Second Respondent sent the Claimants another termination notice (the "**Second Termination Notice**") based on "allegations that the [First Claimant] had not complied with certain provisions of the MSA,"[37] as well as a separate notice terminating the RMA with Pikaro.[38]

153.    On 30 June 2016, the Privatisation Agreement closed and the privatisation was completed (the "**Privatisation**").[39]

## VI.    TRIBUNAL'S DECISION

154.    Having carefully considered the Parties' submissions, the Tribunal decides as follows, addressing in turn the questions:

a.      whether the Tribunal has jurisdiction to hear the dispute;

b.      whether the MSA was validly terminated by the Respondents and a termination fee is due to the Claimants under Clause 8.3.2 of the MSA;

c.      whether a privatisation bonus is due under Clause 3.2.9 of the MSA, and if so, how much and by whom;

---

[34] First termination notice, dated 1 April 2016, Exhibit CF-9.
[35] Sale and purchase agreement with HeSteel, dated 18 April 2016, Exhibit CF-10.
[36] Invoice from HPK Management d.o.o. to Zelezara Smederevo d.o.o., dated 18 April 2016, Exhibit RF-2.
[37] Second Termination Notice, dated 25 June 2016, Exhibit CF-14.
[38] Termination notice, dated 25 June 2016, Exhibit CF-15.
[39] Request, at para. 30; SoC, at para. 46; Annex to RSub2.

d.    whether management fees are due for the months of May and June 2016 under Clause 3.2.5 of the MSA;

e.    whether interest is due;

f.    whether any other requests are well-founded; and

g.    which Party bears the costs of this arbitration.

## A.    TRIBUNAL'S JURISDICTION

155.    The Tribunal's jurisdiction to hear the present dispute is based on Clauses 16 and 17 of the MSA.[40]

156.    Clause 16 of the MSA reads as follows:

"DISPUTE RESOLUTION

16.1 Prior to resorting to remedies pursuant to clause 17, the Parties will attempt to promptly resolve a Dispute in good faith through negotiations.

16.2 Unless otherwise agreed in writing, all discussions regarding the Dispute shall be conducted without prejudice to the rights of each of the Parties and shall be conducted between the authorised representatives of the Parties.  If such Dispute is not resolved within 30 (thirty) days or within a time period prescribed by a later written agreement between the Parties, such Dispute is to be settled according to remedies in clause 17."[41]

157.    'Dispute' is defined in the MSA as:

"any dispute, controversy, claim or disagreement arising directly or indirectly under, out of, in connection with, or in relation to this Agreement (or the subject matter of this Agreement) including, without limitation, any dispute, controversy, claim or disagreement relating to the existence, validity, interpretation, construction, performance, enforcement or termination of this Agreement."[42]

158.    Clause 17 of the MSA provides as follows:

"CHOICE OF LAW AND JURISDICTION

17.1 This Agreement shall be governed by and construed in accordance with the Governing Law.

---

[40] Request, at paras 7-10.
[41] MSA, Exhibit CF-3.
[42] MSA, Exhibit CF-3.

17.2 Any Dispute arising out of or in connection with this Agreement, including any question regarding its existence, validity or termination, which has not been resolved through negotiation pursuant to clause 16 within 30 (thirty) days after the occurrence of such Dispute, shall be referred to and finally resolved by arbitration under the London Court of International Arbitration Rules, which Rules are deemed to be incorporated by reference into this clause.

17.3 The London Court of International Arbitration shall act as both, the administrative body and appointing authority and shall consist of three arbitrators. The Service Provider and Bidder shall have the right to jointly nominate one arbitrator and the Company and RoS shall have the right to nominate by joint signature, one arbitrator and the two party-nominated arbitrators shall jointly nominate the third arbitrator who shall act as a chairman. The place of arbitration shall be London, England. The language to be used in the arbitral proceedings shall be English. All disputes shall be resolved in accordance with the effective substantive laws of Republic of Serbia being the Governing Law.

17.4 Any award shall be binding, final and enforceable before a tribunal possessing jurisdiction.

17.5 Each Party agrees to be bound by all and any awards or decisions of the arbitration tribunal appointed pursuant to this clause whether or not it took part in the arbitral proceedings provided that it was given notice of such proceedings in accordance with the provisions of this clause.  This shall also apply to any decisions relating to procedural matters.

17.6 The Parties waive any rights of application of appeal to any court or tribunal of competent jurisdiction to the fullest extent permitted by law in connection with any question of law arising in the course of an arbitration or with respect to any award rendered in accordance with this clause.

17.7 The Parties agree that the arbitral award may be enforced against the Parties to the arbitration proceedings or their assets wherever they are located or may be found and that a judgment upon the arbitral award may be entered in any court having jurisdiction thereof."[43]

159.    As noted above, none of the Parties has raised any objections regarding the constitution or jurisdiction of the Tribunal.[44]

160.    The Tribunal decides that the dispute falls within the arbitration agreement in Clauses 16 and 17 of the MSA.  For the avoidance of doubt, and to the extent necessary, the Tribunal decides that the Respondents have waived any pre-requisite to arbitration such as negotiation under Clauses 16 and 17.2 of the MSA.

---

[43] MSA, Exhibit CF-3.
[44] See above at para. 7.  See also Request, at paras 7-9, 42-43; Response, at paras 6, 11-13.

161.     In light of the above, the Tribunal decides that it has jurisdiction to hear the present dispute.

### B.     TERMINATION OF MSA AND TERMINATION FEE

162.     Initially, the Claimants sought declaratory relief that "the purported termination of the MSA by the [Second Respondent] was invalid."[45]  The Claimants further argued that they were entitled to terminate the MSA and that, as a consequence, the Second Respondent had an obligation to pay a termination fee to the Claimants under Clause 8.3.2 of the MSA.[46]

163.     Subsequently, the Claimants withdrew those arguments and relief:

> "The Claimants, on reflection, accept that [the] 1 April 2016 [termination] notice was valid when given, as the privatization was under way, which is sufficient for the purposes of clause 8.4.  It makes sense that it is possible to give notice in advance to take effect at the time the privatization is scheduled to complete."[47]

> "Since it is accepted that the MSA was terminated on 30 June 2016, by virtue of the notice of 1 April 2016, the Claimants no longer claim the termination fee of €2.04 million."[48]

164.     The Respondents, at the Hearing, suggested that the Claimants' could not withdraw these claims, unless all Parties agreed.[49]  The Respondents further requested that the Tribunal decide these points with prejudice.[50]

165.     While the Tribunal is unconvinced about the Respondents' argument that a change in the Claimants' arguments and relief requires a formal agreement by all Parties, the Tribunal decides these points, for the avoidance of doubt, on the basis of the Parties' common ground in their submissions.

166.     As stated above, on 1 April 2016, the Respondents sent the First Termination Notice to the First Claimant.[51]  The First Termination Notice reads as follows:

> "Having in mind that the procedure of privatization over the Privredno drustvo za proizvodnju i preradu celika Zelezara Smederevo doo Smederevo, statistic number:

---

[45] Request, at para. 37; SoC, at paras 67-68, 72.1.
[46] SoC, at paras 67-68, 72.1; Claimants' termination notice, dated 14 February 2017, Exhibit CF-25.
[47] CSub1, at para. 20.
[48] CSub1, at para. 171.
[49] Transcript Day 1, 90;19-91:20.
[50] Transcript Day 1, 92:2-3.
[51] See above at para. 149.

07342691, has begun on 4 March 2016, under the number JP 1/16 (hereinafter: Procedure of Privatization) hereby inform you of the following:

According to Article 8.4. of the Management and Consultancy Services Agreement, concluded on 21 March 2015, (hereinafter: the Agreement), in the event of successfully conducted the Procedure of Privatization the Agreement has to be considered as terminated upon the expiration of a period of 90 (ninety) days of receipt of this Notice or the successful completion of the Procedure of Privatization, whichever comes later."[52]

167.    It is uncontested that the First Termination Notice was validly made and took effect on 30 June 2016.[53]  On this basis, the Tribunal therefore decides that (i) the Respondents validly terminated the MSA; and (ii) no termination fee is due by the Respondents to the Claimants under Clause 8.3.2 of the MSA.  The question as to when the termination of the MSA took effect (either based on the First or Second Termination Notice) will be addressed below.[54]

### C.    PRIVATISATION BONUS

168.    The Claimants' claim that the Respondents must pay the privatisation bonus pursuant to Clause 3.2.9 of the MSA,[55] which provides that "the Service Provider shall be entitled to a bonus fee in case any privatization of the Company that occurs within 5 (five) years […] in the amount equal to 30% of the acquisition price of the Company's stake achieved through such privatization procedure but in no event lower than USA 10,000,000.00 (ten million dollar)."[56]

169.    The Respondents contest that the privatisation bonus is due under Clause 3.2.9, on the basis that the MSA was terminated by the Second Termination Notice on 25 June 2016, i.e. before the privatisation closed and thus before the privatisation bonus became due.[57]

170.    As noted above, it is common ground between the Parties that, absent the Second Termination Notice, the MSA would be terminated on 30 June 2016 based on the First Termination Notice.[58]  It is also undisputed that, absent the Second Termination Notice, the

---

[52] First Termination Notice, Exhibit C-9, at p. 1.
[53] CSub1, at paras 20, 171; RSub2, at paras 7-11.
[54] See below at paras 172 et seq.
[55] SoR, at paras 76-83; CSub1, at paras 152-153; CSub2, at paras 113-121.
[56] MSA, Exhibit CF-3.
[57] SoR, at paras 84-112; RSub1 at paras 114-124; RSub2, at paras 68-72, 103-107.
[58] See above at para. 167.

privatisation bonus would be due pursuant to Clause 3.2.9 of the MSA. The Respondents confirmed this at the Hearing:

> "THE CHAIRMAN:  Okay.  Let me, then, maybe ask my subsequent question; absent any later termination with the second Termination Notice, is it also your case that the privatisation bonus would be due on the basis of the first termination.
>
> MR PAVIC:  If -- well, if first termination is the one, and the second termination doesn't produce immediate effect, then, of course, *absent second termination then the bonus is due*.  That was our case from the very beginning, that we were on the course for termination and the bonus there."[59]

> "MR JACOBS:  So if we were to say that the second Notices were invalid, for whatever reason, whether they didn't go through the proper procedures or because they were in breach of good faith, or whatever the reason may be, then you accept the first Notice is a valid notice and the privatisation bonus would be due from the company?
>
> MR PAVIC:  That is exactly what we have been submitting from the very beginning. That is our secondary argument. The first line of argumentation is that we have privatisation bonus which is not due to the second Termination Notice."[60]

171.    The Parties' dispute thus turns around the question whether the MSA was validly terminated earlier than 30 June 2016 based on the Second Termination Notice, and whether therefore the Privatisation Bonus was not due.

1.    Validity and Effect of the Second Termination Notice

172.    According to the Respondents, the Second Respondent validly terminated the MSA by the Second Termination notice on 25 June 2016, by which the termination took effect immediately.[61] The Second Termination Notice reads as follows:

> "Having in mind that [the First Claimant] (hereinafter: HPK) did not fulfill certain provisions of the Management and Consultancy Services Agreement dated on 21 March 2015 (hereinafter: the Agreement), we hereby inform you that, pursuant to Article 8.1. of the Agreement, the [Second Respondent] (hereinafter: the Company) has unilaterally terminated the Agreement by the decision of the Assembly of the Company dated 25 June 2016 which we hereby enclose to this Notice.
>
> The reasons for the termination, among others, are:

---

[59] Transcript, Day 1, 108:3-13.
[60] Transcript, Day 1, 112:25-113:10.
[61] SoD, at paras 84-100; RSub1, at paras 15 et seq.; RSub2, at paras 68 et seq.

• [B]reach of the Article 3.1.5.1 due to the fact that the Net Working Capital, starting from 30 November 2015, until the date of sending of this Notice, constantly amounted less than USD 80,000,000 (eighty million dollars);

• Breach of the Frame Contract of Sale No. 151 by the company Pikaro s.r.o, Bellova 3, 040 0 I Kosice, Slovak Republic, statistic number: 36674079, as a supplier, due to which the subject agreement has been canceled as well, what represents the additional reason for termination of the Agreement;

• Entering into the agreement with a related parties [sic] without prior approval and notification of the Supervisory Board of the Company;

• Breaches of the non-compete obligations defined by the Agreement by HPK;

• Expiration of the Insurance Policy issued in accordance with Article 2.3.7 of the Agreement;

• Breaches of clauses defined in chapter 3 and chapter 4 of the Agreement by HPK;

• Breaches of the provisions of the Serbian Companies Law *("Official Gazette RS", No. 36/2011, 99/2011, 83/2014 - another law and 5/2015)* as well as other applicable laws and regulations;

• Breaches of other obligations stipulated in the Agreement."[62]

173.    In this arbitration, the Respondents have relied on two series of alleged breaches of the MSA to justify the validity and immediate effect of the Second Termination Notice: first, a breach of Clause 8.1.2 MSA;[63] and second, various breaches of the MSA which according to Article 127 of the Serbian Law of Obligations would have immediate effect.[64]

174.    The Claimants argue that neither of these alleged breaches occurred or justified the Second Termination Notice with immediate effect;[65] and that in any event the Second Termination Notice was invalid as a matter of corporate law.[66]

175.    The Tribunal will first look at the alleged breach of Clause 8.1.2 of the MSA, before turning to the other alleged breaches.

### 2.    Breach of Clause 8.1.2 MSA

176.    Clause 8.1 of the MSA provides that:

---

[62] Second Termination Notice, dated 25 June 2016, Exhibit CF-14.
[63] SoD, at paras 86-88; RSub2, at paras 36-67; RPHB, at paras 105-144.
[64] SoD, at paras 89-99; RSub2, at paras 68-102; RPHB, at paras 84-104.
[65] CSub1, at para. 13, 65 et seq.; CSub2, at paras 23 et seq.
[66] CSub1, at paras 57-64; CPHB, at paras 11-16.

"8.1 The RoS and/or the Company may (but shall not be obligated to) terminate this Agreement by a notice to the Service Provider and the Bidder upon the occurrence and during the continuance of any of the following events:

8.1.1 the Service Provider or Consultants or members of the Supervisory Board nominated by the Service Provider as applicable, fail to comply with any of their material obligations in this Agreement (including fulfilment of the KPis as set out by the Business Plan or other obligations set out by the Business Plan and/or any other strategic documentation) and do not correct such failure within 120 (one hundred twenty) days of the date of a notice requiring correction from the non-defaulting Party;

8.1.2 if the Raw Materials Agreements cease to be valid and legally binding before the expiration of third anniversary of the Closing or the Raw Materials Agreements are terminated or breached in any material manner by a respective supplier;

in which cases the Company shall not be obliged to pay neither the Termination Fee nor the Privatization Bonus to the Service Provider and will retain the right on indemnification from the Service Provider and/or the Bidder for of all damages suffered."[67]

177.   Clause 1.1 of the MSA defines 'Raw Material Agreements' as:

"agreement/s on supply of raw materials to the Company to be concluded between the Company, as the purchaser, and the Service Provider or the Bidder and one of their Affiliates, as the supplier of such raw materials, that will, inter alia, include provisions securing the right of the Company to (i) at least 60 (sixty) calendar days of delayed payment of such raw materials (ii) have in any moment of the validity of the Raw Material Agreements on a Company premises a stock of delivered raw materials and / or raw materials ordered and in transit to the Company of a minimum USD 20,000,000 (twenty million dollars) value.  For avoidance of doubt, such Raw Material Agreements shall be valid and legally binding during the entire Term of this Agreement."[68]

178.   As mentioned above:

a.      on 22 April 2015, the Company entered into the RMA, a "Frame Contract of Sale" concerning the purchase of raw materials from Pikaro, an affiliate of the Claimants;[69] and

b.      on 25 June 2016, the Second Respondent sent a termination notice to Pikaro, purporting to terminate the RMA.[70]

---

[67] MSA, Exhibit CF-3.
[68] MSA, Exhibit CF-3.
[69] RMA, Exhibit, CF-6.  See above at para. 146.
[70] Termination notice, dated 25 June 2016, Exhibit CF-15.  See above at para. 152.

179.    According to the Respondents, (i) Pikaro breached the RMA in various ways; (ii) the Second Respondent therefore validly terminated the RMA; and (iii) as a consequence of the termination of the RMA, the Respondents validly terminated the MSA pursuant to its Clause 8.1.2.[71]

180.    According to the Claimants, (i) Pikaro did not breach the RMA, and in any event not in a material manner; (ii) the termination of the RMA was invalid; and (iii) only a material breach of the RMA could be a valid cause for terminating the MSA pursuant to its Clause 8.1.2.[72]

181.    The Tribunal will first address the question of interpretation of Clause 8.1.2 of the MSA, before turning to the alleged breaches and termination of the RMA.

### a)    Interpretation of Clause 8.1.2 MSA

182.    It is common ground between the Parties that Clause 8.1.2 of the MSA allows the Respondents to terminate the MSA in certain cases of breach or termination of the RMA.  In particular, it is undisputed that Clause 8.1.2 comes into play if the RMA was "breached in any material manner by a respective supplier", i.e. here: Pikaro.[73]  However, the Parties disagree as to whether a termination of the RMA *by the Respondents* can trigger Clause 8.1.2, or whether only a termination *by the supplier*, i.e. Pikaro, can do so.

183.    According to the Claimants, Clause 8.1.2 MSA applies only if the RMA is terminated by the supplier, i.e. Pikaro.[74]  Among other things, the Claimants argue that "[o]therwise, the Company could manipulate Article 8.1.2 by terminating the [RMA] in order to give an unreal basis to trigger 8.1.2."[75]

184.    According to the Respondents, Clause 8.1.2 MSA applies if the RMA is terminated, irrespective of which party sought to terminate the RMA.[76]  Among other things, the Respondents argue that this follows from the literal interpretation of Clause 8.1.2.  According to the Respondents: "[t]he qualification '*by the respective supplier*' only applies to the [last] scenario [i.e.] breach of the [RMA] in a material manner […] The text of the Article 8.1.2 of

---

[71] SoD, at paras 64-71; RSub1, at paras 71-87; RSub2, at paras 42-67; RPHB, at paras 105-114.
[72] CSub1, at paras 65-83; CSub2, at paras 49-61; CPHB, at paras 55-92.
[73] CSub1, at para. 65; RSub2, at para. 39.
[74] SoC, at para. 56.1; SoR, at paras 47-49; CSub1, at para. 65; Transcript Day 1, 18:22-25.
[75] CSub1, at para. 65.
[76] RSub2, at paras 37-41.

the MSA cannot be interpreted in any other manner."[77]  In this context, the Respondents
further argue that, in any event, the Tribunal does not have jurisdiction to determine the
validity of the termination of the RMA since the RMA contains a separate and different
arbitration agreement.[78]

185.    The Tribunal finds with the Claimants on this point.  In interpreting Clause 8.1.2, the
Tribunal took into account several factors.

186.    First, the Tribunal is of the opinion that the mere wording of Clause 8.1.2 does not
resolve the issue.  Looking at the text of Clause 8.1.2, it is impossible to determine whether
"by a respective supplier" relates merely to a possible breach of the RMA, or also to its
termination.

187.    Second, and accordingly, the Tribunal takes into account the aim and context of
Clause 8.1.2 MSA.  The evidence suggests that the RMA was an important precondition for
the Respondents when entering into the MSA.[79]  The Respondents wanted to ensure that the
Company had sufficient raw materials, since supply problems had created issues in the past,
i.e. before the MSA took effect.  As explained by Mr Kamaras, the Company has experienced
recurrent issues with the procurement of raw materials prior to the MSA.[80]  It was therefore
essential for the Respondents that the supplier of the raw materials could not terminate the
RMA during the MSA's contractual term.[81]  Accordingly, it was the termination of the RMA
by the supplier that was essential when looking at the effects on the MSA.  Had the Parties
wanted a termination of the RMA by either party to result automatically in a termination of
the MSA, they could have included a clear provision to this effect.  The Tribunal notes that
the RMA indeed contains such a provision for the reverse situation.  According to Clause
10.1 of the RMA, the RMA "shall automatically cease to exist with expiry or termination of
[the] MSA."[82]

188.    In light of this, the Tribunal finds that Clause 8.1.2 of the MSA supposes a
termination of the RMA by the supplier, i.e. Pikaro, for such RMA termination to be able to

---

[77] RSub2, at para. 39.
[78] SoD, at para. 71.
[79] See e.g. MSA, Exhibit CF-3, Article 2.3.3 (RMA was a pre-condition for closing the MSA).
[80] PK1, at para. 9.
[81] See e.g. MSA, Exhibit CF-3, Clause 1.1 (RMA "shall be valid and legally binding during the entire Term of
this Agreement").
[82] RMA, Exhibit CF-6.

trigger the termination of the MSA.  Accordingly, the mere fact that the Second Respondent allegedly terminated the RMA is not, in and of itself, sufficient ground under Clause 8.1.2 of the MSA to justify the termination of the MSA.  The Tribunal therefore does not need to decide whether the RMA termination was valid or not (and incidentally, does not need to decide whether it has jurisdiction to decide this point).  Instead, the Tribunal must determine whether Pikaro "breached in any material manner" the RMA for such breach to trigger Clause 8.1.2 of the MSA.

b)      Alleged Breaches of the RMA

189.    The Respondents allege that Pikaro breached the RMA by not providing the level of financing required thereunder.[83]  In particular, the Respondents argue that Pikaro did not provide the Company, i.e. the Second Respondent, with the agreed 60 days deferred payment conditions (the "**Deferred Payment**" issue), as well as with the overall credit of 20 million (the "**Credit**" issue) pursuant to Clauses 2.4 and 2.6 of the RMA.[84]  The Claimants contest these breaches.[85]

190.    The relevant provisions of the RMA are as follows.  Clause 2.4 RMA stipulates that:

> "In accordance with the [MSA] [...] the Seller [i.e. Pikaro] shall guarantee to the Buyer [i.e. the Company] a credit amounting to USD 20,000,000.- (in words: twenty million US dollars) upon delivery of Goods in form of 60 days deferred payment conditions [...]."[86]

191.    Moreover, Clause 2.6 RMA provides that:

> "The payment shall be effected as follows: 100% of the value of the Goods shall be paid by the Buyer [i.e. the Company] 60 days after the date of loading the Goods by the Producer, advised by the Seller [i.e. Pikaro], based on invoice issued by the Seller [sic]."[87]

192.    'Goods' are defined as "raw materials defined in single Contract(s) produced by the Producer and delivered by the Seller [i.e. Pikaro] on the basis of the single Contract."[88]

---

[83] SoD, at paras 64-72; RSub1, at paras 71-87; RSub2, at paras 42-67.
[84] SoD, at paras 64-72; RSub1, at paras 71-87; RSub2, at paras 42-67.  See also BM1, at para. 19; BM2, at paras 21-26.
[85] SoC, at paras 56.2-56.7; SoR, at paras 50-54; CSub1, at paras 70-80.  See also PV1, at paras 37-47; PV2, at paras 17-38.
[86] RMA, Exhibit CF-6.
[87] RMA, Exhibit CF-6.
[88] RMA, Exhibit CF-6, p. 2.

c)      Deferred Payment Issue

193.    The aim of the Deferred Payment was to provide the Company with a better cash-flow.  Prior to the RMA (and MSA), the Company had to pre-pay its goods in many instances which detrimentally affected its cash-flow.[89]  During the negotiation of the MSA, the provision of Deferred Payment terms was discussed as a vital issue for the Company.[90]  The Claimants agreed that it would be able to provide the Company with the Deferred Payment terms.[91]  The idea was to provide "breathing space" for the Company.[92]

194.    In a simplified manner, the chronology of the supply chain of raw materials from their producer to the Company typically looks as follows:[93]

      a.      Producer loads and sends the goods to Pikaro;

      b.      Goods are on their way from the producer to Pikaro (the "**In-Transit Time**");

      c.      Pikaro receives and reviews the goods;

      d.      Pikaro sends the goods to the Company and invoices the Company;

      e.      Company receives the goods;

      f.      Payment of goods is due according to invoice; and

      g.      Company pays Pikaro for the goods.

195.    While the Parties are essentially in agreement regarding the above, they disagree about (i) when the Deferred Payment period starts to run; (ii) when the Deferred Payment period ends; (iii) how long the Deferred Payment period is; and (iv) whether Pikaro breached the Deferred Payment period.  The Tribunal will look at these points in turn.

(1)      Start Date of Deferred Payment

196.    According to the Claimants, the Deferred Payment starts before the goods are loaded by the producer.  Indeed, the Claimants argue that the relevant starting date is when the Company would have "otherwise" had to pay for the raw materials, i.e. in absence of the

---

[89] PV1, at paras 43 et seq.; BM2, at para. 23; Transcript Day 2, 75:3-11.
[90] RSub1, at para. 72.
[91] Transcript Day 3, 10:17-18.
[92] RPHB, at para. 6.
[93] Claimants' Expert presentation at the Hearing, slide 8; Respondents' Expert presentation at the Hearing, slide 8.

RMA with Pikaro.[94] The Claimants explain that "[p]rior to the [RMA], the Company was required to pre-pay for raw materials before loading."[95] The Deferred Payment granted by Pikaro should therefore, according to the Claimants, be calculated from the time when the Company would previously have had to pay for the goods.[96] The Claimants' expert, referring to Mr Pavol Vrchovinsky's testimony, assumed that this should be 5 days prior to the date of the loading of the goods.[97]

197.    The Respondents argue that the pre-payment date prior to the RMA is irrelevant: according to the Respondents the calculation of the pre-payment date remains unclear and unspecified and, in any event, was not agreed upon by the Parties either in the RMA or otherwise.[98] Instead, the Respondents' expert calculated the starting date of the Deferred Payment period as from the date of the shipment of the goods from Pikaro to the Company.[99]

198.    The Tribunal finds with neither Party on this point. Rather, it is clear from Clause 2.6 of the RMA that the relevant moment in time for the Deferred Payment period to start is when the goods are loaded by the producer. Clause 2.6 RMA clearly states that "the Goods shall be paid by the Buyer [i.e. the Company] 60 days *after the date of loading the Goods by the Producer*, advised by the Seller [i.e. Pikaro], based on invoice issued by the Seller [sic]."[100] Accordingly, the Tribunal finds that the Deferred Payment period starts to run when the goods are loaded and sent by the producer to Pikaro.

(2)    End Date of Deferred Payment

199.    According to the Claimants, the Deferred Payment's end date is the actual payment date of the invoice,[101] whereas the Respondents argue that the relevant end date is the payment due date on the invoice.[102] The Respondents argue that the invoice due date is the only relevant date since "[o]nce an invoice falls due, the debtor is in default [and thus] [i]t is

---

[94] SoC, at paras 56.4-56.5; SoR, at paras 50-51; CSub1, at para. 73.c; CSub2, at par. 57.e. Compare CPHB, at paras 59, 64. See also PK1, at para. 37; PV1, at paras 43-47.
[95] SoC, at para. 56.4.
[96] SoC, at paras 56.4-56.5; SoR, at paras 50-51; CSub1, at para. 73.c; CSub2, at para. 57.e. See also PK1, at para. 37; PV1, at paras 43-47.
[97] FI Report, at paras 3.17, 3.32, tables 3.1 and 3.2, referring to VM, at paras 44, 45 and Exhibit CF-234.
[98] SoD, at para. 68; RSub1, at para. 83; RSub2, at para. 47; RPHB, at para.11. See also BM1, at para. 22.
[99] AQ1 Report, at para. 46; AQ2 Report, at para. 31; Respondents' Expert presentation at the Hearing, slides 6, 9.
[100] RMA, Exhibit CF-6 (emphasis added).
[101] SoR, at para. 50; CSub1, at para. 73; CSub2, at para. 57.d; CPHB at paras 55-65. See also PV1, at para. 46.
[102] RSub2, at paras 43-46; RPHB, at para. 12. See also BM2, at para. 23.

no longer financed and its payment is no longer deferred – the debtor is now late with payment and may be charged default interest."[103]

200.   The Tribunal finds with the Claimants on this point for a number of reasons. First, Clause 2.6 of the RMA refers to the "payment" of the goods by the Company after 60 days, and not to any invoicing period or due date.[104]   Second, this is also in line with the ultimate aim of the RMA which was to provide a credit or "breathing space" to the Company in order to ease its cash-flow.[105]   What matters in this context is the actual payment and not the formal due date.   Third, it is important to keep in mind the economic reality that Pikaro was controlled by the Service Provider.[106]   Accordingly, the Service Provider was the one who issued the invoice (though Pikaro) and was also responsible for its payment by the Company (as its manager), subject to obtaining the co-signature of the OFGR.   Therefore, the Respondents' argument that a debtor faces adverse consequences, including late payment interest, in case an invoice is not settled in time, is unrealistic and thus unconvincing in this context.

201.   In light of the above, the Tribunal decides that the relevant end date for the Deferred Payment period is the actual payment date of the goods by the Company.

(3)   Length of Deferred Payment

202.   According to the Claimants, the 60 days Deferred Payment period provided for in Clauses 2.4 and 2.6 of the RMA has been altered in subsequent contracts between Pikaro and the Company.[107]   More specifically, the Claimants argue that:

a.   the RMA, as a framework agreement, foresaw and allowed the parties (i.e. Pikaro and the Company) to enter into subsequent implementation agreements in form of single contracts regarding the sale of raw materials;[108]

b.   Pikaro and the Company entered into several of those single contracts which (i) provided for shorter invoicing periods (e.g. 5 days, 30 days);[109] (ii) were each time

---

[103] RPHB, at para. 12; Transcript Day 1, 87:1-88:10.
[104] RMA, Exhibit CF-6.
[105] See above at para. 193.
[106] RSub2, at para. 44; PK1, at paras. 1-2.
[107] SoR, at paras 51.1-51.4; CSub1, at para. 73; CSub2, at para. 57. See also PK1, at paras 36-42.
[108] SoR, at paras 51.1-51.4. See also PK1, at paras 36-42.
[109] Single contracts, Exhibits CF-51, CF-52, and CF-246.

approved by the Company's supervisory board and by the Respondents' OFGR;[110] and (iii) superseded the Parties' previous agreement in the RMA;[111] and

c.    the RMA did not prohibit shorter invoicing periods since (i) Clause 1.1 allowed for the parties to "otherwise agree[] in writing";[112] and (ii) Clause 1.3 provided that the single contracts were an "integral part" of the RMA.[113]

203.    According to the Respondents, the single contracts' invoicing periods could not change the requirement of a Deferred Payment period of 60 days as per Clauses 2.4 and 2.6 of the RMA.[114]

204.    The Tribunal finds with the Respondents on this point for two independent reasons.

205.    First, the single contracts deal with the invoicing period, i.e. the date when the payment of the goods is due.[115]  As determined above (and according to the Respondents' own argument), however, the relevant moment for the Deferred Payment period is not the invoice due date, but the date of the actual payment.[116]  As such, the provisions in the single contracts dealing with the invoicing period and payment due dates are irrelevant in the Tribunal's view for its analysis of the Deferred Payment.

206.    Second, and in any event, the Parties could not deviate in the single contracts from the Deferred Payment provisions contained in Clauses 2.4 and 2.6 of the RMA.  Clause 1.1 of the RMA clearly provides that "[t]he terms of the Frame Contract shall also apply to all single Contracts [...]" and goes on that "[u]nless agreed otherwise by the Parties in writing, any *terms and circumstances* related to the purchasing or buying of documents used in connection with the Contract(s) *that are not in compliance with the Frame Contract will become null and void, and only the terms of the Frame Contract shall be valid.*"[117]  While the Tribunal finds the reference to "purchasing or buying of documents" somewhat unclear, Clause 1.1 establishes a clear hierarchy between the RMA framework contract and the single contracts, in the sense that the former's terms prevail over the latter's.  The addition "[u]nless

---

[110] SoR, at paras 51.1-51.4; CSub2, at para. 57.b.  See also PK1, at para. 52; PV1, at para. 47.
[111] SoR, at para. 51.3.
[112] CPHB, at para. 56; Transcript, Day 1, 55:5-60:12; Day 5 23-28.
[113] CPHB, at para. 56; Transcript, Day 5 23-28.
[114] RSub1, at paras 84-87; RSub2, at paras 44-45.
[115] See e.g. Exhibit C-51, Clause 2.3; Exhibit C-52, Clause 2.3.  See also Transcript Day 5, 23:24; 24:3.
[116] See above at para. 201.
[117] RMA, Exhibit CF-6 (emphases added).

agreed otherwise by the Parties in writing" logically therefore does not refer to any amendments via the single contracts, but only to an amendment of the framework agreement, i.e. the RMA itself.  Furthermore, the Claimants cannot rely on Clause 1.3 of the RMA.[118] Clause 1.3 provides that "*[q]uantities and prices* shall be determined under the single Contract(s), mutually signed by both parties" and "[t]he same present integral part of this Frame Contract."[119]  Therefore, when looked at fully, it becomes clear that Clause 1.3 applies to quantities and prices and not to invoicing or payment terms which are dealt with in Clause 2 of the RMA.

207.    In light of the above, the Tribunal finds that the Deferred Payment period, which runs from the date of the loading of the goods by the producer to their actual payment by the Company, must be 60 days as per Clauses 2.4 and 2.6 of the RMA.

(4)    Breach of Deferred Payment

208.    Having thus established the Deferred Payment period, the subsequent question is whether Pikaro breached the Deferred Payment period in the case at hand.

209.    It is common ground between the Parties (and the Tribunal agrees) that for the purposes of Clauses 2.4 and 2.6 of the RMA not every single payment need to comply with the 60 days requirement, but rather that Pikaro provides the 60 days Deferred Payment conditions to the Company as an average.  This was confirmed by Mr Milosevic at the Hearing:

> "Q Second.  Yes.  You first said that Mr Kamaras is claiming that -- sorry, just a second -- yes -- that the credit period is to be calculated as an average of sixty days from the date of company would otherwise have to pay raw materials, and that -- is it -- first of all, comment this formula, average sixty days, et cetera, as the method of calculating this sixty days deferred payments, and whether Mr Kamaras correctly interpreting your agreement in regard the method, so whether you agreed to that or not.
> A ***Well, it is the average that we were looking at, average credit period of sixty days***."[120]

---

[118] CPHB, at para. 56.
[119] RMA, Exhibit CF-6 (emphasis added).
[120] Transcript Day 3, 14:22-23.

210.    The Parties, however, disagree on how to calculate such average and have submitted significant expert evidence on this point.[121]

211.    The Respondents argue, based on their expert's reports, that the 60 days period on average was not met.[122]  However, the Tribunal notes that the Respondents' expert did not calculate the average Deferred Payment taking into account the relevant start and end date. The Respondents' expert calculated the average days between the "shipment date"[123] (which he explained was the date when Pikaro shipped the goods to the Company[124]) and the invoice due date.

212.    The Claimants' expert has provided calculations on the average days between the loading of the goods by the producer and the actual payment by the Company.[125]  However, the Tribunal has hesitations as to the accuracy of the figures provided by the Claimants' expert, in particular concerning the In-Transit Time (i.e. the time between the moment when the producer sends the goods to Pikaro and the moment when the goods are received by Pikaro).[126]  The Tribunal is of the opinion that the Claimants' assumed length of the In-Transit Time (21 days) is not supported by evidence.  This figure has not been independently verified by the Claimants' expert, as Mr Illet stated in his report:

> "I am therefore unable to validate the 21 day figure and am instructed that it is accurate."[127]

213.    Rather, the 21 days figure has been put together by the First Claimant's employee Mr Pavol Vrchovinsky,[128] partially relying on estimates from his colleagues.[129]  Indeed, the Claimants' expert admitted during the Hearing that the 21 days In-Transit Time were incorrect and based his updated calculations on a different figure.[130]

214.    Nevertheless, even leaving aside these hesitations, the calculations by the Claimants' expert show that the Deferred Payment period was not 60 days on average.  In his expert

---

[121] AQ1 Report, at paras 42-57; FI Report, at paras 3.1-3.33; AQ2 Report, at paras 24-34.
[122] AQ1 Report, at paras 42-57; AQ2 Report, at paras 24-34; Respondents' expert presentation at the Hearing, slides 6-9.
[123] AQ1 Report, at para. 46; AQ2 Report, at para. 31.
[124] Respondents' expert presentation at the Hearing, slide 8; Transcript Day 4, 166:4-8.
[125] FI Report, at paras 3.15-3.33.
[126] See above at para. 194.
[127] FI Report, at para. 3.16.
[128] VM, at para. 19, referring to Exhibit CF-234.
[129] Transcript Day 2, 123:1-5.
[130] Transcript Day 4, 82:5-7; 89:14-21.

report, Mr Illet calculated that the average time from the loading of the goods to the payment date was 59 days (taking into account invoices issued during the entire timeframe of the RMA)[131] or 63 days (taking into account only invoices issued after September 2015).[132] He then updated these figures at the Hearing to 54 days in the first scenario, and 58 days in the second scenario.[133] Accordingly, in both scenarios, on the Claimants' own figures, the average number of days is below 60.

215.    For the avoidance of doubt, the Tribunal notes that the only scenario under which the Claimants' expert calculated an average that is higher than 60 days was one that took into account unpaid invoices.[134] These unpaid invoices constitute only a fraction of the total number of relevant invoices, and the number of unpaid days was on average 472 days according to Mr Illet's assumptions.[135] Accordingly, the Tribunal finds that adding these unpaid invoices would unduly affect the weighted average and should therefore remain excluded.

216.    In light of the above, the Tribunal is satisfied that Pikaro did not provide the 60 days Deferred Payment required under Clauses 2.4 and 2.6 of the RMA. While this constitutes a breach of the RMA, the Tribunal now needs to determine whether the RMA was breached "in a material manner" so as to trigger Clause 8.1.2 of the MSA.

### (5)    Material Breach

217.    According to Clause 8.1.2 of the MSA, it applies if the RMA is "breached in any material manner by a respective supplier."[136]

218.    'Material' is defined in Clause 1.1. of the MSA as follows:

> "'Material' means in respect of any fact, object, claim, liability or event which could cause, would result or lead directly or indirectly to a significant impact on, inter alia, the business, assets or operations of the Company exceeding EUR 500,000 (five hundred thousand euros) or equivalent in other currency, except those disclosed within this Agreement."[137]

---

[131] FI Report, at Table 3.1.
[132] FI Report, at Table 3.2.
[133] Claimants' expert presentation at the Hearing, slide 9. This update was due to the fact that the In-Transit Time days had to be reduced, according to Mr Illet, from 20.9 to 15.6. Transcript Day 4 82:5-7; 89:14-21.
[134] FI Report, at Tables 3.1 and 3.2; Claimants' expert presentation at the Hearing, slide 9.
[135] FI Report, at Tables 3.1 and 3.2.
[136] MSA, Exhibit CF-3.
[137] MSA, Exhibit CF-3.

219.   The Parties have made no submissions on the meaning of the word 'material' in Clause 8.1.2 MSA.  The Tribunal notes, however, that the Parties have commented on the meaning of the word 'material' in Clause 8.1.1 MSA:

> a.   according to the Respondents, the definition in Clause 1.1 does not apply to Clause 8.1.1 since the term 'material' is not capitalized,[138] noting furthermore that the Serbian version of Clause 8.1.1 uses a different word for 'material' than in Clause 1.1, and that this word means 'substantive' (as opposed to procedural);[139] and

> b.   the Claimants contest the Respondents' interpretation and state that Clause 8.1.1 MSA requires a material breach (rather than a breach of a material obligation), while at the same time accepting that the definition in Clause 1.1. does not apply to the non-capitalized term 'material' in Clause 8.1.1 MSA.[140]

220.   Similarly, Clause 8.1.2 uses the word 'material' without it being capitalized.  The Tribunal thus finds that the non-capitalized word 'material' in Clause 8.1.2 MSA does not refer to the definition in Clause 1.1. MSA, which requires a specific threshold.  In the Tribunal's view, the obvious and literal meaning of "in a material manner" thus applies: i.e. in a manner that matters or is significant.  Mere formal breaches or breaches that are insignificant should therefore be excluded from the application of Clause 8.1.2 MSA.

221.   In this context, it is important to note that the Deferred Payment condition was not an end in-and-of itself.  Rather, as detailed above, it was a means to provide the Company with a financial 'breathing space.'[141]  The provisions of the RMA make clear that the ultimate goal was to provide the Company with a credit line through the use of the Deferred Payment conditions.  Indeed, Clause 2.4 RMA refers to a "credit amounting to USD 20,000,000.- […] *in form of* 60 days deferred payment conditions."[142]  The Deferred Payment issue is therefore linked to the Credit issue, in the sense that the former is meant to provide the latter.

222.   Accordingly, the Tribunal finds that the breach of the 60 days Deferred Payment is material only if, as a result thereof, the 20 million credit target is not met.  In other words, in order to decide whether the 60 days Deferred Payment conditions qualifies as a breach in a

---

[138] RSub1, at para. 92.
[139] RSub1, at paras 93-94.
[140] CSub2, at para. 92.
[141] See above at para. 193.
[142] RMA, Exhibit CF-6.

"material manner" for the purposes of Article 8.1.2 MSA, the Tribunal needs to look at the 20 million Credit issue.

### d)   Credit Issue

223.   The relevant provision concerning the Credit issue is Clause 2.4 of the RMA which provides as follows:

> "In accordance with the [MSA] [...] the Seller [i.e. Pikaro] shall guarantee to the Buyer [i.e. the Company] a credit amounting to USD 20,000,000.- (in words: twenty million US dollars) upon delivery of Goods in form of 60 days deferred payment conditions [...]."[143]

224.   The Parties have filed significant submissions and evidence on this point.[144]  They disagree, among other things, about (i) the form of the Credit; (ii) the correct methodology to calculate the Credit; and (iii) whether the Credit was provided by Pikaro.  The Tribunal will look at these issues in turn.

### (1)   Form of Credit

225.   There is dispute among the Parties as to how Pikaro should provide the 20 million Credit to the Company.

226.   The Claimants argue that the Credit in Clause 2.4 RMA refers to a "financial credit" and does "not require a level of physical stocks in the pipeline."[145]  In any event, according to the Claimants, the 20 million does not represent a "mandatory minimum."[146]

227.   According to the Respondents, Clause 1.1 of the MSA requires that the Company be provided with raw materials of at least USD 20 million in value, looking at the physical levels of the goods in stock and in transit.[147]

228.   In the Tribunal's view there are two separate, albeit related, issues.

---

[143] RMA, Exhibit CF-6.
[144] Claimants: SoR, at paras 52-53.3; CSub1, at paras 75-80; CSub2, at paras 51-53; CPHB, at paras 67-85; PK1, at paras 35-46; PV, at paras 39-42; PK2, at paras 45-53; PV2, at paras 17-38; FI Report, at paras 4.1-4.35. Respondents: RSub1, at paras 74-82; RSub2, at paras 51-65; RPHB, at paras 19-43; BM2, at paras 21-26; AQ1 Report, at paras 58-85; AQ2 Report, at paras 35-51, 71-85.
[145] CSub2, at paras 54-55; CPHB at paras 86-91. See also PK1, at para. 38; PV2, at paras 25, 32.
[146] CPHB at para. 87.
[147] RSub1, at paras 75-77; RSub2 at para. 52.  See also BM1, at para. 19.

229.    The first issue is whether the Credit is understood as a "financial credit" or requires a certain level of actual physical goods to be in stock at, or in transit to, the Company.  On the one hand, Clause 1.1 of the MSA refers to the "right of the Company to […] have in any moment of the validity of the Raw Material Agreements on a Company premises a ***stock of delivered raw materials and / or raw materials ordered and in transit*** to the Company of a minimum USD 20,000,000 (twenty million dollars) value."[148]  On the other hand, Clause 2.4 of the RMA provides that "the Seller [i.e. Pikaro] shall guarantee to the Buyer [i.e. the Company] ***a credit amounting to USD 20,000,000.-*** (in words: twenty million US dollars) upon delivery of Goods in form of 60 days deferred payment conditions […]."[149]

230.    This apparent conflict between these two provisions of the MSA and RMA is however easily resolved if one looks at the relationship between the MSA and the RMA. Indeed, the conclusion of the RMA was a precondition for the closing of the MSA pursuant to Clause 2.3.3 of the MSA:

> "The Closing of this transaction shall occur when the following preconditions are met: […] [t]he Raw Materials Agreements are duly signed in a form reasonably satisfactory to all Parties […]."[150]

231.    It is for that purpose that Clause 1.1 of the MSA contains a definition of "Raw Material Agreements."  By signing the Closing and Takeover Protocol, the Parties attested to the fact that they were satisfied with the terms of the RMA as entered into:

> "The Parties acknowledge that the Raw Material Agreement has been signed with the terms and conditions as well as in a form satisfactory to the Parties and as defined by the MSA."[151]

232.    The Closing and Takeover Protocol further refers to the "***value*** of the Raw Material Agreement" and the "***funds*** of USD 20,000,000 (twenty million dollars)" in this context.[152]

233.    In light of the above, the Tribunal is satisfied that Clause 2.4 MSA is the relevant provision on point and it requires a certain level of financing, not a physical level of stocks.

---

[148] MSA, Exhibit CF-3.
[149] RMA, Exhibit CF-6.
[150] RMA, Exhibit CF-6.
[151] Closing and Takeover Protocol, Exhibit CF-4, at Article 2.4.3.
[152] Closing and Takeover Protocol, Exhibit CF-4, at Article 2.4.3.

234.    The second issue is whether the amount of 20 million is understood to be a minimum or maximum.  The Claimants suggest the latter, noting that the amount "is only a credit, not a mandatory minimum,"[153] and that "[Clause] 1.1 of the MSA […] only envisages a *right* to a credit, not some mandatory minimum."[154]  However, Clause 2.4 requires that "the Seller [i.e. Pikaro] ***shall guarantee*** to the Buyer [i.e. the Company] *a credit* amounting to USD 20,000,000.- (in words: twenty million US dollars) […]."[155]  Accordingly, in the Tribunal's view, this means that this was the minimum amount of credit that Pikaro was required to make available to the Company.  It was, however, for the Company to determine whether or not it wished, at any particular point in time, to utilise the full amount of the credit that was to be made available.  It is possible to envisage situations in which the Company would not wish to utilise the credit.  For example, there was a ramp-up period in the initial phase of the RMA, and neither party expected that the full amount of USD 20,000,000 credit would be utilised immediately, even though it was potentially available.  However, apart from the ramp-up period, there was no evidence which indicated that the Company did not wish to use the full 20 million credit during the currency of the RMA.

235.    In sum, the Tribunal finds that Clause 2.4 of the RMA requires that Pikaro provide the Company with a credit or financing line of at least 20 million in form of the Deferred Payment conditions, discussed above.

(2)    Method of Calculation

236.    The Parties are also in dispute as to how to calculate the Credit amount and have provided extensive submissions and evidence on this point.[156]

237.    In essence, the main disagreement between the Parties is whether the appropriate method of calculation is to take into account only Pikaro's receivables under the RMA (the "**Gross Financing Approach**") or the overall financial position between Pikaro and the Company, looking at other contracts entered into between them (the "**Net Financing Approach**").

---

[153] CPHB, at para. 87.
[154] CSub2, at par 52.a (emphasis in the original).  See also PK1, at para. 38
[155] RMA, Exhibit CF-6 (emphasis added).
[156] Claimants: SoR, at paras 52-53.3; CSub1, at paras 75-80; CSub2, at paras 51-52; CPHB, at paras 81-91; PK1, at paras 35-46; PV, at paras 39-42; PK2, at paras 45-53; PV2, at paras 17-38; FI Report, at paras 4.1-4.35. Respondents: RSub1, at paras 74-82; RSub2, at paras 51-65; RPHB, at paras 19-43; BM2, at paras 21-26; AQ1 Report, at paras 58-97; AQ2 Report, at paras 35-51, 71-85.

238.   Indeed, as detailed above,

    a.   on 22 April 2015, Pikaro and the Company entered into the RMA which deals with the supply of raw materials to the Company; and

    b.   on 21 May 2015, Pikaro and the Company entered into the Pikaro Sales Contract according to which Pikaro, as an agent, sells the Company's products to end-producers.[157]

239.   According to the Claimants, the Gross Financing Approach is the appropriate method of calculation.[158]   The Claimants do not agree with the Respondents' attempts to take into account receivables from the Pikaro Sales Contract: they argue that this "confuse[s] two totally different things" because the RMA and the Pikaro Sales Contract are different contractual relationships.[159]

240.   According to the Respondents a form of Net Financing is the appropriate approach.[160] Among other things, the Respondents argue that

    a.   the Gross Financing Approach artificially isolates the RMA from the overall Pikaro/Company financial relationship and is therefore "completely unfounded and divorced from reality;"[161]

    b.   Pikaro and the Company entered into several set-off agreements which show that they "did not consider the two arrangements [i.e. the RMA and the Pikaro Sales Contract] to be separate and unrelated;"[162] and

    c.   the two arrangements were connected since "the claims of Pikaro towards end-buyers for [the Company]'s products were utilized to obtain means to finance [the Company]."[163]

241.   The Respondents also refer to an "effective gross financing" approach which is calculated, according to the Respondents' expert as a Gross Financing Approach "decreased

---

[157] See above at para. 147.
[158] CSub2, at paras 51-52; CPHB, at paras 67-85. See also PV1, at paras 48-50; PV2 at paras 22-28.
[159] CSub1, at para. 77; CSub2, at paras 51, 53; CPHB, at paras 67-85.
[160] RSub1, at paras 78-82; RSub2, at paras 57-63; RPHB, at paras 19-37. See also BM2, at para. 26.
[161] RSub1, at para. 78.
[162] RSub2, at para. 59.
[163] RSub2, at para. 60.  See also PK1, at para. 40.

by the amounts of Pikaro's accounts payables due."[164]   However, as the Respondents' expert explained at the Hearing, the "effective gross financing" approach is another form of net financing:

> "MR JACOBS:  Can I just ask something?  On your effective gross financing, that does involve a netting-off of amounts owed one way against amounts owed the other way.
> A:  That's correct.  Yes.
> MR JACOBS:  I am just a bit puzzled, why is it gross financing?  Why isn't that a species of net financing? Is there something about --
> A:  That is a very good question.  I would like to feel I came up with the term, but the term was defined to me about what needed to be done and that was the term that was given to me so I would like to say I came up with it and I made it up but I am afraid that wasn't the case, so the key thing is you are quite right, it is about understanding the netting-off between the payables and the receivables due date, so you are right on that point.  I would say, and I agree with you, *it is probably more of a net -- it is probably in the camp of the net calculation*."[165]

242.   The Tribunal finds with the Claimants on this point.  The Tribunal is unconvinced that any form of Net Financing (including "effective gross financing") is required under Clause 2.4. of the RMA.

243.   First, this clearly results from the provisions of the RMA itself.  According to Clause 2.4. of the RMA the Credit was to be provided "in form of 60 days deferred payment conditions"[166] on the "Goods", with are defined as "raw materials […] produced by the Producer and delivered by the Seller [i.e. Pikaro] […]."[167]  Accordingly, it is clear from the provisions of the RMA that the Credit is to be calculated on the basis of the raw materials delivered under the RMA from Pikaro to the Company.  The RMA does not refer to the fact that the Credit should be calculated taking into account receivables from other contractual arrangements (such as the Pikaro Sales Contract) or the overall financial position between the Parties.

---

[164] AQ2 Report, at para. 76.
[165] Transcript Day 3, 168:7-24.
[166] RMA, Exhibit CF-6.
[167] RMA, Exhibit CF-6, p. 2.

244.     Second, the Tribunal notes that at the time the RMA was entered into (i.e. April 2015), the Pikaro Sales Contract did not exist yet: it was only negotiated and entered into one month later (i.e. May 2015).  At that later moment in time, the Service Provider suggested that the Company could sell its products to the end costumers via Pikaro so that it could benefit from more favourable financing conditions.  Mr Boris Milosevic testified at the Hearing to this effect:

> "*Sometimes in May, end of May, June*, Pikaro suggested, Mr Kamaras, Pikaro, HPK, suggested that, basically, because of the practical limitations and issues with respect to factoring of the receivables that Železarah as towards foreign suppliers, foreign customers in Serbia, that basically we transfer a part of them, which are on deferred payment terms, to Pikaro in order for Pikaro to utilize their own credit lines in Unicredit, Slovakia, and as a result of that, to be able to faster collect cash with that collection of cash to purchase even more inventories at the better and favourable conditions […]."[168]

245.     The Parties anticipated this to be a temporary solution, as again Mr Boris Milosevic testified at the Hearing:

> "On that discussion, on those Supervisory Board, I remember I clearly said to everyone that basically this is a *temporary solution* for until Železara opens its own subsidiary abroad, and that is how we all understood each other."[169]

246.     It is therefore unconvincing that in the RMA, entered into at a time when the Pikaro Sales Contract did not even exist, the parties agreed to include receivables from that Pikaro Sales Contract in the calculation of the Credit terms.

247.     Once the Pikaro Sales Contract was entered into, and once it became apparent that it would not be a temporary solution, as initially planned, but a long-term arrangement, the Respondents could have sought to re-negotiate the definition of Credit under the RMA. There is no evidence before the Tribunal that such renegotiation took place.

248.     The Tribunal notes in this context that Mr Boris Milosevic seems to suggest that Mr Peter Kamaras accepted a Net Financing Approach at a meeting that took place on 24 January 2016.  In his first witness statement, Mr Kamaras stated:

> "Finally, in January 2016, Mr. Kamaras openly verbally stated on the meeting held on Sunday 24 January 2016 in KPMG offices on which Mr. Ivica Kojic, Mr. Bojan

---

[168] Transcript, Day 3, 11:9-20 (emphasis added).
[169] Transcript, Day 3, 11:22-12:1 (emphasis added).

Bojkovic, Mr. Nenad Mijailovic, Mr. Milun Trivunac and myself attended that he is unable to provide this financing to Zelezara as envisaged by the MSA."[170]

249.    He also noted in his second witness statement:

"I always go back to 24th January 2016 when Mr. Kamaras admitted to the close audience that he does not have the necessary USD 20 million of financing to provide to Zelezara."[171]

250.    At the Hearing, he testified in cross examination as follows:

"Pikaro said on 24 January 2016 to Mr Ivica Kojic, Chief of Staff of the Prime Minister, Mr Nenad Mihailovic, State Secretary in the Ministry of Finance, Mr Milan Trivunac, Assistant Minister in the Ministry of Economy, Mr Bojan Bojkovic, member of Supervisory Board of Železara and to myself, a member of Supervisory Board of Železara, that he does not have a possibility to be in a position that 20 million net exposure is towards him, that he cannot return those receivables, and that he cannot have 20 million of financing towards us.  That is what he said on the 24th."[172]

251.    While the Tribunal notes that there is no corroborative evidence that Mr Kamaras made those statements, in any event, the Tribunal is not satisfied that such a remark could result in a change of the definition of Credit in the RMA which, as stated above, only takes into account the raw materials and receivables under this agreement.[173]

252.    In sum, the Tribunal is therefore satisfied that the correct approach to calculate the Credit amount under the RMA is a Gross Financing Approach.

(3)    Breach of Credit

253.    Having determined that the Gross Financing Approach is the correct approach to calculate the Credit amount pursuant to Clause 2.4 RMA, the Tribunal now needs to determine whether the Credit was breached.

254.    As a preliminary remark, the Parties are in agreement that there has to be some flexibility at the initial stages of the RMA.  An initial 'ramp-up' period was necessary since the Credit was to be provided in form of the 60 days Deferred Payment conditions, as discussed above.[174]  As explained by Mr Kamaras:

---

[170] BM1, at para. 19.
[171] BM2, at para. 26.
[172] Transcript, Day 4, 42:3-13.
[173] See above at para. 243.
[174] See above at para. 234-235.

"In fact, credit of over $20 million was provided beginning in August 2015 after the *initial ramp-up* and then throughout the relevant period apart from November 2015 when it fell slightly below due to the lessening of orders."[175]

255.   This was also confirmed by Mr Boris Milosevic at the Hearing:

"We have understood quite clearly that it *cannot be 20 million on Day 1* that you pool and receive the inventories, raw materials, in the value of that, that *it will take time* for the goods, for the raw materials to arrive to Smederevo, and for them to be put into the Production."[176]

256.   However, the Parties are in disagreement as to the times when the Credit was met or breached:

a.      according to the calculations of the Claimants' expert, the Credit was breached at certain times in 2015, but not since December 2015;[177] and

b.      according to the calculations of the Respondents' expert, the Credit was breached at times, but not in January/February and May/June 2016.[178]

257.   The Tribunal notes that it has reservations on both experts' calculations.

258.   On the one hand, the Respondents' expert did not include in its calculation any In-Transit Time.  As noted above, such time was not included in his calculation of the Deferred Payment,[179] and consequently also not in the calculation of the Credit in form of Deferred Payment.[180]  Mr Qureshi confirmed this at the Hearing:

"THE CHAIRMAN:  Before we move on, just really to clarify,
I think it is very clear from this outline or timeline,
*when you referred to shipment date, you always referred
to shipment date by Pikaro to Železara to the company*.
A: *By Pikaro to Železara.  Yes.*
Okay, in terms of the comparison of the two
*financing periods*, just to make it very clear, in terms
of what our start and end date is, I was saying, or
*I was instructed to assume that it was a shipment date*
compared to Mr Ilett saying the date of Pikaro's
pre-payment, the end date I say is, or have been

---

[175] PK2, at para. 45.
[176] Transcript, Day 3, 9:7-12 (emphasis added).
[177] FI Report, at para. 4.24; Claimants' Expert presentation at the Hearing, slide 11.
[178] AQ1 Report, at paras 75, 76; AQ2 Report, at para. 84; Respondents' Expert presentation at the Hearing, slide 13.
[179] See above, at para. 211.
[180] AQ1 Report, at para. 34; AQ2 Report, at para. 31; Respondents' Expert presentation at the Hearing, slide 16.

> instructed to assume payment due date compared to
> Mr Ilett's date of invoice settled."[181]

259.    However, since the Tribunal found above that the Deferred Payment period includes the In-Transit Time, such In-Transit Time must also be included in the calculation of the Credit (provided in form of the Deferred Payment).

260.    On the other hand, while the Claimants' expert included the In-Transit Time, he did so on the basis of an assumption that this In-Transit Time would be 21 days.[182]  As discussed above, Mr Illet could not independently verify this assumption and admitted at the Hearing that it was wrong.[183]  There is also some unclarity as to whether all categories included by Mr Illet in his calculations are indeed goods ordered by, or in transit to, the Company (via Pikaro).[184]

261.    Irrespective, however, of the Tribunal's comments as to the calculations provided by the Parties' experts, the Tribunal is satisfied that even on the Respondents' calculations[185] (and in any event on the Claimants' ones[186]) the Credit was met in June 2016.  Indeed, under any given gross financing approach, the Credit was above 20 million in June 2016, as illustrated by Mr Qureshi at the Hearing:[187]

---

[181] Transcript, Day 3, 166:4-16 (emphasis added).  See also Transcript Day 4, 170:3-171:5.
[182] FI Report, at para. 3.16.
[183] See above, at para. 212.
[184] FI Report, at para. 4.18; Transcript Day 4, 154:25-156:24.
[185] AQ1 Report, at paras 75, 76; AQ2 Report, at para. 84; Respondents' Expert presentation at the Hearing, slide 13.
[186] FI Report, at para. 4.24; Claimants' Expert presentation at the Hearing, slide 11.
[187] Respondents' Expert presentation at the Hearing, slide 16.



262.    Accordingly, at the time when the Respondents filed the Second Termination Notice on 25 June 2016, there was no breach of the Credit requirement under Clause 2.4 RMA, and thus also no material breach of the Deferred Payment condition under Clause 2.6 RMA.

263.    It is however that moment in time that is relevant under Clause 8.1.2 of the MSA to assess whether a material breach of the RMA occurred and thus justifies a termination of the MSA. Indeed, Clause 8.1.2 MSA clearly provides that "[t]he RoS and/or the Company may (but shall not be obligated to) terminate this Agreement […] *upon the occurrence and during the continuance of any of the following events*: […] if the Raw Materials Agreements […] are terminated or breached in any material manner by a respective supplier […]."[188]

264.    The Respondents' counterarguments on this point are not convincing.

265.    The Respondents argue first that the requirement "upon the occurrence and during the continuance of" only applies to Clause 8.1.1 (which provides for a correction time) and not to Clause 8.1.2 (which provides for a termination with immediate effect).[189]

266.    This interpretation, however, is not supported by the language of Clause 8.1 of the MSA which makes no such distinction; instead the requirement "upon the occurrence and

---

[188] MSA, Exhibit CF-3.
[189] RPHB, at paras 108-111.

during the continuance of" is found in the introduction of Clause 8.1 and thus applies irrespectively to everything that follows, i.e. Clause 8.1.1 and 8.1.2:

> "8.1 The RoS and/or the Company may (but shall not be obligated to) terminate this Agreement by a notice to the Service Provider and the Bidder upon the occurrence and ***during the continuance of any of the following events***:
>
> 8.1.1 the Service Provider or Consultants or members of the Supervisory Board nominated by the Service Provider as applicable, fail to comply with any of their material obligations in this Agreement (including fulfilment of the KPIs as set out by the Business Plan or other obligations set out by the Business Plan and/or any other strategic documentation) and do not correct such failure within 120 (one hundred twenty) days of the date of a notice requiring correction from the non-defaulting Party;
>
> 8.1.2 if the Raw Materials Agreements cease to be valid and legally binding before the expiration of third anniversary of the Closing or the Raw Materials Agreements are terminated or breached in any material manner by a respective supplier;
>
> in which cases the Company shall not be obliged to pay neither the Termination Fee nor the Privatization Bonus to the Service Provider and will retain the right on indemnification from the Service Provider and/or the Bidder for of all damages suffered."[190]

267.    The Respondents further argue that the Serbian version of the MSA would lead to a different interpretation since the Serbian version:

> "makes it clear that the termination may be made where there is *"occurrence or continuation" (in Serbian: 'nastupanja ili trajanja').* Given that the transaction lawyers who drafted this document were all Serbian,166 Serbian text is a 'hidden anchor language' of the contract – the native language of its drafters. Therefore, it is relevant and useful interpretation tool for any ambiguities which might arise in respect of the nominally prevailing English text."[191]

268.    However, as just shown above, there is no ambiguity in the English text of Clause 8.1.2 of the MSA.  Therefore, pursuant to the language provision in Clause 15.3.1 of the MSA, the English version prevails in case of discrepancy or inconsistency:

> "This Agreement has been executed in Serbian and English language. ***In case of any discrepancy or inconsistency between these two versions, the English version shall prevail.***"[192]

---

[190] MSA, Exhibit CF-3 (emphasis added).
[191] RPHB, at para. 112.
[192] MSA, Exhibit CF-3 (emphasis added).

269.    In light of the above, the Tribunal finds that at the relevant moment in time, i.e. on 25 June 2016, no material breach of the RMA existed that could have triggered a termination of the MSA with immediate effect according to Clause 8.1.2 of the MSA.

### 3.    Other Breaches of the MSA

270.    The Respondents further allege a number of other breaches as bases for the Second Termination Notice.  According to the Respondents, the Claimants:

> a.    failed to maintain the required level of net working capital of 80 million for the Company pursuant to Clause 3.1.5 of the MSA (the "**New Working Capital**" issue);[193]
>
> b.    failed to fulfil the requirements in relation to related party arrangements pursuant to Clause 4.2 of the MSA (the "**Related Party Arrangement**" issue);[194]
>
> c.    failed to fulfil the requirement of a professional insurance indemnity pursuant to Clause 2.3.7 of the MSA (the "**Professional Insurance**" issue);[195]
>
> d.    breached their non-competition obligations pursuant to Clause 11 of the MSA (the "**Non-Competition**" issue);[196]
>
> e.    failed to provide the required skilled managers for the Company (the "**Managers**" issue);[197] and
>
> f.    obstructed the privatisation and closing of the Privatisation Agreement (the "**Obstruction of Privatisation**" issue).[198]

271.    The Claimants contest that any of these breaches occurred.[199]  In any event, according to the Claimants, a 120 days correction period would have been necessary pursuant to Clause 8.1.1 MSA.[200]

272.    The Respondents in turn argue that the 120 days correction period was unnecessary and that they could terminate the MSA with immediate effect according to Article 127 of the Serbian Law of Obligations (the "**LO**").[201]

---

[193] SoD, at paras 49-63; RSub1, at paras 48-70; RSub2, at paras 78-88; RPHB, at paras 44-52.
[194] SoD, at paras 73-74; RSub1, at paras 88-94; RSub2, at paras 89-95.
[195] SoD, at paras 75-79; RSub1, at paras 99-100; RSub2, at para. 96.
[196] SoD, at paras 80-83; RSub1, at paras 95-98; RSub2, at paras 97-99.
[197] RSub1, at paras 102-106; RSub1, at paras 102-106; RSub2, at paras 100-102.
[198] SoD, at paras 37-48; RSub1, at paras 20-47, 101; RSub2, at paras 74-77; RPHB, at paras 53-74.
[199] SoR, at paras 9.4-46; 55-75; CSub1, at paras 84-95, 109-150; CSub2, at paras 23-48, 62-107; CPHB, at paras 25-51, 93-118.
[200] SoR at para. 66, 75; CSub1, at paras 24, 96-108; CSub2, at para. 112; CPHB at para. 21.
[201] SoD, at paras 89-100; RSub2, at paras 68-72; RPHB, at paras 84-104.

273.    The Tribunal will address the 120 days correction period in Clause 8.1.1 MSA, and whether Article 127 LO allows immediate termination instead, before looking at the alleged breaches in turn.

a)      120 Days Correction Period (Clause 8.1.1 MSA)

274.    Clause 8.1.1 of the MSA provides as follows:

> "The RoS and/or the Company may (but shall not be obligated to) terminate this Agreement by a notice to the Service Provider and the Bidder upon the occurrence and during the continuance of any of the following events: [...]
>
> the Service Provider or Consultants or members of the Supervisory Board nominated by the Service Provider as applicable, fail to comply with ***any of their material obligations in this Agreement*** (including fulfilment of the KPis as set out by the Business Plan or other obligations set out by the Business Plan and/or any other strategic documentation) ***and do not correct such failure within 120 (one hundred twenty) days of the date of a notice requiring correction from the non-defaulting Party***."[202]

275.    It is thus clear from the simple language of Clause 8.1.1 that any termination of the MSA based on a breach of "material obligations" therein requires that (i) the non-defaulting party send a "notice requiring correction;" and (ii) the defaulting party does not correct the default within 120 days from such notice.

276.    It is undisputed that the Respondents did not send a notice requiring correction, and in any event not before the Second Termination Notice.  Rather, the Respondents argue that they did not have to wait for the 120 days correction period to end, but could terminate the MSA with immediate effect according to Article 127 LO,[203] discussed in the next section.

b)      Immediate Termination (Article 127 LO)

277.    Article 127 LO provides as follows:

> "A party to an agreement may terminate the agreement without leaving the debtor a subsequent time limit for performance, should the ***debtor's conduct*** indicates (sic) that it ***will not perform his obligation even during the course of subsequent time limit***."[204]

278.    The Respondents make, among other things, the following submissions:

---

[202] MSA, Exhibit CF-3 (emphasis added).
[203] SoD, at paras 89-100; RSub1, at paras 109-113.
[204] Article 127, Exhibit RL-3.

"Article 126 of the Law on Obligations stipulates that, as a rule, *a creditor wishing to terminate an agreement must provide appropriate subsequent period for the debtor to perform*. However, this general rule is subject to three exceptions.

Two exceptions deal with situations where timely performance is key. First, no additional time period need be given where the contract sets a deadline for performance of an obligation and it is evident that one party will not fulfil it (Article 128 of the Law on Obligations). Second, where timely performance is an essential element of the contract, expiration of deadline rescinds the contract automatically, unless creditor opts to keep it afoot (Article 125 of the Law on Obligations).

The third *exception*, Article 127 of the Law on Obligations, deals with obligations where deadline for performance was either not set or its observance is not of essential nature. Even in such situations, a party is nevertheless *entitled to terminate the agreement without leaving an additional period to the debtor, if one can conclude from the debtor's behavior that it will not fulfill its obligation even if given subsequent period to perform*. The purpose of this article is to *dispense of the need to give additional period where giving it would be useless*."[205]

279.    The Respondents also refer to the following commentary:

"It seems to us that there is space for a broad interpretation of [Article 127 LO]. Debtor's conduct may be such that it has explicitly stated that it would not perform the contract. However, even in cases when it can be inferred from debtor's certain conduct that it would not perform the contract, creditor is not obliged to leave it the appropriate subsequent time limit, but can instead terminate the contract by a simple statement without leaving such a time limit. Therefore, debtor's conduct should be understood so as to include its direct actions – a statement by which it declines the contract performance, as well as its indirect actions, by which its intention not to perform the contract can be established in a certain manner. By the same token, *it would suffice to establish that the debtor is unable to perform the contract within the appropriate subsequent time limit*."[206]

280.    The Claimants make, among other things, the following submissions on this point:

"On 127, […] The material demonstrates the principle that if a breach or prospective breach is not so serious that it deprives the creditor of the purpose of the contract, it cannot be grounds for termination. This is established by Perovic Commentary […]. So for 127, the prospective breaches which the debtor's conduct make obvious must be so serious as *to prevent achievement of the purpose of the contract within a reasonable deadline for performance* […]. To use another phrase, the prospective breaches must go to the root of the contract. 131's rule that insignificant breaches cannot justify termination is not exhaustive: many breaches that are more than insignificant will not be enough under 127. This is consistent with principle. Serbian law aims to preserve contracts and permitting termination for breaches which were not so serious that they defeated the purpose of the contract, nor fundamental, would

---

[205] RPHB, at paras 86-88 (footnotes omitted, emphasis added). See also RSub1, at paras 107-113; RSub2, at para. 77.
[206] Borislav Blagojević, Vrleta Krulj "Commentary of the Law on Obligations", Book I, Savremena Administracija, 1983 Belgrade, Article 127, Exhibit RL 14 (emphasis omitted and added).

contradict this policy. (3) ***Uncertainty as to whether the debtor will perform is not enough: this must be obvious from his conduct*** […]. (4) Termination is not possible under 127 where the 120 day notice provision which the parties have agreed in 8.1.1 can and should be used (outside e.g. refusal to perform with insufficient time available to give notice)."[207]

"So the correct analysis is that in the main Perovic commentary (1995) […]: to justify termination the breach must be so serious as to ***undermine the purpose of the contract***: in effect it must be fundamental; partial performance which yields."[208]

281.    In light of the above, the Tribunal finds that on the essential points the interpretation of Article 127 LO is clear.

282.    First, Article 127 LO constitutes an exception to the general rule in Article 126 LO that a party who wishes to terminate an agreement must provide an "appropriate subsequent period" for the debtor to perform, i.e. to correct the non-performance (the "**Correction Period**").  In the present case, the Parties agreed in Clause 8.1.1 of the MSA that this "appropriate subsequent period" or Correction Period would be 120 days.

283.    Second, a party may exceptionally terminate an agreement with immediate effect, i.e. without a Correction Period.  Article 127 uses the terms "without leaving the debtor a subsequent time limit for performance."[209]  This exception applies if "the ***debtor's conduct*** indicates that it will not perform his obligation even ***during the course of subsequent time limit***."[210]  Article 127 LO therefore makes clear that one needs to (i) look at the debtor's conduct; and (ii) assess whether the debtor would perform the contract during the "subsequent time limit."  That "subsequent time limit" is the Correction Period, i.e. the time limit the debtor would normally have been given to correct the non-performance.  Indeed, a Correction Period is unnecessary if "the debtor's conduct indicates that it will not perform his obligation" during such time.  In sum, as stated by the Respondents, "[t]he purpose of this article is to dispense of the need to give [an] additional period where giving it would be useless."[211]

284.    Having thus determined the relevant legal standard, the Tribunal will now assess the Respondents' conduct, looking at the alleged breaches in turn.

---

[207] CPHB, at para. 53 (footnotes omitted, emphasis added).
[208] CPHB, at para. 54(c) (footnotes omitted, emphasis added).
[209] Article 127 LO, Exhibit RL-3.
[210] Article 127 LO, Exhibit RL-3 (emphasis added).
[211] RPHB, at para. 88.

c)      Net Working Capital (Clause 3.1.5.1 MSA)

285.   Clause 3.1.5.1 of the MSA provides as follows:

"The Service Provider commits: [...] to at all times keep the Net Working Capital of
the Company not lower than USD 80,000,000 (eighty million dollars)."[212]

286.   'Net Working Capital' is defined in the MSA as:

"Current Assets reduced by all:

(a) liabilities to domestic or foreign suppliers for purchases of any goods, assets or
services;

(b) liabilities to banks or other institutions for working capital loans, maintenance
loans, capital expenditure loans, leases, overdrafts, etc.;

(c) liabilities to government for unpaid taxes, contributions, custom duties or any
other fiscal liabilities;

(d) liabilities to employees for salaries, bonuses and any other remunerations
(excluding employee benefits calculated under IAS 19);

(e) accrued expenses;

(f) liabilities to customers for advance payments received."[213]

287.   It is common ground between the Parties that the Net Working Capital of the
Company has been below 80 million since October 2015.[214]  Notwithstanding, the Claimants
argue that Article 3.1.5.1 of the MSA was not breached because, according to the Claimants,
the drop of the Net Working Capital was due to (i) an event of *vis major*[215] – an argument that
the Claimants later withdrew;[216] (ii) the Respondents' misrepresentations about the
Company's financial information when the Parties entered into the MSA;[217] and (iii)
subsequent conduct of the Respondents.[218]

288.   The Tribunal is of the opinion that it need not decide these points.  Even assuming a
breach of 3.1.5.1 of the MSA (since it is established that the 80 million threshold was not
met), the Tribunal finds that such breach would not lead to a termination with immediate

---

[212] MSA, Exhibit CF-3.
[213] MSA, Clause 1.1, Exhibit CL-3.
[214] SoC, at para. 55.1; RPHB, at para. 92.
[215] SoC, at para. 55.2.1; SoR, at paras 30-34.
[216] CSub1, p. 34, at footnote 10.
[217] CSub1, at para. 92; CSub2, at paras 71-81; PK1 47; PV1 12-36, 57-5.
[218] CSub1, at para. 93; CSub2, at paras 82-84; PV1 58, 66-67.

effect.  Indeed, the Tribunal finds that, regarding the New Working Capital, it is not established that the Claimants' conduct was such that it would not perform the contract during the "subsequent time limit."

289.    First, the Claimants' witnesses have testified that, if requested, there could have been several ways to address the New Working Capital:

> "A shareholder capital contribution (taking no more than one week);
>
> A pledge of the fixed and current assets of the business in order to secure a long-term loan from a commercial bank ([...], which would have taken c. 90 days);
>
> Securing from HeSteel a long-term advance payment (either to the Company or to the supplier) for the purchase of raw materials (taking between 30 and 60 days provided all approvals were given); and
>
> Balance sheet adjustments of payment terms for the purchase of raw materials and the sale of end products – payment terms for raw materials delivered by Pikaro could have been extended to 370 days, with the effect that the payables would have been reclassified in the Company's accounts as long-term (and hence not forming part of the calculation of NWC). At the same time, payment terms for end products purchased by Pikaro from the Company could have been extended to 355 days (hence the receivables would remain current assets and form part of the calculation of NWC). This would have taken c. 60 days depending on the actual raw material flow.[219]

290.    Second, as discussed above, the purpose of Article 127 LO was to provide an exception to the normal requirement of a Correction Period if it became clear, from the debtor's conduct, that such Correction Period was useless because the debtor would not perform.[220]  As also noted above, in the present case, the Parties agreed on a Correction Period of 120 days.[221]  At the time when the Second Respondent filed the Second Termination Notice, i.e. on 25 June 2016, the MSA had only 5 more days to run, i.e. until 30 June 2016, because of the First Termination Notice.[222]  Under these circumstances, there is no purpose to apply Article 127 LO, which is to allow a party to forego the agreed 120 days Correction Period, if it is clear that the other party would not perform the contract during that time. Here, the performance of the MSA became moot after only 5 days due to its termination on the basis of the First Termination Notice, and the issue of non-performance during the 120 days Correction Period is thus irrelevant.

---

[219] PV1, at paras 66.1-66.4.
[220] See above at para. 283.
[221] See above at para. 282.
[222] See above at paras 166-167.

291.    Third, the Respondents' counterarguments on this point are inapposite.[223]  In particular, the Respondents' argument that the New Working Capital threshold had not been met since November 2015 cannot justify a different conclusion.  Quite to the contrary, because the Respondents were aware since November 2015 that the New Working Capital was below the 80 million threshold, there was no reason or new development that would justify invoking the exception of Article 127 LO only days before the end of the MSA.

292.    In light of the above, the Tribunal finds that the drop in the New Working Capital, even assuming it constituted a breach of Article 3.1.5.1 of the MSA, could not justify a termination with immediate effect by the Second Termination Notice.

#### d)    Related Party Arrangements (Clause 4.2 MSA)

293.    It is undisputed amongst the Parties that the Company, in June 2015, entered into a contract with GLS Steel Distributors Ltd ("**GLS**") which is ultimately owned by two individuals (Mr Nasser and Mr Fruchter) who also hold a 20% participation in the First Respondent.[224]

294.    The Respondents argue that GLS was a "Related Party" pursuant to the MSA and that the Claimants should have used the required approval mechanism under Clause 4.2 of the MSA.[225]

295.    According to the Claimants, among other things, (i) at the time the Company entered into the contract with GLS, Mr Nasser and Mr Fruchter had not yet acquired any stake in the First Respondent (this only occurred in September 2015); (ii) it was public knowledge that Mr Nasser and Mr Fruchter held a participation in the First Respondent; and (iii) the contact with GLS was not a "Related Party Arrangement" within the meaning of the MSA.[226]

296.    Clause 4.2. of the MSA provides as follows:

> "The Service Provider recognises that Related Party Arrangements need to be effected on a transparent, arm's length basis and in the best interests of the Company and the Service Provider hereby agrees that, prior to effecting any Related Party Arrangement, the Service Provider shall:

---

[223] RSub1, at para. 110; RPHB, at para. 91.
[224] SoR, at paras 56.1-56.3; SoD, at paras 73-74; RSub1, at paras 88-94; RSub2, at paras 89-95.
[225] SoD, at paras 73-74; RSub1, at paras 88-94; RSub2, at paras 89-95.
[226] CSub1, at paras 122-128; CSub2, at paras 89-94.  PK1, at paras 8-81, 100; PK2, at paras 54-57.

[4.2.1] provide full disclosure of and provide all supporting documents relating to such Related Party Arrangement to the Supervisory Board.

[4.2.2] obtain the co-signature of the OFGR (such co-signature not to be unreasonably withheld or delayed); and

[4.2.3] check whether there are any legal or regulatory requirements that might prevent such arrangements, generally or only in certain territories or circumstances, notify the Supervisory Board of the existence of any such requirement. The Service Provider shall not enter into any such agreement before the said requirements are met."[227]

297.   Moreover, there are several definitions in Clause 1.1 of the MSA that are relevant.

298.   "Related Party Agreement" is defined as:

"any arrangement, transaction or agreement (or any modification of any arrangement, transaction or agreement) involving the Company or any subsidiary or any other Affiliate thereof or the business or properties thereof, on the one hand, and the Service Provider or any Affiliate or the business or properties thereof (whether as a party thereto or receiver or provider of any accommodation, consideration, goods or services), on the other hand."[228]

299.   "Affiliate" means:

"in relation to any person be it legal entity or natural person, (a) any other person directly or indirectly Controlling or Controlled by or under common Control with, such a person, or (b) any (i) Officers, Officer, trustee or beneficiary of such a person, (ii) spouse, parent, sibling or descendant of any person described in (i) or spouse, parent, sibling or descendant of the person directly or indirectly Controlling, or which is under common Control with, such person, and (iii) any trust (or its equivalent under any Governing Law) for the benefit of any person described in (i) and (ii)."[229]

300.   "Control" is defined as:

"directly or indirectly, whether through the ownership of shares/stake, by contract or otherwise (i) the right to have the majority of the voting rights exercisable at a shareholders meeting (or its equivalent) of the person concerned or (ii) the right to appoint, and/or remove and/or direct/procure the decision making process of other corporate bodies (including but not limited to, supervisory boards, managing boards or equivalent thereof of the person concerned), and the terms "Controlled" and "Controlling" shall be construed accordingly."[230]

301.   In light of the above, the Tribunal hold as follows.

---

[227] MSA, Exhibit CF-3.
[228] MSA, Clause 1.1, Exhibit CL-3.
[229] MSA, Clause 1.1, Exhibit CL-3.
[230] MSA, Clause 1.1, Exhibit CL-3.

302.    First, the fact that Mr Nasser's and Mr Fruchter's participation in the First Respondent
was allegedly a matter of public knowledge is not determinative: the approval procedural
under Clause 4.2 of the MSA requires that the First Respondent "provide all supporting
documents relating to such Related Party Arrangement to the Supervisory Board" and does
not provide for an exception in case of public information.

303.    Second, the Claimants' argument that Mr Nasser and Mr Fruchter acquired their
participation only three months after the Company entered into the contract with GLS is
inapposite.  Otherwise, it would be easy to circumvent the approval procedural of Clause 4.2
of the MSA.

304.    Third, however, the Tribunal is not satisfied that the GLS contract qualifies as a
"Related Party Arrangement" in the sense of the MSA and thus that Clause 4.2 applies in the
case at hand.  According to Clause 1.1 of the MSA a "Related Party Agreement" is defined as
an "arrangement, transaction or agreement" between the Company on the one hand and the
"Service Provider [i.e. the First Claimant] or any Affiliate or the business or properties
thereof" on the other hand.[231]  The question is therefore whether GLS qualifies as an
"Affiliate" of the First Claimant.  "Affiliate" pursuant to Clause 1.1 of the MSA requires
some form of direct or indirect or common "Control."[232]  "Control" in turn is defined as "(i)
the *right to have the majority of the voting rights* exercisable at a shareholders meeting (or
its equivalent) of the person concerned or (ii) *the right to appoint, and/or remove and/or
direct/procure the decision making process of other corporate bodies* (including but not
limited to, supervisory boards, managing boards or equivalent thereof of the person
concerned)."[233]

305.    The Respondents have not established that Mr Nasser and Mr Fruchter have either a
majority of the voting rights in, or the right to procure the decision-making process of, the
First Claimant.[234]  In light of this, the Tribunal finds that it is not established that the contract
with GLS was a "Related Party Arrangement" in the sense of the MSA and thus required the
approval procedural of Clause 4.2 of the MSA.

---

[231] MSA, Clause 1.1, Exhibit CL-3.
[232] MSA, Clause 1.1, Exhibit CL-3.
[233] MSA, Clause 1.1, Exhibit CL-3 (emphases added).
[234] See e.g. RSub2 at para. 92 without supportive evidence.

e)      Professional Insurance (Clause 2.3.7 MSA)

306.    The Respondents argue that the First Claimant failed to provide a professional insurance indemnity pursuant to Clause 2.3.7 of the MSA.[235]  The Claimants deny such breach.[236]

307.    Clause 2.3.7 of the MSA requires that:

> "[t]he Service Provider has executed an agreement on professional insurance indemnity in a form approved by the RoS and the Company with minimum insurance coverage of EUR 5,000,000 (five million euros)."[237]

308.    It is undisputed between the Parties that the First Claimant provided an insurance policy for professional indemnity cover for the period from 20 April 2015 to 20 April 2016,[238] and that the policy was renewed for the period of 20 April 2016 to 20 April 2017.[239]

309.    The Respondents argue that the policies were not in accordance with Serbian insurance law since they were not issued by a Serbian-based insurance company.[240]  However, the evidence shows that the policy was indeed provided by a Serbian insurance company, namely Wiener Städtische A.D.O Belgrade.[241]

310.    The Respondents further argue that the second policy was never delivered to the Company, and that such non-delivery defeated the purpose of Clause 2.3.7 of the MSA.[242]

311.    The Tribunal is not satisfied that the non-delivery of the insurance policy constitutes in and of itself a breach of Clause 2.3.7 of the MSA, which does not refer to any delivery obligation.  In any event, even assuming such alleged breach of Clause 2.3.7 of the MSA, the Respondents did not establish how the Respondents' conduct would justify, pursuant to Article 127 LO, foregoing the 120 days Correction Period under Clause 8.1.1 of the MSA: if requested, the Company could have delivered the policy within 120 days.

---

[235] SoD, at paras 75-79; RSub1, at paras 99-100; RSub2, at para. 96.
[236] SoR, at paras 58-59; CSub1, at paras 129-139; CSub2, at para. 106.
[237] MSA, Exhibit CL-3.
[238] Insurance Policy, Exhibit CF-20.
[239] Insurance Policy, Exhibit CF-21.
[240] SoD, at para. 78.
[241] Insurance Policy, Exhibit CF-21, at p. 8.
[242] RSub1, at para. 100; RSub2, at para. 96

f)      Non-Competition (Clause 11 MSA)

312.    The Respondents further allege that the First Claimant and Mr Peter Kamaras breached their Non-Competition obligations pursuant to Clause 11 of the MSA in their contacts with HeSteel.[243]  The Claimants deny these breaches.[244]

313.    Clause 11 of the MSA provides that:

> "The Service Provider and the Bidder [i.e. the Claimants] hereby undertakes for the benefit of the other Parties that, during the Term of this Agreement, the Service Provider, the Bidder as well as members of the Supervisory Board nominated by the Service Provider and the Consultants, shall not, and shall procure that each of its Affiliates shall not, without the consent of the RoS:
>
> 11.1.1 carry on or be engaged or hold any direct or indirect interest in the issued share capital of any business that operates in the steel sector, and represents direct competitor of the Company regardless of the territory or jurisdiction;
>
> 11.1.2 provide any goods or services, or enter into, or have an interest in, any arrangement with any third party providing goods or services, in respect of any business that operates in the steel sector and represents direct competition of the Company, regardless of the territory or jurisdiction;
>
> 11.1.3 cause or permit any person directly or indirectly to do any of the foregoing acts or things in the name of or with the support of the Service Provider or the Bidder.
>
> 11.2 During a period of 2 (two) years after the termination of this Agreement, the obligations set out in this clause 11 shall continue to exist, but shall become limited to the European Economic Area."[245]

314.    The Respondents make the following submissions in this context.

315.    The Respondents note that they "do not contend that communication between HeSteel and the Claimants in the course of Privatization represents a breach of noncompetition duty."[246]  They add that "[d]ue to their role in Zelezara, Claimants had to enter into communication with HeSteel in order to facilitate the Privatization process."[247]

316.    However, the Respondents take issue with alleged "improper relations between the Claimants and HeSteel,"[248] namely the fact that the Claimants (i) sent a management proposal

---

[243] SoD, at paras 80-83; RSub1, at paras 95-98; RSub2, at paras 97-99.
[244] SoR, at paras 60-64; CSub1, at paras 140-146; CSub2, at paras 95-105.
[245] MSA, Exhibit CL-3.
[246] RSub2, at para. 98.
[247] RSub2, at para. 98.
[248] RSub2, at para. 98.

to HeSteel on 20 April 2016;[249] (ii) sent a draft management agreement to HeSteel on 28 June 2016;[250] and (iii) appeared at a meeting on 28 June 2016 alongside HeSteel.[251]

317.    In the Tribunal's view, none of these actions establish a breach of Clause 11.1 of the MSA that would justify a termination thereof on 25 June 2016.

318.    First, the meeting of 28 June 2016 took place *after* the Second Termination Notice of 25 June 2016.  Accordingly, anything that occurred during that meeting cannot justify the termination on 25 June 2016 with immediate effect, i.e. three days prior.

319.    Second, and similarly, the draft management agreement was sent by Mr Pavol Vrchovinsky to Mr Song on 28 June 2016, i.e. *after* the Second Termination Notice. Moreover, and in any event, in this draft agreement, the First Claimant offered its management services to HeSteel for the period following the privatisation, i.e. after 30 June 2016.  Indeed, the draft management agreement refers in the recitals to "[t]he closing of the transaction envisaged under the Asset Sale and Purchase Agreement" i.e. the closing of the Privatisation Agreement.[252]  Again, any action after 30 June 2016 cannot constitute a breach of the MSA that would justify its termination with immediate effect on 25 June 2016, i.e. five days prior.

320.    Third, the management proposal, dated 15 April 2016, and sent by Mr Kamaras to Mr Wang on 20 April 2016, concerns interim management services pending the closing of the privatisation on 30 June 2016.  In terms of the proposal, this concerns the relationship with the Company's "suppliers and customers", "employees", and "business partners", including preparing the "documents in compliance with Asset Sales and Purchase Agreement (ASPA) [i.e. the Privatisation Agreement]" in view of its closing.[253]  It is unclear how this could constitute a breach of Clause 11.1 of the MSA.  In any event, it appears from the evidence that the management proposal was not accepted by HeSteel and thus never came into effect.[254]  The Tribunal thus finds that the Respondents have not established that any of

---

[249] RSub1, at para. 98; RSub2, at para. 98; Email from Mr Kamaras to Mr Wong, dated 20 April 2016, attaching management proposal, dated 15 April 2016, Exhibit, RF-33.
[250] RSub1, at para. 98; RSub2, at para. 98; Email of Mr Pavol Vrchovinsky to Mr. Song, attaching drafts of agreements from 28 June 2016, Exhibit RF-32.
[251] SoD, at para. 83; RSub1, at paras 96-97; RSub2, at para. 99; EB, at para. 11; BM1, at para. 25.
[252] Exhibit RF-32, at p. 4
[253] Exhibit RF-33, at p. 37.
[254] PK1 61-62; PK2 62.

the Claimants' actions prior to 25 June 2016 would amount to the breach of Clause 11.1 of the MSA.

321.    The Tribunal notes, for the avoidance of doubt, that it does not have to decide whether the Claimants breached Clause 11.2 of the MSA *following* the termination of the MSA, because the question before the Tribunal is whether any breach of Clause 11.1 of the MSA would *justify* such termination.

g)   Managers

322.    The Respondents argue that the Claimants failed to provide the required skilled Managers for the Company.[255]  The Claimants deny this.[256]  However, the Tribunal notes that according to the Respondents, "the issues surrounding the managers appointed by HPK ***were not grounds for termination of the MSA***, and this was never alleged by the Respondents."[257] The Tribunal therefore finds that it does not have to address this issue in the context of the validity and effects of the Second Termination Notice.

h)   Obstruction of Privatisation

323.    Finally, the Respondents argue that the Claimants obstructed the Privatisation and closing of the Privatisation Agreement, including by (i) failing to provide or obtain waiver letters from the Company's customers, business partners and otherwise; (ii) obstructing the negotiation of utility contracts with the Company's suppliers; (iii) issuing certain bills of exchange; (iv) failing to secure the necessary level of raw materials for the steel production; and (v) failing to provide necessary information to HeSteel.[258]

324.    According to the Respondents, these actions constitute breaches of the Claimants' duty of care towards the Company pursuant to Articles 63 and 64 of the Serbian Companies Law, to which the Claimants must abide according to Clause 3.8.1.1 of the MSA.

325.    The Claimants deny that they obstructed the Privatisation process, and in any event that this would constitute a breach under the MSA or a valid basis for the Second Termination Notice.[259]

---

[255] RSub1, at paras 102-106; RSub2, at paras 100-102.
[256] SoR, at para. 9; CSub1, at paras 147-150; CSub2, at para. 107.
[257] RSub2, at para. 101.
[258] SoD, at paras 37-48; RSub1, at paras 20-47, 101; RSub2, at paras 74-77; RPHB, at paras 53-74.
[259] CSub1, at paras 112-118; CSub2, at paras 23-48; CPHB, at paras 25-54.

326.    The Tribunal will look at the relevant legal provisions before assessing the alleged breaches in turn.

> (1)    Clause 3.8.1.1 MSA in combination with Articles 63 and 64 Serbian Companies Law

327.    Clause 3.8.1.1 of the MSA reads as follows:

> "The Service Provider shall owe the following duties to the Company: […] Duty of care (within the meaning of the articles 63 and 64 of the Serbian Companies Act)."[260]

328.    Article 63 of the Serbian Companies Law in turn provides that:

> "Persons referred to in Article 61 paragraph 1 items 4) and 5) of this Law shall *carry out their duties in that capacity in good faith, with due diligence and in a reasonable belief that they act with the company's best interest*.
>
> For the purposes of paragraph 1 of this Article, due diligence shall be the level of care which a *reasonably cautious person* would use if he/she had the knowledge, skills and experience that could reasonably be expected of a person carrying out the same functions in a company.
>
> If a person referred to in Article 61 paragraph 1 items 4) and 5) has certain specific knowledge, skills or experience, such knowledge, skills and experience shall also be taken into account for the purpose of evaluation of due diligence.
>
> It is deemed that persons referred to in Article 61 paragraph 1 items 4) through 5) of this Law may also base their actions on the information and opinions provided by persons specialized in a specific filed for whom they reasonably believe they have acted in good faith in each specific case.
>
> A person referred to in Article 61 paragraph 1 items 4) through 5) who demonstrates that he/she acted in accordance with this Article shall not be liable for any damage incurred by a company as a result of such action."[261]

329.    Article 64 of the Serbian Companies Law provides that:

> "A company may bring legal action against a person referred to in Article 61 paragraph 1 items 4) through 5) of this Law for indemnification of any damage caused to it by such person through a breach of the duty of care provided for in Article 63 of this Law."[262]

330.    The Claimants do not contest that Articles 63 and 64 of the Serbian Companies Law are relevant and must be complied with pursuant to Clause 3.8.1.1 of the MSA.  However,

---

[260] MSA, Exhibit CL-3.
[261] Exhibit RL-1 (emphasis added).
[262] Exhibit RL-1.

they challenge that any obstruction occurred.[263]  The Tribunal will look at the alleged breaches or obstruction actions in turn.

### (2)    Waiver Letters

331.    The Respondents' argument on this point is twofold: the Claimants failed to (i) provide their waiver letters as part of the closing of the Privatisation; and (ii) take appropriate steps in order to obtain waiver letters from the Company's customers and business partners.[264]

332.    On the first issue, the Claimants argue that there was no obligation for the Claimants to provide any waiver letter.[265]  However, Clause 7.2(i)(d) of the Privatisation Agreement provided as a pre-condition for the closing:

> "[to provide a] termination agreement or similar document entered into between the Seller [i.e. the Second Respondent] and HPK Management doo [i.e. the First Claimant] *confirming that* the [MSA] is terminated as of the Closing Date, and that *HPK Management d.o.o do not have any claim, rights or title against the Uniform Sales Package*."[266]

333.    Although the Claimants are not parties to the Privatisation Agreement, the First Claimant, as manager of the Company, was aware of this pre-condition.  Therefore, unduly withholding any agreement or document under Clause 7.2(i)(d) could have constituted a breach of the First Claimant's duty of care vis-a-vis the Company.

334.    However, it appears on the evidence that the Claimants provided assurances that were satisfactory to HeSteel and the Privatisation closed on 30 June 2016 as planned.[267]  Moreover, and in any event, any above-described breach could only materialize at the closing of the Privatisation Agreement on 30 June 2016, if the pre-condition of Clause 7.2(i)(d) was not met.  Therefore, this could not be a valid ground for the termination of the MSA in the Second Termination Notice with immediate effect on 25 June 2016, i.e. 5 days prior.[268]

---

[263] CSub1, at paras 112-118; CSub2, at paras 23-48; CPHB, at paras 25-54.
[264] SoD, at paras 39-42; RSub1, at paras 26-32; RSub2, at para.76.
[265] SoR, at paras 19-21; CSub2, at para. 25.
[266] Privatisation Agreement, dated 18 April 2016, Exhibit CF-10 (emphasis added).
[267] It is undisputed that the Privatisation closed on 30 June 2016.  SoC, at para. 46; Annex to RSub2. The fact that the Claimants appear to have provided their waiver letters only on 1 July 2016 (see Correspondence between HeSteel and Mr Kamaras, dated 1 July 2016, Exhibit RF-29) is irrelevant in this context.
[268] See also Transcript Day 3, 86:3-6 (Mr Boris Milosevic: "HPK letter was needed before the closing not before termination. *We didn't terminate because they didn't provide a waiver letter*. We didn't terminate the MSA because Pikaro hasn't provided a waiver letter.") (emphasis added).

335.    On the second issue, Clause 4.1(iv) of the Privatisation Agreement further included as a pre-condition of closing that the Company provide certain waivers from third parties listed in Annex 6.[269] The Respondents argue that the Claimants did not take the necessary steps to obtain those waiver letters from the Company's customers and business partners,[270] whereas the Claimants allege that they took all necessary steps, going over and above their duties under the MSA.[271]

336.    The Tribunal finds that the evidence does not establish that any difficulty in obtaining the waiver letters swiftly from third parties was due to the Claimants' lack of efforts, as opposed to the inherent difficulties in such a process.[272] It is however clear from the evidence that the waiver letters from the relevant third parties (other than Pikaro) were obtained before the closing, either on 24, 28, or 29 June 2016.  The fact that the waiver letters were obtained prior to closing indicates that efforts had been made to obtain them prior to the Second Termination Notice.  Mr Boris Milosevic testified as follows at the Hearing:

> "Q Leaving aside Pikaro and HPK, all the waiver letters the
> Service Provider had to get were obtained by --
> A No, that is not correct. *Two of the waiver letters were*
> *not received on the 24th. They were received only on 28*
> *or 29 June*. If so I recall well, one was Hurkovicz(?)
> but please don't keep me for the words. I really don't
> know the details. I forgot but I know, there were two
> suppliers who have not signed their waiver letters until
> the 24th.
> Q But they were obtained by the closing.
> A Yes. *We have obtained them by the closing in those*
> *hectic few days before the closing*."[273]

337.    Pikaro, an affiliate of the Claimants, was also one of the parties required to provide a waiver letter pursuant to Clause 4.1(iv) of the Privatisation Agreement in combination with Annex 6.[274] This waiver letter was provided on 30 June 2016, and finalized and signed 1 July 2016.[275] This delay in the signature of the Pikaro waiver letter did not prevent the

---

[269] Privatisation Agreement, dated 18 April 2016, Exhibit CF-10, and Appendix 6, Exhibit CF-41.
[270] SoD, at paras 39-42; RSub1, at paras 26-32; RSub2, at para.76.
[271] SoR, at paras 19-21; CSub1, at para. 115.b; PK1, at paras 66-67; CPHB, at paras 32-34.
[272] See e.g. PK1, at paras 66-68; PK2, at paras 7-; BM1, at para. 28.
[273] Transcript Day 3, 83:5-16 (emphasis added).
[274] Privatisation Agreement, dated 18 April 2016, Exhibit CF-10.
[275] Email correspondence between Mr Kamaras and Mr Zheng, dated 30 June and 1 July 2016, attaching various versions of the waiver letter, Exhibits CF-189-191.

Privatisation from closing and, as confirmed by Mr Boris Milosevic at the Hearing, was not the reason for the Claimants' alleged termination of the MSA on 25 June 2016:

> "Q There is not a single document in which you chase for an HPK waiver letter before the termination.
> A HPK letter was needed before the closing not before termination. We didn't terminate because they didn't provide a waiver letter. ***We didn't terminate the MSA because Pikaro hasn't provided a waiver letter.***"[276]

338. In light of the above, the Tribunal is satisfied that the Claimants' conduct with regard to the waiver letters was not such that it would have justified a termination on 25 June 2016, and in any event not one with immediate effect pursuant to Article 127 LO, foregoing any Correction Period as provided for in Article 126 LO and Clause 8.1.1 of the MSA.

### (3)    Utility Contracts

339. The Respondents further argue that the Claimants obstructed the Privatisation and closing of the Privatisation Agreement, by obstructing the negotiation of utility contracts between HeSteel and the Company's suppliers.[277] More particularly, the Respondents state that obtaining contracts with the main suppliers of the Company (e.g. electricity, gas, etc.) was a precondition of the closing of the Privatisation Agreement, and the Claimants did not "fulfill their tasks" in this respect since some contracts were hastily entered into shortly before the closing.[278] The Respondents specifically refer to the Company's supplier of technical gas, Messer Tehnogas Serbia ("**Messer**"), and allege that the Claimants "obstructed the conclusion of the agreement between Messer and HeSteel […]."[279]

340. According to the Claimants, they had no contractual obligation to help procure those contracts; they nevertheless took any reasonable steps to do so; and any delay in finalizing these contracts was not attributable to the Claimants.[280]

341. The Tribunal notes that obtaining contracts with certain suppliers, including Messer, was a precondition of the closing of the Privatisation Agreement pursuant to Clause 4.1(xi) thereof.[281] Similar to the waiver letters issue discussed above,[282] the Claimants were not a

---

[276] Transcript Day 3, 86:1-6 (emphasis added).
[277] SoD, at para. 38; RSub1, at paras 33-37; RSub2, at para. 76; RPHB, at paras 56-65; EB, at paras 1-12.
[278] SoD, at para. 38.
[279] RSub1, at para. 35. See also EB, at paras 1-12.
[280] SoR, at paras 15-18; CSub1, at para. 115.a; CSub2, at paras 31-35; CPHB, at paras 29-31; PK1, at paras 63-65, 103; PK2, at paras 18-27.
[281] Privatisation Agreement, dated 18 April 2016, Exhibit CF-10.
[282] See above at para. 333.

party to the Privatisation Agreement and thus had no contractual obligation thereunder. However, as manager of the Company, the First Claimant had a duty of care vis-a-vis the Company under Articles 63 and 64 of the Serbian Companies Law. Accordingly, they had to use best efforts to help the Company fulfil the pre-conditions under the Privatisation Agreement.

342.   The Tribunal is of the view that the Claimants did not always give urgent attention to the need to conclude a contract with Messer in the time leading up to 25 June 2016. Mr Bode, General Manager of Messer, testified in his witness statement[283] and at the Hearing that Mr Kamaras suggested in early June that there was no urgency in negotiating the supply contract with Messer since he did not believe that the closing of the Privatisation would happen by 30 June 2016:

> "Q Okay, in your written statement you said that you asked Mr Kamaras about urgency of the matter knowing from media that the closing under the privatisation contract was scheduled for 30 June 2016. Can you tell us what did Mr Kamaras told you on your question, what did he answer on your question, and how was it, his reaction about it.
> A Mr Kamaras mentioned that **he doesn't believe that the closing will happen until 30 June, that it will be in the third quarter, even maybe later** which was logical for me at the time because we had not been very advanced at the stage of contract conclusion and negotiation."[284]

> "…then I guess I asked, or I asked how urgent is the matter, since from the press I heard, on 30 June the closing should be, and his statement was, "**It is unrealistic that that will happen on 30 June. It will happen probably in the third quarter, maybe in the fourth**". That was for me very important, very important information, because he was the side, he was for me the party I should negotiate with, and that, for me, was -- there is no rush."[285]

343.   However, the documentary evidence also shows that there were steps taken towards the negotiation of the supply agreement with Messer. For instance, on 21 June 2016, Mr

---

[283] EB, at para. 9.
[284] Transcript Day 3, 159:20-160:6 (emphasis added).
[285] Transcript Day 4, 4:1-9 (emphasis added).

Marcel Német, of the Company, wrote to Mr Bode and Mr Ringhofer of Messer to provide some technical data necessary for the contract negotiation.[286]

344.    In light of the above, the Tribunal finds that the Claimants' lack of urgency in relation to Messer was not such that it amounted to a breach of the MSA, and in any event not one that could have justified a termination of the MSA with immediate effect pursuant to Article 127 LO.  The Respondents have also not established that the Claimants' conduct was such that it would not perform the MSA during a subsequent Correction Period and that thus any such Correction Period was unnecessary or useless.

345.    Finally, for the avoidance of doubt, the Tribunal notes that the Claimants' actions *after* 25 June 2016 (e.g. at the 28 June 2016 meeting with Messer) are irrelevant to assess whether the termination on 25 June 2016 was validly made.

(4)    Bills of Exchange

346.    The Respondents argue that the Claimants obstructed the Privatisation and closing of the Privatisation Agreement by issuing certain bills of exchange to the detriment of the Company.[287]  The Claimants deny these allegations.[288]

347.    The Tribunal notes that the Respondents make the following statement:

"Although *the incident surrounding bills of exchange* evidences the negligent attitude of the Claimants and their apparent lack of good faith, it *was not the reason for the termination of the MSA since this incident only came to light after the MSA was terminated*."[289]

348.    In light of the above, the Tribunal does not need to decide this point in order to assess whether the alleged termination of the MSA on 25 June 2016 was valid.

---

[286] Email Mr Német to Mr Bode and Ringhofer, dated 21 June 2016, Exhibit CF-250. See also SB2, at paras 8, 9.
[287] SoD, at paras 44-45; RSub1, at paras 38-40; RSub2, at para. 76.
[288] SoR, at para. 23; CSub1, at para. 115.c; CSub2, at paras 36-37; CPHB, at paras 49-51.
[289] RSub1, at para. 40.

(5)     Supply of Raw Materials

349.    The Respondents argue that the Claimants obstructed the Privatisation and closing of the Privatisation Agreement by failing to secure the necessary level of raw materials for the steel production at the Company.[290]  The Claimants deny these allegations.[291]

350.    Under the Privatisation Agreement, the full working of the two blast furnaces at the steel factory of the Company was a pre-condition for the closing of the Privatisation.[292]  Mr Kamaras stated at the Hearing that he was aware thereof:

> "Q Have you been aware that Hesteel, the Chinese company,
> wished to purchase a plant with two functioning blast
> furnaces?
> A Yes. Yes I was."[293]

351.    This was the reason why, in May 2016, the second blast furnace was re-started after having been out of operations since November 2015.[294]  In June 2016, there were two instances in which one of the two blast furnaces had to be shut down: from 11-13 June 2016 and on 22 June 2016:

   a.      Concerning the 11-13 June 2016 outage, the Respondents argue that it was due to insufficient levels of scrap, a raw material needed for the production of steel.[295] According to the Claimants, the outage was initially due for maintenance reasons, but was then "brought forward when a railroad accident led to a short-term scrap shortage."[296]

   b.      Concerning the 22 June 2016 outage, the Respondents state that it was due to insufficient levels of coke, another raw material needed for the production of steel.[297] The Claimants argue that, while the coke levels were low, the outage was for planned maintenance works.[298]  The Respondents contest this stating that (i) maintenance

---

[290] SoD, at paras 47-48; RSub1, at paras 45-47; RSub2, at para. 76; RPHB, at paras 66-74; MV, at paras 1-18.
[291] SoR, at paras 24-26; CSub1, at paras 115.d-g; CSub2, at paras 41-43; CPHB, at paras 35-41; SB1, at paras 18-38; SB2, at paras 12-14; PK1, at paras 75-55; PK2, at paras 38-40.
[292] Privatisation Agreement, dated 18 April 2016, Exhibit CF-10, at Appendix 1, Clause 45(d).
[293] Transcript, Day 1, 147:7-10.
[294] PK1, at para. 75.
[295] RPHB, at para. 69 referring to Mr Mihailovic's testimony at the Hearing, see Transcript Day 3, 127-131.
[296] CPHB, at para. 40 referring to Mr Barica's testimony at the Hearing, see Transcript Day 2, 12:3-18.
[297] RPHB, at paras 70-73; VM, at paras 16-18; Mr Mihailovic's testimony at the Hearing, see Transcript Day 3, 116-117, 124:1-14.
[298] CSub2, at para. 43; CPHB, at paras 35-39; SB1, at para. 33; SB2, at para. 14. PK2 at para. 40.

works never require more than 24 hours; and (ii) the required maintenance works had already been done earlier that month, on 11 June 2016.[299]

352.    The Tribunal finds as follows on the raw materials issues.

353.    On the one hand, it is satisfied that the blast furnace outages at the Company were partly due to the First Claimant: as manager of the Company, the First Claimant was responsible to ensure the necessary levels of raw materials to run the steel production and failed to do so at all given times.  For instance, Mr Mihailovic testified at the Hearing that the coke levels at the Company on 21, 22, and 23 June were too low to allow a safe steel production.[300]  Mr Kamaras admitted this in an email of 21 June when he wrote "[w]e have to shut down the blast furnaces for 60 hours because of the lack of coke."[301]

354.    On the other hand, the evidence shows that the outages were also, at least partially, due to external factors.  The earlier outage from 11-13 June was, at least partially, due to a railroad accident;[302] the later outage on 22 June was, at least partially, due to difficulties with the regular coke supplier.  For instance, on 20 May 2016, Mr Oravec, responsible for the Procurement of Strategic Raw Materials at the Company, wrote:

> "[…] purchase of Coke from Slovakia is an emergency purchase because supplier from Lukavac has *logistical issues caused by Croatian railways repairing a tunnel*, which prevents transportation of coal from Ploce to Lukavac.  We are going next week to inspect situation in Lukavac and to find solution.  *We need to buy this Coke from Slovakia in order not to jeopardize the production in the meantime.*"[303]

355.    The evidence also shows that the First Claimant took steps to remedy the negative impact of these externals events, to the extent possible.  For instance, on 30 May 2016 Mr Kamaras met with another coke supplier,[304] and on 5 June 2016 coke was ordered, via Pikaro, from alternative sources.[305]

356.    In light of the above, the Tribunal finds that the raw material supply issues do not amount to a breach of the MSA, and at least not one that would justify an immediate

---

[299] Mr Mihailovic's testimony at the Hearing, see Transcript Day 3, 127:23-128:10, 151:11-12.
[300] Transcript Day 3, 116-117.
[301] Email Mr Kamaras to Mr Ovinca, dated 21 June 2016, Exhibit RF-54.
[302] Mr Barica's testimony at the Hearing, see Transcript Day 2, 12:3-18.
[303] Email Mr Oravec to various, dated 20 May 2018, Exhibit CF-48 (emphasis added).  See also Email from Mr Kamaras to Minister Sertic, dated 27 May 2016, Exhibit RF-16.
[304] Email from Mr Kamaras to Minister Sertic, dated 27 May 2016, Exhibit RF-16.
[305] Email from Ms Dulinová to various, dated 5 June 2016, Exhibit CF-206.  See also email exchange between Mr Cvijovic and Mr Oravec, Exhibit CF-99.

termination pursuant to Article 127 LO. The Respondents have not shown that the Claimants' conduct was such that they would not perform the MSA during a subsequent Correction Period and that thus any such Correction Period was unnecessary or useless.

(6)     Other Issues

357.    Finally, the Respondents argue that the Claimants obstructed the Privatisation and closing of the Privatisation Agreement by failing to prepare and provide necessary information to HeSteel, or to otherwise assist the Privatisation.[306] Among other things, the Respondents allege that the Claimants failed to hire the required legal assistance, and to convene regular coordination meetings.[307] The Claimants deny these allegations.[308]

358.    The Tribunal finds that the Respondents have not established these points. To the contrary, the documentary evidence shows that the Claimants did set up co-ordination meetings.[309] Moreover, there is no contemporaneous document complaining about any lack of legal or other information.

\*       \*       \*       \*       \*

359.    In sum, the Tribunal finds that the Respondents have not established any breaches of the MSA that would justify the immediate termination thereof. Having looked at the Claimants' conduct regarding the various alleged breaches, the Tribunal finds that such conduct does not warrant an immediate termination under Article 127 LO, forgoing the Correction Period provided for in Article 126 LO and Clause 8.1.1 of the MSA.

360.    As a consequence, the Tribunal finds that the Second Termination Notice of 25 June 2016 was not validly made. The Tribunal therefore does not need to look at the other alleged bases of invalidity of the Second Termination Notice, e.g. the argument that it was contrary to Serbian corporate law,[310] good faith[311] etc.

---

[306] RSub1, at paras 41-43; PK1, at para. 27.
[307] RSub1, at paras 41-43; PK1, at para. 27.
[308] CSub2, at paras 38-40.
[309] Privatisation Coordination Team meeting, dated 19 May 2016, Exhibit CF-225; Privatisation Coordination Team meeting, dated 24 May 2016, Exhibits CF-144 and CF-226.
[310] CPHB, at paras 11-16.
[311] CPHB, at paras 17-25.

4.    Amount of Privatisation Bonus

361.    Having thus established that the Second Termination of 25 June 2016 was not valid, the Privatisation Bonus is due under Clause 3.2.9 of the MSA. This is undisputed between the Parties, as noted above.[312]

362.    The Parties are, however, in dispute about the amount of the Privatisation Bonus under Clause 3.2.9 of the MSA. Clause 3.2.9 of the MSA provides as follows:

> "In addition to the Management Fee outlined in clauses 3.2.4, 3.2.5, 3.2.6, 3.2.7 and 3.2.8, the Service Provider shall be entitled to a bonus fee in case of any privatisation of the Company that occurs within 5 (five) years (or a period of five years plus any additional period of this Agreement agreed to under clause 7.2 hereof) calculated as of the Closing of this Agreement, *in the amount equal to 30% of the acquisition price of the Company' stake achieved through such privatisation procedure but in no event lower than USD 10,000,000* (ten million dollars) (the Privatisation Bonus)."[313]

363.    Clause 3.2.9 of the MSA thus provides for a guaranteed minimum Privatisation Bonus of 10 million (the "**Minimum Bonus**"), but also for the possibility of a higher bonus calculated as "30% of the acquisition price of the Company' stake achieved through such privatisation procedure" (the "**Variable Bonus**").

364.    According to the Claimant, the Variable Bonus applies to all kinds of privatisation procedures and thus should be 30% of the price paid by HeSteel for the Company's assets,[314] whereas the Respondents argue that the Variable Bonus does not apply to a privatisation through an asset sale.[315]

365.    More specifically, the Claimants state that (i) the term "stake" in Clause 3.2.9 of the MSA has a broad meaning going beyond "shares;"[316] (ii) the Parties could have used a more specific wording in Clause 3.2.9 of the MSA (such as "equity" or "shares") but did not;[317] (iii) the English version of the MSA prevails;[318] (iv) any other interpretation does not

---

[312] See above, at para. 170.
[313] MSA, Exhibit CF-3 (emphasis omitted and added).
[314] SoR, at paras 76-83; CSub1, at paras 154-157; CSub2, at paras 113-121; CPHB, at paras 3-10. See also Transcript, Day 5, at 54:10 et seq.
[315] SoD, at paras 101-112; RSub1, at paras 114-124; RSub2, at paras 103-107; RPHB, at paras 75-83.
[316] SoR, at para. 78; CSub1, at para. 156.c
[317] SoR, at para. 78.
[318] SoR, at para. 78; CSub1, at para. 156.a; CPHB, at paras 3-5.

correspond to the will of the Parties or the purpose of the Privatisation Bonus;[319] and (v) the MSA Negotiation Transcript does not show anything else.[320]

366.    To the contrary, according to the Respondents (i) the term "stake" in Clause 3.2.9 of the MSA is most commonly used in the commercial context as "equity of a company, i.e. its shares;"[321] (ii) the Serbian version of Clause 3.2.9 of the MSA uses the term "*udela*" (from "*udeo*") which means "shares" in Serbian;[322] (iii) the transcript of the MSA negotiations confirms this understanding referring to "equity";[323] and (iv) there is no purpose of a success bonus in case of an asset sale since the value of the assets "has nothing to do with the Claimants and their effort (or at the very best, their influence could have only been marginal)."[324]

367.    In interpreting Clause 3.2.9 of the MSA, the Tribunal will look in turn at (i) the literal meaning of Clause 3.2.9 of the MSA, (ii) the context of the negotiations of the MSA; (iii) the purpose of the privatisation bonus in Clause 3.2.9 of the MSA; and (iv) the Parties' subsequent conduct.

a)    Literal Meaning of Clause 3.2.9 MSA

368.    Clause 3.2.9 of the MSA refers to "30% of the acquisition price of the Company's stake achieved through such privatisation procedure."[325]

369.    While the Claimants are correct that the word "stake" might in certain instances have a broader meaning, in the context of commercial transactions and companies, the term "stake" refers to "participation" (such as in the forms of shares).  This is indeed also how the Claimants themselves have repeatedly used the term in their submissions:

> "Subsequently in September 2015 the businessmen behind GLS (Yves Nassan and Lazar Fruchter) did acquire a minority *stake* in the Bidder but even that would not have satisfied the control requirements in the MSA."[326]

---

[319] CSub1, at para. 156.e; PK1, at paras 20-21.
[320] CSub1, at para. 156.f.
[321] SoD, at para. 108; RSub1, at para. 116; RPHB, at paras 76-79.
[322] SoD, at para. 109; RSub1, at para. 116;
[323] SoD, at para. 11; RSub1, at paras 121-122; Transcript of negotiations, Exhibit RF-17, at p. 34.  See also BM2, at para. 14.
[324] RSub1, at para. 120.
[325] MSA, Exhibit CF-3.
[326] RSub1, at para. 126.a (emphasis added).

"the evidence that Lazar and Fruchter's *stake* was only 20% [...]"[327]

370.    This interpretation is also confirmed by the Serbian version, and the use of the term "*udela*" (from "*udeo*").  It is clear that in case of any discrepancies between the English and Serbian version, the English version prevails pursuant to Clause 15.3.1 of MSA which provides that:

> "This Agreement has been executed in Serbian and English language. In case of any discrepancy or inconsistency between these two versions, the English version shall prevail."[328]

371.    However, the Tribunal finds that here there is no discrepancy or inconsistency between the English and Serbian versions on this point since both language versions point in the same direction, i.e. that "stake" or "*udeo*" should be interpreted as meaning "participation" or "shares."

372.    A difficulty in the literal interpretation of Clause 3.2.9 of the MSA arises from the fact that it refers to "the Company's stake" which, in correct English, would mean the stake *of* the Company and thus the participation (or shares) the Company holds in another company.  It is undisputed that the Company's participation (or shares) in another company was not (and could not have been) part of the Privatisation.  Rather, what was a possible means of privatisation was to sell the participation (or shares) *in* the Company.  The Tribunal is satisfied that this somewhat incorrect use of the English is due to the fact that mostly non-native English lawyers negotiated and drafted the text of the MSA in English (which was later translated into Serbian).  This is the result indeed from the documentary evidence[329] and was confirmed by the Respondents' counsel at the Hearing:

> "MR JACOBS: Okay.  There were obviously some *drafts before the final MSA*.  Were those drafts *always circulated in English*, just like the red line we have seen?
>
> [Mr Pavic]: *Only English*.  Only the -- not only the final -- I think we have -- I don't know when the *translation was done from English to Serbian*, whether it was already done around 20 March or not.  The translation -- I think by the time we selected it, if I am not mistaken and we selected them around 20 March, that at that time only the English version was around, and Serbian version was included in -- as a translation few days after."[330]

---

[327] RSub2, at para. 91.
[328] MSA, Exhibit CF-3.
[329] Email from Mr Marjanovic to Mr Kamaras and others, dated 15 March 2015, attaching a revised draft MSA, Exhibit CF-217.
[330] Transcript Day 4, 72:3-13 (emphasis added).

b)      Negotiations of Clause 3.2.9 MSA

373.    The Parties also refer to a transcript of the negotiations of the MSA held in mid-March 2015.[331]

374.    The Claimants refer to a passage of the transcript at p. 23 which reads as follows:

"ML [Marek Lorinz, on behalf of the Claimants]: The consideration was, let's say if you, let's say want to privatize the plant before the expiration of 3 years, th[e]n we are entitled to the success fee, which is *X % of the sale price, X % of investment commitment* but no less than asked for.

MH [Mark Harrison, on behalf of the Claimants]: That sounds like you're happy. I mean… for those 3 years MSA agreement, and as you say, whoever comes along in a really good phase, it's a win-win, the Government wins, we take the success fee and that's it."[332]

375.    According to the Claimants this shows that what was proposed at this stage was a percentage of the "sale price" irrespective of the form of privatisation.[333]

376.    The Tribunal is unconvinced about this argument. To the contrary, in the Tribunal's view, the reference to an "investment commitment" shows that what the Parties had in mind was that the purchaser invested in the Company after the privatisation. This is different from an asset sale where the Company, after having sold its assets, is an empty shell in which no one would consider investing.

377.    The Respondents rely on another passage of the transcript on pp. 33-34 in which Mr Boris Milosevic rejected the idea of a 30% bonus on the investment or capital commitment to the Company, but accepted a 30% bonus on the equity. He stated:

"BM: With respect to the exit bonus, our suggestion is to have it *30% of the sales price only, without these capital commitments*, because this would be very difficult to assess and to calculate. *Capital commitment will be something that the company will get* and I think it's very difficult for the company to find the cash given that those capital commitments will be over a 5 period… 5 years to find cash now in order to pay 30% of the future capital commitment by somebody."[334]

"BM: No, that's… sure, that's understandable. I mean you know in privatizations that they weight those things differently. One is the purchase price weighting, one is the

---

[331] Negotiation Transcript, Exhibit RF-17.
[332] Negotiation Transcript, Exhibit RF-17, at p. 23 (emphasis added).
[333] CPHB, at para. 4.
[334] Negotiation Transcript, Exhibit RF-17, at p. 33 (emphasis added).

- 86 -

weighting of a... No, no, I'm talking about *we cannot have 30% on the equity and 30% on the capital commitment.*"[335]

"BM: If it's a *30% of the privatization proceeds for the equity* and or higher of 30% of that or 10 million dollars, I think that is ok."[336]

378.    According to the Respondents this shows that what the Parties had in mind was that the Variable Bonus of 30% applied to an equity sale, i.e. if the Republic of Serbia sold its participation in the Company.

379.    The Tribunal is satisfied that this is indeed what the Parties had in mind during the negotiation of the MSA, and this was accepted by Mr Kamaras as he confirmed at the Hearing:

"PROFESSOR ORLIC:  Good.  Can we go to the page 34 [of the Negotiation Transcript]?  It goes like this:

*"Peter Kamaras:  No, no, I am listening.  Do you have any suggestions?*

*"Boris Milosevic:  Our suggestion was only*

*Mark Harrison zero", and there was general laughter.  Now,*

*Mr Boris Milosevic says, and I am quoting: "If it is a 30 per cent of the privatization receipts for the equity and/or higher of 30 per cent of that or $10 million I think that is okay"*

*"Peter Kamaras:  Okay"*

So you accepted what Boris Milosevic ask you for.

A Yes, Professor, yes.  I did.  Can I put the broader picture behind it?  There was a discussion brought by Marek Lor[i]nz, what happens if Železara is giving away for nothing for investment in case somebody comes and says okay, I will get it for free, but I invest 1 billion, *that is basically what the Chinese did.  For this case they suggested this minimum 10 million amount.  This was my understanding of this 10 million*, and somebody get it for free but promises -- we originally, I think, I believe it should be there, ask also for 30 per cent.  Marek Lorinz gave me this idea, asking for 30 per cent of the investment, can be outrageous number so this was rejected flatly, so we agreed that in case of such a strange -- well, not strange actually, but -- there is this minimum of 10 million, okay?  *And in case it is sold for real money, that there is money to be paid to the government, then we get 30 per cent.*  This was my understanding of the story.

PROFESSOR ORLIC:  But it was said for the equity.

A It says so very likely, yes.  It says so in the transcript, yes."[337]

---

[335] Negotiation Transcript, Exhibit RF-17, at p. 33 (emphasis added).
[336] Negotiation Transcript, Exhibit RF-17, at p. 34 (emphasis added).
[337] Transcript, Day 1, 182:9-183:16 (emphasis added).

380.    Mr Kamaras thus confirmed that for a situation like at present ("that is basically what the Chinese did") the Minimum Bonus of 10 million was agreed ("For this case they suggested this minimum 10 million amount.  This was my understanding of this 10 million […]").  In case the Republic of Serbia sold its participation in the Company, the Variable Bonus of 30% was meant to apply (if "there is money to be paid to the government, then we get 30 per cent").

381.    Finally, in the context of the MSA negotiations, the Claimants also refer to an email sent on 15 March 2015, attaching a revised draft MSA.[338]  It was in this round of edits that the language "of the Company's stake" was included.[339]  The Claimants refer to the cover email sent with the draft MSA which states, among other things, "[i]n the enclosed version of the MSA we defined in much better way the termination clauses in order to outline exactly what agreed on the meeting (other changes made to the MSA are more or less of a technical nature)."[340]  The Claimants deduce from this that the change regarding the Privatisation Bonus in Clause 3.2.9 of the draft MSA was not meant to bring any chance and thus continued to apply irrespective of the addition of "the Company's stake."[341]

382.    The Tribunal does not find this argument convincing.  The cover email clearly states: "Enclosed please find the Management Services Agreement (the MSA) revised by KPMG.  We are of the opinion that this draft version of the MSA reflects all what agreed on the yesterday's meeting."[342]  Had the draft including the edit regarding "the Company's stake" not reflected the Parties' agreement, the Claimants should have pointed this out, and no such evidence is on file.  In any event, the relevant change in the wording did reflect the discussion at the meeting.

c)      Purpose of Clause 3.2.9 MSA

383.    Finally, the Parties argue about the purpose of the Variable Bonus in Clause 3.2.9 of the MSA.

384.    The Respondents argue that the purpose of the Variable Bonus of 30% was to incentivize the First Claimant to manage the Company in such a way as to make it the most

---

[338] Email from Mr Marjanovic to Mr Kamaras and others, dated 15 March 2015, Exhibit CF-217.
[339] Email from Mr Marjanovic to Mr Kamaras and others, dated 15 March 2015, Exhibit CF-217, at p. 19.
[340] Email from Mr Marjanovic to Mr Kamaras and others, dated 15 March 2015, Exhibit CF-217, at p. 1.
[341] CPHB, at para. 4.
[342] Email from Mr Marjanovic to Mr Kamaras and others, dated 15 March 2015, Exhibit CF-217, at p. 1.

profitable.[343]  Therefore, according to the Respondents, the Variable Bonus does not apply to an asset sale since the value of the assets "has nothing to do with the Claimants and their effort (or at the very best, their influence could have only been marginal)."[344]

385.    The Claimants challenge this argument and state that "the value of physical assets will depend on the success of management – in a steel mill, management has a lot to do with the good condition of the furnaces, the level of stock, etc."  They add that "such improvements will also affect the profitability of those assets and of any acquired entity […]."[345]

386.    The Tribunal finds with the Respondents on this point.  The Parties systematically referred to the Privatisation Bonus as a "success fee" in their negotiations, including for instance here:

> "ML [Marek Lorinz, on behalf of the Claimants]: The consideration was, let's say if you, let's say want to privatize the plant before the expiration of 3 years, th[e]n we are entitled to the *success fee*, which is X % of the sale price, X % of investment commitment but no less than asked for.
>
> MH [Mark Harrison, on behalf of the Claimants: That sounds like you're happy. I mean… for those 3 years MSA agreement, and as you say, whoever comes along in a really good phase, it's a win-win, the Government wins, we take the *success fee* and that's it."[346]

387.    This shows the understanding that the Variable Bonus was to incentivize and reward "success" on the First Claimant's part, as manager of the Company, to make it profitable. While the value of the assets of the Company (e.g. title to land, infrastructure etc.) might be maintained or possibly even be slightly increased, it remains largely independent of the management of the Company.

388.    The analysis might be slightly different for raw materials: the manager can increase the stocks and thus the value of the assets.  It is, however, wrong to suggest that this be a sign of successful management.  As explained by the Claimants' witness, Mr Stanislav Barica, the raw material levels are those needed for the steel production, not more not less; any unwarranted increase in raw material stocks (and thus value) risks to lead to their deterioration, even though they had to be paid for by the Company:

---

[343] SoD, at para. 103; RPHB, at para. 80.
[344] RSub1, at para. 120.
[345] RSub2, at para. 116.c.
[346] Negotiation Transcript, Exhibit RF-17, at p. 23 (emphasis added).

"Fresh coke relatively *quickly deteriorates in quality and begins to disintegrate*, reducing its efficiency. The coke's function in the blast furnace is to create a supporting structure and allow wind flow through the charge, so the size and strength of the coke are very important. If a company keeps a higher inventory of coke on site, it will suffer from a significantly higher volume of undersize coke (due to disintegration), which cannot be charged directly into the blast furnace. The only use for undersize, degraded coke is as a replacement fuel for sinter production, but as coke is very expensive compared with the fuel ordinarily used for sinter production, this is uneconomical and increases production costs. Accordingly, the *ordering and storage of coke on site requires a careful balancing act*."[347]

389.    The Tribunal is thus satisfied that the purpose of the Variable Bonus was to incentivize successful management on the part of the First Claimant, and that this purpose shows that the Variable Bonus does not apply to an asset sale for which the price depends on the value of the assets and not the manager's success.

d)    Parties' Subsequent Conduct

390.    Finally, the Tribunal notes that the Claimants also refer to a number of documents showing the Parties' subsequent conduct, such as (i) exchange of emails between Mr Kamaras and Mr Milosevic on 21 April 2016;[348] and (ii) a draft Annex to the MSA, also exchanged between the Parties in April 2016.[349]

391.    However, the Tribunal is of the opinion that these subsequent documents, established at a time when the Parties were already gearing up for a dispute, are less relevant. For the avoidance of doubt, the Tribunal holds that nothing in the above-mentioned documents are of such a nature as to change the conclusion on the amount of the Privatisation due under Clause 3.2.9 of the MSA.

392.    In sum, and in light of the above, the Tribunal finds that the Variable Bonus as per Clause 3.2.9 of the MSA does not apply to the Privatisation in the case at hand which was done in the form of an asset sale. Accordingly, the amount of the Privatisation Bonus due under Clause 3.2.9 of the MSA is USD 10 million.

---

[347] See SB1, at para. 19 (emphasis added).
[348] Email exchange between Mr Kamaras and Mr Milosevic, dated 21 April 2016, Exhibit RF-27. See SoR, at para. 82.
[349] Draft MSA Annex, Exhibit CF-85. See CPHB, at para. 6.

5.     Debtor of the Privatisation Bonus

393.    Having determined that the Privatisation Bonus of USD 10 million is due to the
Claimants, the Tribunal now turns to the question who must pay such amount.  The Parties
disagree on this point.  The Claimants argue that the First and Second Respondents are both
liable: either as a matter of their joint and several liability under the MSA[350] or because the
First Respondent is independently liable to the Claimants,[351] while the Respondents deny any
liability on the part of the First Respondent.[352]  The Tribunal will look at the two series of
arguments in turn.

a)     Joint and Several Liability of the First and Second Respondent

394.    According to the Claimants, the First and Second Respondents are jointly and
severally liable.[353]  The Claimants argue that joint and several liability results, among other
things, from (i) Serbian law; (ii) the wording of Clause 3.2.9 of the MSA which states
without limitations that the Service Provider "shall be entitled to" a Privatisation Bonus;[354]
and (iii) the Parties' intention and common sense since "the obligation to compensate the
Service Provider [...] naturally falls on RoS as well as the Company."[355]  The Respondents
deny any liability of the First Respondent.[356]

395.    First, on the Serbian law point, the Claimants argue that the MSA is a "contract of
order" under Article 749 LO, and that therefore pursuant to Article 764 LO the First and
Second Respondents are jointly and severally liable.

396.    Article 749 LO provides:

"(1) By contract of order the provider undertakes the obligation towards the principal
to perform certain actions on his account.

(2) At the same time the provider shall be authorized to undertake such actions.

---

[350] SoC, at paras 65-66; SoR, at paras 84-91; CSub1, at para. 170; CSub2, at paras 122-125; CPHB, at para. 122.
[351] SoR, at paras 92-96; CSub1, at para. 170; CPHB, at para. 122.
[352] SoD, at paras 113-124; RSub1, at paras 127-137; RSub2, at paras 110-112; RPHB, at paras 127-134.
[353] SoC, at paras 65-66; SoR, at paras 84-91; CSub1, at para. 170; CSub2, at paras 122-125; CPHB, at para. 122.
See also Transcript Day 5, 59:18 et seq.
[354] SoR, at para. 85; CSub2, at para. 122.
[355] SoR, at para. 87.
[356] SoD, at paras 113-124; RSub1, at paras 127-134; RSub2, at paras 110-112; RPHB, at paras 127-134.

(3) The provider shall be entitled to remuneration for his effort, unless otherwise provided by the contract or derives from the nature of the mutual relationship between the parties."[357]

397.    Article 764 LO reads as follows:

"Should several principals entrust a performance of an order to a provider, they shall be jointly and severally liable towards him."[358]

398.    In the Tribunal's view, the MSA is not a "contract of order" in the sense of Article 749 LO.  Under the MSA, the Service Provider was to provide certain management services to the Company.  Clause 3.2.1 of the MSA relates to the "Provision of Management Services" and states that "[t]he Service Provider shall provide the Company with the Management Services during the Term."[359]  According to Clause 1.1 of the MSA, "Management Services" means "the management services to be provided by the Service Provider pursuant to clause 3,"[360] which in turn lists a number of services regarding the management of the Company. These are services provided by the Service Provider to the Company and not an "obligation towards the principal to perform certain actions on his account" such as envisaged by Article 749 LO.  Furthermore, this argument does not assist the Claimants in establishing the liability of the First Respondent, since the services were to be provided to the Company, not to the First Respondent.

399.    In any event, even assuming the MSA was to be qualified as a "contract of order" as per Article 749 LO, joint and several liability according to Article 764 LO only applies absent any other agreement by the Parties, as per Article 10 LO which provides that "[t]he parties in an obligation relationship are free to regulate their relations upon their own will, within the limits of imperative norms, public policy and good customs, as they find appropriate."[361]  The possibility of agreement to the contrary is accepted by the Claimants.[362]  As detailed below, the Parties agreed that the First Respondent was not liable to pay the Privatisation Bonus.

400.    Second, looking at the provisions of the MSA, the Claimants argue that Clause 3.2.9 of the MSA provides that the Service Provider "shall be entitled to a bonus fee" without any

---

[357] Serbian Law on Obligations, Article 349, Exhibit RL-3.
[358] Serbian Law on Obligations, Article 364, Exhibit RL-3.
[359] MSA, Exhibit CF-3.
[360] MSA, Exhibit CF-3.
[361] Serbian Law on Obligations, Article 10, Exhibit RL-3.
[362] SoR, at para. 91 ("The parties did not reach a contrary agreement …").

limitation, and because Clause 3.2.9 of the MSA does not say "it is only due from one of the RoS and the Company" it results that both of them are jointly and severally liable.[363]

401.    The Tribunal does not agree with the Claimant's interpretation.  Clause 3.2.9 of the MSA is silent as to the debtor of the Privatisation Bonus.  Clause 3.2.9 of the MSA merely provides that:

> "In addition to the Management Fee outlined in clauses 3.2.4, 3.2.5, 3.2.6, 3.2.7 and 3.2.8, *the Service Provider shall be entitled to a bonus fee* in case of any privatisation of the Company […] (the Privatisation Bonus)."[364]

402.    However, other provisions of the MSA deal with the invoicing and payment of the Privatisation Bonus and clearly refer to the Company as the debtor of the payment obligation. Among others, Clause 5.1.1 relates to the Management Fees (which includes the Privatisation Bonus under Clause 3.2.9 of the MSA) and provides that any invoice shall be made to the Company:

> "The Management Fees as regulated by 3.2.4, 3.2.5, 3.2 .6, 3.2.7, 3.2.8 and *3.2.9* shall be reimbursed as stipulated in clause 3.2 and *invoiced to the Company*."[365]

403.    Similarly, Clause 5.1.2 of the MSA deals with any such payment to the Service Provider and provides that it shall be made by the Company:

> "*All payments required by this Agreement to be made to the Service Provider shall be made by the Company* by means of bank transfer in RSD, in accordance with the median exchange rate of the National Bank of Serbia on the day of payment to the Service Provider's account RSD 170- 30023743000-98, as set out in the invoice."

404.    Clause 5.1.9 relates to the right to object to invoices issued pursuant to Clause 5.1.1 and, again, only refers to the Company:

> "Such invoice would be payable immediately and *the Company* would not have the right to object to it."

405.    Moreover, Clause 8.5 of the MSA, which deals with the effects of termination on the Privatisation Bonus, refers to the payment of the Privatisation Bonus by the Company, without mentioning the Republic of Serbia in this context:

---

[363] CSub2, at para. 122.  See also SoR, at para. 85.
[364] MSA, Exhibit CF-3 (emphasis omitted and added).
[365] MSA, Exhibit CF-3 (emphasis omitted and added).

"If the RoS or the Company terminates this Agreement in accordance with clause 8.4, *the Company shall be obliged to pay to the Service Provider the Privatization Bonus* in line with the terms specified in clause 3.2.9."

406.    The result of the above-mentioned provisions of the MSA is that the Company is the debtor of the Privatisation Bonus, and not the First Respondent.

407.    Third, the contemporaneous evidence from the time when the Parties negotiated the MSA also shows the Parties' agreement to exclude any liability of the First Respondent. The question of the liability of the Republic of Serbia was discussed at length during the negotiation meeting held on 14 March 2015.[366] The issue was that any liability by the Republic of Serbia could have been interpreted as illegal state-aid under European Union law.[367] While the Parties did not seem to have found a solution during the negotiations on 14 March 2015, a later email exchange resolved this point. In an email, dated 15 March 2015, Mr Mladjan Marjanovic sent a revised version of the MSA, with revisions made by KPMG on behalf of the Respondents, and noted in his cover email:

"As we have already informed you, any kind of guarantee of the Republic of Serbia would be considered as a State Aid. Hence, *we deleted any monetary obligation of the Republic of Serbia from the Agreement* (re payment obligations in case Železara fails to pay its liabilities)."[368]

408.    Indeed, one of the changes suggested in the red-line version of the MSA was to include in Clause 5.1.3, discussed above, that any payment was to be made by the Company:[369]

5.1.45.1.3    Invoices referring to the Fixed Fee shall be issued monthly and shall be payable by the Company in accordance with terms of this Agreement.

409.    In the reply email, dated 16 March 2015, the Claimants confirmed their agreement on this point. Mr Goran Martinovic on behalf of the Claimants replied to several points made by the Respondents in a table format. Regarding the issue of the liability of the Republic of Serbia, the column "HPK Reply" reads as follows:

---

[366] Negotiation Transcript, Exhibit RF-17, at p. 35 et seq.

[367] Negotiation Transcript, Exhibit RF-17, at p. 36 et seq.

[368] Email from Mr Marjanovic to Mr Kamaras and others, dated 15 March 2015, attaching a revised draft MSA, Exhibit CF-217, cover email at point 7.

[369] Email from Mr Marjanovic to Mr Kamaras and others, dated 15 March 2015, attaching a revised draft MSA, Exhibit CF-217, at p. 21.

"We have *accepted* this and have *removed the language that was stating that the RoS would be liable for the Company obligation* in respect of the obligations *arising out of the MSA*."[370]

410.    In light of the above, there can be no doubt as to the Parties' agreement that the First Respondent would not be liable for any obligations arising out of the MSA, including the payment of the Privatisation Bonus.

411.    Fourth and finally, this is also confirmed by the Claimants' contemporaneous understanding.  Indeed, on 18 April 2016, the First Claimant issued a pro forma invoice regarding the Privatisation Bonus.  This invoice is only addressed to, and payment only requested from, the Company (i.e. the Second Respondent) and not the Republic of Serbia (i.e. the First Respondent).[371]

412.    In sum, and in light of the above, the Tribunal finds that there is no joint and several liability for the First and Second Respondent, and that only the Second Respondent is be liable for the payment of the Privatisation Bonus under the MSA.

### b)    Independent Liability of the First Respondent

413.    The Claimants further argue that the First Respondent is independently liable on the basis that it (i) breached the MSA; (ii) procured the Second Respondent to breach the MSA and thus committed a tort under Serbian law; and (iii) abused the rule of limited liability.[372] The Respondents deny these points.[373]

414.    First, regarding the First Respondent's alleged breach of the MSA: in essence, the Claimants argue that the First Respondent breached the MSA with the Second Termination notice.  More specifically, they allege that "the termination it forced through was in breach of the MSA because (a) Zelezara was not entitled to terminate under its terms, (b) the circular Decision violated MSA protective terms such as co-signature, HPK's position as CEO and the role of the SB (3.4.1 to 3.4.3, 3.3); and (c) was in bad faith."[374]

---

[370] Email from Mr Martinovic to Mr Marjanovic and others, dated 16 March 2015, attaching a revised draft MSA, Exhibit RF-26, at p. 2.
[371] Invoice from HPK Management d.o.o. to Zelezara Smederevo d.o.o., dated 18 April 2016, Exhibit RF-2.
[372] SoR, at paras 92-96; CSub1, at para. 170; CPHB, at para. 122.  See also Transcript, Day 5, 60:7 et seq.
[373] RSub1, at paras 135-137.
[374] CPHB, at para. 122.

415.    As detailed above, the Tribunal has found that the Second Termination Notice by the Second Respondent was invalid.[375]  As such, the Second Termination Notice was without legal effect.  Accordingly, the Claimants have failed to show how the Second Termination Notice amounted to a separate breach of the MSA, by the First Respondent or otherwise, that has any detrimental consequences on the Claimants.  The detrimental consequences to the Claimants merely flow from the failure to pay the Privatisation Bonus, which (as discussed above) was a liability of the Company.

416.    Second, the Claimants further argue that the First Respondent is liable under Serbian tort law because it procured the Second Respondent to breach the MSA.[376]  The Claimants have provided no support for their theory that inducing a contractual breach leads to tortious liability under Serbian law.  Moreover, and in any event, under the Claimants' theory, the alleged breach by the Second Respondent, procured by the First Respondent, is "the sending of the invalid Second Termination Notice."[377]  For the reasons stated above, the Tribunal has found that the Second Termination Notice was invalid and without legal effect, and therefore the Claimants have failed to show how it could be an induced breach of the MSA causing any harm to the Claimants.

417.    Third, the Claimants further state that the First Respondent abused the rules of limited liability under Serbian corporate law because the First Respondent's actions caused the Second Respondent not to pay the Privatisation Bonus, which the Company would have otherwise paid.[378]  According to the Claimants, the First Respondent "used Zelezara's corporate identity, in a bad faith termination plan to rid itself of HPK and liability for the bonus [...]. It used Zelezara instead of giving notice itself in an abusive attempt to avoid liability (had it given notice itself, its breach would have been even more direct)."[379]  The fact that the Second Respondent, instead of the First Respondent, has issued the Second Termination Notice is irrelevant, since, as detailed above, the Second Termination Notice is invalid and without legal effect.  Therefore the liability of the Second Respondent has not been discharged or affected by the Second Termination Notice.

---

[375] See above, at para. 360.
[376] SoR, at paras 92-96.
[377] SoR, at para. 92.
[378] SoR, at paras 92-96; CSub1, at para. 170; CPHB, at para. 122.
[379] CPHB, at para. 122.

418.   Furthermore, the Tribunal does not accept that there was any abuse of limited liability by the First Respondent.  As set out above, the only liability for the Privatisation Bonus was a liability of the Second Respondent.  The First Respondent did not in any sense use the Second Respondent to cause damage to the Claimants.  Whilst it is true that there has (on the Tribunal's findings) been a failure to pay the Privatisation Bonus, and that this should now be paid by the Second Respondent, there is no connection between the Second Respondent's failure to pay and any "abuse of limited liability."

419.   In sum, the Claimant's arguments regarding the First Respondent's independent liability are inapposite.

### 6.   Creditor of the Privatisation Bonus

420.   Having found that the Second Respondent is liable to pay the Privatisation Bonus, as determined in the previous sections, the Tribunal now turns to the question to whom it is due.

421.   The Claimants' request for relief has varied on this point.  In their Statement of Case, the Claimants sought the payment to be made to the Service Provider, i.e. the First Claimant:

> "Declaring that RoS and the Company are jointly liable to ***pay to the Service Provider*** […] the Privatisation Bonus pursuant to clause 3.2.9 of the MSA.
>
> Ordering the Company and RoS jointly and severally to pay ***to the Service Provider*** an amount equal to 30% of the Acquisition Price plus VAT of 20% of that sum, plus interest accruing from 30 June 2016 (to be assessed) plus costs."[380]

422.   However, in subsequent submissions, the Claimants sought payment to be made to both Claimants:

> "In conclusion, it is submitted that the Tribunal should ***award the Claimants*** €16,197,806.09 plus VAT at 20%, and RSD 100,536,504 by way of management fee for May and June 2016, in damages or debt.  If the correct privatisation bonus turns out to be higher, the Claimants will claim the higher sum."[381]

423.   The Claimants provide no explanation as to the legal basis for the Second Claimant's claims other than:

> "HPK Engineering B.V. is the Bidder for the purposes of the MSA and the sole owner of the Service Provider.  It has an interest in enforcing the terms of the MSA because of the benefit it may derive as sole owner of the Service Provider from the recovery of

---

[380] SoC, at paras 72.1-73 (emphasis added).
[381] CSub1, at paras 173-176 (emphasis added).  See also CSub2, at para. 131; CPHB, at para. 123.

money owed to the Service Provider.  It therefore has valid claims against the Company and RoS for declarations as to the liability of the Company and RoS and is therefore a proper party to this arbitration."[382]

424.    The Respondents deny that any amounts are due to the Second Claimant.[383]

425.    The Tribunal finds with the Respondents on this point.  Regarding the Privatisation Bonus, Clause 3.2.9 of the MSA clearly states that it is due to the Service Provider:

> "In addition to the Management Fee outlined in clauses 3.2.4, 3.2.5, 3.2.6, 3.2.7 and 3.2.8, *the Service Provider shall be entitled to a bonus fee* in case of any privatisation of the Company that occurs within 5 (five) years […] (the Privatisation Bonus)."[384]

426.    Moreover, it was the First Claimant (i.e. the Service Provider) who issued the pro forma invoice regarding the Privatisation Bonus on 18 April 2016.[385]  The Second Claimant is not mentioned.

427.    In light of the above, the Tribunal finds that the Privatisation Bonus is due to the First Claimant only.

428.    In sum, the Tribunal finds that the Second Respondent owes USD 10,000,000 to the First Claimant as the Privatisation Bonus pursuant to Clause 3.2.9 of the MSA.

### D.    MANAGEMENT FEES

429.    According to the Claimants, the Service Provider has a right to the Management Fee for the months of May and June 2016 until the termination of the MSA took effect,[386] and has issued invoices accordingly.[387]  According to the Respondents no such Management Fee is due.[388]

430.    Pursuant to Clause 3.2.4 of the MSA:

---

[382] SoR, at para. 101.
[383] SoD, at paras 132-133.
[384] MSA, Exhibit CF-3 (emphasis omitted and added).
[385] Invoice from HPK Management d.o.o. to Zelezara Smederevo d.o.o., dated 18 April 2016, Exhibit RF-2.
[386] SoC, at paras 61-62; SoR, at paras 97-100; CSub1, at para. 169;
[387] Invoice from HPK Management d.o.o. to Zelezara Smederevo d.o.o., dated 31 May 2016, Exhibit CF-22; Invoice from HPK Management d.o.o. to Zelezara Smederevo d.o.o., dated 30 June 2016, Exhibit CF-23.
[388] Transcript Day 5, 108:20-109:14.

"The Service Provider shall be entitled to a Management Fee for its Management Services. The Management Fee shall consist of the fixed fee and variable fee as more closely defined below."[389]

431.    Clause 3.2.5 of the MSA further provides:

"The fixed portion of the Management Fee shall amount EUR 340,000 (three hundred and forty thousand euros) per month (VAT exclusive) (the Fixed Fee)."[390]

432.    The Tribunal finds that the Respondents have failed to provide any valid reasons why the Fixed Fee pursuant to Clause 3.2.5 of the MSA should not be due for the months of May and June 2016.  The Respondents have not established, indeed not even argued, that the Claimants have failed to manage the Company during those months.  The idea of the Fixed Fee (as opposed to the Variable Fee in Clause 3.2.6 and the Privatisation Bonus in Clause 3.2.9 of the MSA) is that it is due as long as the Service Provider is the manager of the Company.

433.    In light of the above, the Tribunal finds that the monthly Fixed Management Fee is due for the months of May and June until the end of the MSA on 30 June 2016, as per the First Termination Notice, as determined above.[391]

434.    The Management Fee is due by the Second Respondent to the First Claimant.  First, this results from Clause 3.2.4 of the MSA which provides that "[t]he Service Provider shall be entitled to a Management Fee."[392]  Second, the arguments above regarding joint and several liability apply equally here.[393]  Third, this is indeed what results from the invoices issued by the First Claimant to the Second Respondent on 31 May 2016 (for the Management Fee for May 2016)[394] and 30 June 2016 (for the Management Fee for June 2016).[395]

435.    Finally, the amount sought in the Claimants' request for relief is for Serbian Dinar (RSD) 100,536,504 which corresponds to the sum of the two invoices: RSD 50,225,412 for May 2016[396] and RSD 50,311,092 for June 2016.[397]

---

[389] MSA, Exhibit CF-3.
[390] MSA, Exhibit CF-3 (emphasis omitted).
[391] See above, at para. 167.
[392] MSA, Exhibit CF-3.
[393] See above, at paras 398-412.
[394] Invoice from HPK Management d.o.o. to Zelezara Smederevo d.o.o., dated 31 May 2016, Exhibit CF-22.
[395] Invoice from HPK Management d.o.o. to Zelezara Smederevo d.o.o., dated 30 June 2016, Exhibit CF-23.
[396] Invoice from HPK Management d.o.o. to Zelezara Smederevo d.o.o., dated 31 May 2016, Exhibit CF-22.
[397] Invoice from HPK Management d.o.o. to Zelezara Smederevo d.o.o., dated 30 June 2016, Exhibit CF-23.

436.     In light of the above, the Tribunal finds that the Second Respondent owes to the First Claimant RSD 50,225,412 for the Management Fee for May 2016 and RSD 50,311,092 for June 2016.

### E.     INTEREST

437.     On the point of interest, the Claimants have referred to Article 26.4 of the LCIA Rules and Section 5.2.1 of the MSA and made the following submission:

> "As stated on the website of the National Bank of Serbia, the default interest rate is the key policy rate plus 8% and the key policy rate was 4% from 07.07.16, then 3.75% from 07.09.17, then 3.5% from 09.10.17 to date. HPK claim simple interest on all their claims at the above rates for the period 30.06.16 (30.05.16 for the May management fee), to date of payment.  At 01.01.18 this will total €3,026,562 accruing at €5,317 daily thereafter.  We submit such rate is the agreed rate and is appropriate. We do not know if this approach will be disputed but, if for any reason it is not accepted by the Tribunal, we submit that at the least a high commercial rate (c. 9% to reflect Serbian borrowing costs) would be appropriate and interest should then be awarded on a compound basis with quarterly rests."[398]

438.     According to the Respondents, the relevant provisions are those of Serbian law concerning default interest, and in particular the Law on Default Interest No. 119/2012 (the "**Law on Default Interest**").[399]  The Respondents state that "for debt in domestic currency (Serbian dinars) the rate of interest per annum is 8% plus key policy rate [and] [f]or euro-denominated debt, Article 4(1) of the Law [on Default Interest] states explicitly that the annual default interest rate is 8% plus main refinancing operation rate of the European Central Bank."[400]  The Respondents add that "[s]ince the main refinancing operations rate of the ECB is zero, default interest rate on euro-denominated debt is 8%."[401]

439.     The Respondents further allege that "Claimants seek compound interest" which, according to the Respondents, "is prohibited in Serbian law, and declared unconstitutional by the Serbian Constitutional Court [...] [and] thus an element of Serbian public policy."[402]

440.     The relevant provisions are as follows.  Article 26.4 of the LCIA Rules provides:

> "***Unless the parties have agreed otherwise***, the Arbitral Tribunal may order that simple or compound interest shall be paid by any party on any sum awarded at such

---

[398] CPHB, at para. 123.
[399] Respondents' submission of 18 January 2018, at para. 17; Law on Default Interest, Exhibit RL-17.
[400] Respondents' submission of 18 January 2018, at para. 17.
[401] Respondents' submission of 18 January 2018, at para. 17.
[402] Respondents' submission of 18 January 2018, at para. 18.

rates as the Arbitral Tribunal decides to be appropriate (without being bound by rates of interest practised by any state court or other legal authority) in respect of any period which the Arbitral Tribunal decides to be appropriate ending not later than the date upon which the award is complied with."[403]

441.    In the MSA, the Parties agreed on interest rates as follows in Section 5.2.1:

"In the event the Company does not pay any amount due within the applicable time frame, the Service Provider may charge interest at the rate of the ***official legal default interest rate in line with the Governing Law***."[404]

442.    Pursuant, to Sections 1.1 and 17.3 of the MSA the "Governing Law" is Serbian law, so the Law on Default Interest applies.  According to its Article 1, the Law on Default Interest, "prescribes the rate and the manner of calculating the default interest to be paid by the debtor which is in default with performance of a monetary obligation."[405]  Article 2 specifies that "[t]he debtor which is in default with performance of a monetary obligation, owes, alongside the principal, the default interest in correspondence with the amount of the debt, until the date of payment, at the rate determined by this law."[406]

443.    Articles 3 and 4 determine the rate of default interest as being eight percent points above a reference rate.  The reference rate differs according to the currency of the main debt:

a.      if the debt is in Serbian dinar, Article 3 provides that "[t]he rate of the default interest […] is determined yearly, at the level of ***key policy rate of the National Bank of Serbia***, increased by eight percentage points;"

b.      if the debt is in Euros, Article 4(1) provides that "[t]he rate of the default interest […] is determined yearly, at the level of ***reference interest rate of the European Central Bank*** for main refinancing operations, increased by eight percentage points;" and

c.      if the debit is another foreign currently, Article 4(2) provides that "[t]he rate of the default interest […] is determined yearly, at the level of ***reference/basic interest rate which is prescribed and/or applied at performing main operations by the***

---

[403] LCIA Rules, Article 26.4 (emphasis added).
[404] MSA, Exhibit CF-3 (emphasis added).
[405] Law on Default Interest, Exhibit RL-17.
[406] Law on Default Interest, Exhibit RL-17.

*central bank of the state of domicile currency*, increased by eight percentage points."[407]

444.    In application of the above, for the Management Fees which are due in Serbian dinar, the applicable interest rate is eight percent points above the key policy rate of the National Bank of Serbia.  The key policy rate of the National Bank of Serbia is set out on its website http://nbs.rs/internet/english/33/33_8/index.html and the historical data for Serbian dinar is:

| Шифра валуте /Currency code | Назив земље/ Country | Ознака валуте/ Currency designation | | |
|---|---|---|---|---|
| 941 | Република Србија/ Republic of Serbia | RSD | | |

| Референтна/Основна каматна стопа у % на годишњем нивоу/ Key/Base policy rate in % p.a. | Увећање референтне/основне каматне стопе у п.п./Increase in the Key/Base policy rate in p.p. | Стопа затезне камате/Default interest rate | | |
|---|---|---|---|---|
| | | У % на годишњем нивоу/ In % p.a. | Датум објављивања/ Announcement date | Важи од/ Valid from |
| 11.25 | 8.00 | 19.25 | 24.12.2012 | 25.12.2012 |
| 11.50 | 8.00 | 19.50 | 17.1.2013. | 18.1.2013. |
| 11.75 | 8.00 | 19.75 | 5.2.2013. | 6.2.2013. |
| 11.25 | 8.00 | 19.25 | 14.5.2013. | 15.5.2013. |
| 11.00 | 8.00 | 19.00 | 6.6.2013. | 7.6.2013. |
| 10.50 | 8.00 | 18.50 | 18.10.2013. | 19.10.2013. |
| 10.00 | 8.00 | 18.00 | 7.11.2013. | 8.11.2013. |
| 9.50 | 8.00 | 17.50 | 17.12.2013. | 18.12.2013. |
| 9.00 | 8.00 | 17.00 | 8.5.2014. | 9.5.2014. |
| 8.50 | 8.00 | 16.50 | 12.6.2014. | 13.6.2014. |
| 8.00 | 8.00 | 16.00 | 13.11.2014. | 14.11.2014. |
| 7.50 | 8.00 | 15.50 | 12.3.2015. | 13.3.2015. |
| 7.00 | 8.00 | 15.00 | 9.4.2015. | 10.4.2015. |
| 6.50 | 8.00 | 14.50 | 11.5.2015. | 12.5.2015. |
| 6.00 | 8.00 | 14.00 | 11.6.2015. | 12.6.2015. |
| 5.50 | 8.00 | 13.50 | 13.8.2015. | 14.8.2015. |
| 5.00 | 8.00 | 13.00 | 10.9.2015. | 11.9.2015. |
| 4.50 | 8.00 | 12.50 | 14.10.2015. | 15.10.2015. |
| 4.25 | 8.00 | 12.25 | 11.2.2016. | 12.2.2016. |
| 4.00 | 8.00 | 12.00 | 7.7.2016. | 8.7.2016. |
| 3.75 | 8.00 | 11.75 | 7.9.2017. | 8.9.2017. |
| 3.50 | 8.00 | 11.50 | 9.10.2017. | 10.10.2017 |
| 3.25 | 8.00 | 11.25 | 14.3.2018. | 15.3.2018. |

445.    The Management Fee for May became due on 31 May 2016, and the applicable interest rate is thus:

    a.    from 1 June 2016 to 7 July 2016: 12.25%;

    b.    from 8 July 2016 to 7 September 2017: 12%;

    c.    from 8 September 2017 to 9 October 2017: 11.75%;

    d.    from 10 October 2017 to 14 March 2018: 11.50%; and

    e.    since 15 March 2018: 11.25%.

---

[407] Law on Default Interest, Exhibit RL-17 (emphasis added).

446.   The Management Fee for June became due on 30 June 2016, and the applicable interest rate is thus:

    a.     from 1 July 2016 to 7 July 2016: 12.25%;

    b.     from 8 July 2016 to 7 September 2017: 12%;

    c.     from 8 September 2017 to 9 October 2017: 11.75%;

    d.     from 10 October 2017 to 14 March 2018: 11.50%; and

    e.     since 15 March 2018: 11.25%.

447.   For the Privatisation Bonus which is set out in US Dollars, the default interest rate is, in application of Article 4(2) of the Law on Default Interest, 8 percent points above "the reference/basic interest rate which is prescribed and/or applied at performing main operations by the central bank of the state of domicile currency", i.e. the US Federal Reserve Bank (FED).  These are also set out on the website of the National Bank of Serbia:

| Шифра валуте /Currency code | Назив земље/ Country | Ознака валуте/ Currency designation | | |
|---|---|---|---|---|
| 840 | САД/United States | USD | | |

| Распон референтне/Основне каматне стопе у % на годишњем нивоу/ Key/Base policy rate range in % p.a. | | Увећање референтне/основне каматне стопе у п.п./Increase in the Key/Base policy rate in p.p. | Стопа затезне камате/Default interest rate | | |
|---|---|---|---|---|---|
| минимална каматна стопа/minimum | максимална каматна стопа/maximum | | У % на годишњем нивоу/ In % p.a. | Датум објављивања/ Announcement date | Важи од/ Valid from |
| 0.00 | 0.25 | 8.00 | 8.13 | 24.12.2012. | 25.12.2012. |
| 0.25 | 0.50 | 8.00 | 8.375 | 17.12.2015. | 18.12.2015. |
| 0.50 | 0.75 | 8.00 | 8.625 | 15.12.2016. | 16.12.2016. |
| 0.75 | 1.00 | 8.00 | 8.875 | 16.3.2017. | 17.3.2017. |
| 1.00 | 1.25 | 8.00 | 9.125 | 15.6.2017. | 16.6.2017. |
| 1.25 | 1.50 | 8.00 | 9.375 | 14.12.2017. | 15.12.2017. |
| 1.50 | 1.75 | 8.00 | 9.625 | 22.3.2018. | 23.3.2018. |

448.   The Privatisation Bonus became due on 30 June 2016, and the applicable interest rate is thus:

    a.     from 1 July 2016 to 15 December 2016: 8.375%;

    b.     from 16 December 2016 to 16 March 2017: 8.625%;

    c.     from 17 March 2017 to 15 June 2017: 8.875%;

    d.     from 16 June 2017 to 14 December 2017: 9.125%;

    e.     from 15 December 2017 to 22 March 2018: 9.375%; and

    f.     since 23 March 2018: 9.625%.

449.    For the avoidance of doubt, the Tribunal notes that the interest above is simple and not compound interest, and runs only until the main debt is paid in full.

### F.    OTHER RELIEF REQUESTED BY THE CLAIMANTS

450.    In addition to the requests for relief dealt with by the Tribunal above, the Claimants have, at times, included additional relief in their submissions.  For instance, in their Witness Submission, the Claimants requested declaratory relief as follows:

> "Further or alternatively the Claimants claim declarations as appropriate as per paragraphs 160, 165, 167 and/or 168 above."[408]

451.    The same relief was included in the Claimants' Rebuttal Witness Submission[409] and Post-Hearing Brief.[410]

452.    Having granted the Claimants' primary relief for payment, in the previous sections, the Claimants' alternative declaratory relief is moot.  For the avoidance of doubt, the Tribunal dismisses the requests for the same reasons as those stated in the previous sections.

### G.    ARBITRATION COSTS

453.    The Claimants, in their Cost Submission, list their costs as follows:[411]

| | | |
|---|---|--:|
| a | HK LLP Professional Charges | £718,695 |
| b | Disbursements (e.g. travel, translation, transcription, printing, copying) | £32,946 |
| c | Barrister's fees | £236,282 |
| d | Experts' fees | £230,965 |
| e | Serbian law advice | £171,751 |
| f | LCIA advance payments to date | £111,750 |
| | **Total** | **£1,502,389** |

454.    The Claimants further make the following submissions:

> "In arbitrations like this, costs should presumptively follow the event (see LCIA Rule 28.4).  If the Claimants are successful – that is, if they are awarded the privatisation bonus – they should be awarded their costs.  If, hypothetically, the Claimants lose on more collateral issues (e.g. whether HPK Engineering has its own claim), they should still recover costs in full.  The bulk of costs were incurred on the core issues of whether there was breach justifying termination and whether termination was lawful/in good faith.  Both Respondents should be ordered to pay the Claimants' costs

---

[408] CSub1, at paras 173-176.
[409] CSub2, at para. 131.
[410] CPHB, at para. 123.
[411] CCS, at para. 1.

jointly and severally, even if, hypothetically, liability is found only against the Company. The Respondents forced the Claimants to bring proceedings by refusing to pay which was RoS's decision as was the decision to terminate. Moreover, RoS, as the sole owner of the Company, is funding and directing the conduct of the proceedings. The Respondents could potentially have avoided these proceedings but refused the Claimants' Request for Mediation made at the outset under the LCIA Mediation Rules. The Respondents should be ordered jointly and severally to pay the Claimants' costs in full.

The above costs are reasonable and proportionate to the complexity of the issues raised in this arbitration and the amounts in dispute. Under Rule 28.4 the Tribunal may take into account the parties' conduct, including cooperation in facilitating the proceedings in time and cost and any non-co-operation resulting in undue delay and expense. There is nothing in the Claimants' conduct that warrants any deduction. The Claimants engaged constructively with the arbitral process at all times and co-operated fully with all directions of the Tribunal. They enabled the proceedings to be conducted quickly and efficiently according to the timetable. The Respondents' argument in recent correspondence that the Claimants engaged in '*guerrilla*' tactics is nonsense. For example, the Respondents' complained that the Claimants '*rejuggled*' expert testimony '*on the fly*'. In fact, the expert evidence was updated to help the Tribunal grapple with new points arising for the first time in cross-examination. The Claimants did not win every procedural debate but they won many. None of their stances was unreasonable. All procedural disputes were swiftly resolved.

By contrast, it was the Respondents' conduct that increased the costs of this arbitration. The Respondents took a scorched earth approach. Instead of focussing on the real issues, they made a wide range of allegations, many of them obviously bad and some knowingly false, but all of which had to be answered (many in the end found no place in RPHB). The Respondents breached disclosure obligations (see CRB 10-11; CPHB 2, 10), and raised new arguments at late stages. For example, the Claimants were right to object to the potential new points in the list at RRB 69 (not in the end pursued). Another example of the Respondents' obstructive approach is their refusal to agree to any additional documents even in obviously legitimate cases. The Tribunal admitted many of the proposed additions, for example, in its orders of 27 October 17 and 29 December 2017. Worst of all was the Respondents' conduct of their case in a vague, shifting manner which increased costs as the Claimants had to guess the case they had to meet and respond to numerous possibilities. Had the Respondents advanced a limited range of targeted, clear and unvarying allegations of breach, the costs of this arbitration for both parties would have been substantially lower."[412]

455.   The Respondents, in their Cost Submission, list their costs as follows:[413]

---

[412] CCS, at paras 2-4.
[413] RCS, at para. 1.

*(i) Costs and expenses of the Republic of Serbia*

|   | | |
|---|---|---|
| - | Costs of legal counsel | EUR 248,963.08[1] |
| - | LCIA administrative expenses | GBP 100,000 |
| - | Costs of expert witness services | EUR 102,000 |
| - | Other expenses (travel, accommodation etc.) | EUR 23,651.92 |

**Total:**                                        **EUR 374,615 and GBP 100,000**

*(ii) Costs and expenses of Zelezara Smederevo d.o.o.*

|   | | |
|---|---|---|
| - | Costs of legal counsel | EUR 243,292.65 |
| - | LCIA administrative expenses | GBP 10,000 |
| - | Other expenses (travel, accommodation etc.) | EUR 10,854.32 and GBP 11,344.93 |

**Total:**                                        **EUR 254,146.97 and GBP 21,344.93**

456.    The Respondents further make the following submissions:

> "Taking the above in to account, Respondents request the following: that the Claim ants are obliged to reimburse the Republic of Serbia the costs incurred in these arbitration proceedings within 15 days from receipt of the award, in total amount of EUR 374,615 and GBP 100,000;
>
> that the Claimants are obliged to reimburse Zelezara Smederevo d.o.o. the costs incurred in these arbitration proceedings within 15 days from receipt of the award, in total amount of EUR 254,146.97 and GBP 21,344.93."[414]

457.    Having carefully considered the Parties' submissions on cost, the Tribunal makes the following decision.

458.    First, regarding the costs of the arbitration other than the legal or other expenses incurred by the Parties (the "**Arbitration Costs**"), Article 28.1 of the LCIA Rules provides that they "shall be determined by the LCIA Court in accordance with the Schedule of Costs" and that "[t]he parties shall be jointly and severally liable to the LCIA and the Arbitral Tribunal for such Arbitration Costs."

459.    According to Article 28.1 of the LCIA Rules, the NET arbitration costs have been determined by the LCIA Court as follows:

---

[414] RCS, at para. 2.

| | |
|---|---|
| Registration fee: | GBP 1,750.00 |
| LCIA's administrative charges: | GBP 20,254.34 |
| Tribunal's fees: | GBP 213,507.10 |
| Total costs of arbitration | GBP 235,511.44 |

These fees and expenses are subject to the applicable VAT.

460.   Article 28.2 of the LCIA Rules further states:

> "The Arbitral Tribunal shall specify by an award the amount of the Arbitration Costs determined by the LCIA Court. The Arbitral Tribunal shall decide the proportions in which the parties shall bear such Arbitration Costs (in the absence of a final settlement of the parties' dispute regarding liability for such costs). If the Arbitral Tribunal has decided that all or any part of the Arbitration Costs shall be borne by a party other than a party which has already covered such costs by way of a payment to the LCIA under Article 24, the latter party shall have the right to recover the appropriate amount of Arbitration Costs from the former party."

461.   The Tribunal decides that the Parties should bear the NET Arbitration Costs in equal shares, ie the Claimant should bear GBP 117,755.72 and the Respondents should bear GBP 117,755.72. The Second Claimant, as the only Party liable to pay VAT (having not confirmed to the LCIA that it holds a valid EU VAT Registration number) shall bear the VAT on the Arbitration Costs in the amount of GBP 11,510.22. Given that the Claimants have paid the Registration fee, deposits and interest accrued in the amount of GBP 124,385.83 and the Respondents have paid deposits and interest accrued in the amount of GBP 122,623.80, the Claimants shall pay to the Respondents the sum of GBP 4,868.08 (i.e. the Respondents' payment of GBP 122,623.80 minus the Respondents' share of GBP 117,755.72).

462.   Second, regarding the Parties' legal or other expenses (the "**Legal Costs**"), Article 28.3 of the LCIA Rules provides:

> "The Arbitral Tribunal shall also have the power to decide by an award that all or part of the legal or other expenses incurred by a party (the "Legal Costs") be paid by another party. The Arbitral Tribunal shall decide the amount of such Legal Costs on such reasonable basis as it thinks appropriate. The Arbitral Tribunal shall not be required to apply the rates or procedures for assessing such costs practised by any state court or other legal authority."

463.   Article 28.4 of the LCIA Rules further provides:

"The Arbitral Tribunal shall make its decisions on both Arbitration Costs and Legal Costs on the general principle that costs should reflect the parties' relative success and failure in the award or arbitration or under different issues, except where it appears to the Arbitral Tribunal that in the circumstances the application of such a general principle would be inappropriate under the Arbitration Agreement or otherwise. The Arbitral Tribunal may also take into account the parties' conduct in the arbitration, including any co-operation in facilitating the proceedings as to time and cost and any non-co-operation resulting in undue delay and unnecessary expense. Any decision on costs by the Arbitral Tribunal shall be made with reasons in the award containing such decision."

464.   In light of the above, and pursuant to Article 28.4 of the LCIA Rules, the Tribunal decides that the award of the Parties' Legal Costs should reflect the Parties' relative success and failure in this arbitration. While the Tribunal is minded to also take into account the Parties' conduct in the arbitration, including any co-operation in facilitating the proceedings as to time and cost and any non-co-operation resulting in undue delay and unnecessary expense, the Tribunal finds that in the present case no Party or side was responsible more than the other for any undue delays or incurred costs in the proceedings.

465.   Based on the Parties' relative success and failure in the award or arbitration, the Legal Costs are awarded as follows.

466.   Regarding the First Respondent, the Claimants' claims were unsuccessful, and the Claimants are thus ordered to pay the First Respondent's Legal Costs. The Claimants' arguments that the First Respondent should nevertheless be found liable for costs because "[t]he Respondents forced the Claimants to bring proceedings by refusing to pay which was RoS's decision as was the decision to terminate"[415] is unsubstantiated and unconvincing: it fails for the same reasons the Claimants' claims against the First Respondent failed in the first place.[416] Given that the claims in this arbitration were brought by both Claimants, both Claimants are jointly and severally liable for the First Respondent's Legal Costs. The Claimants are thus ordered to pay to the First Respondent the amount of EUR 374,616.

467.   Regarding the Second Respondent, the Claimants' claims were partially successful:

---

[415] CCS, at para. 2.
[416] See above at paras 394-419.

a.    The Claimants initially sought declaratory relief that "the purported termination of the MSA by the [Second Respondent] was invalid" and requested that the Second Respondent was ordered to pay a termination fee to the Claimants under Clause 8.3.2 of the MSA – a claim the Claimants later withdrew.[417]

b.    On the Privatisation Bonus claim, the Claimants succeeded on principle, but not on the amount, and not regarding the Second Claimant.[418]

c.    On the Management Fee claims, the Second Claimant succeeded.[419]

468.    In light of the above, the Tribunal finds that the Second Claimant should be able to recover 80% of its Legal Costs, which reflects the relative success of its claims in this arbitration.  The amount of the Second Claimant's Legal Costs is deemed to be GBP 1,390,639 (being the total of the Claimants' costs minus the LCIA advance of GBP 111,750, taken into account as part of the Arbitration Costs above).  The Tribunal sees no reasons to further distinguish between the First Claimant's and Second Claimant's Legal Costs, since there is no evidence that the Claimants' cost would have been any different had the claims only been brought by the Second Claimant.

469.    The Party liable for the Claimants' costs is the Second Respondent, since the First Respondent was found not to be liable vis-a-vis the Claimants on any of the claims listed above.[420]  The Claimants' argument that "[b]oth Respondents should be ordered to pay the Claimants' costs jointly and severally, even if, hypothetically, liability is found only against the Company"[421] is unconvincing: it fails for the same reasons the Claimants' argument for joint and several liability on the main claim failed, as detailed above.[422]

470.    Accordingly, the Second Respondent is ordered to pay to the First Claimant GBP 1,112,511.20, i.e. 80% of GBP 1,390,639.

---

[417] See above at paras 130-134.
[418] See above at paras 361-392; 420-428.
[419] See above at paras 429-436.
[420] See above at paras 394-419.
[421] CCS, at para. 2.
[422] See above at paras 394-412.

## VII.    AWARD

NOW THEREFORE THE ARBITRAL TRIBUNAL DECIDES, HOLDS, AND ORDERS
AS FOLLOWS:

a.     Orders the Second Respondent to pay to the First Claimant the Privatisation
Bonus in the amount of USD 10,000,000 (in words: ten million);

b.     Orders the Second Respondent to pay simple interest on the amount in (a) at a
rate of 8.375% from 1 July 2016 to 15 December 2016; 8.625% from 16 December
2016 to 16 March 2017; 8.875% from 17 March 2017 to 15 June 2017; 9.125% from
16 June 2017 to 14 December 2017; 9.375% from 15 December 2017 to 22 March
2018; and 9.625% since 23 March 2018 and until full payment of the amount in (a);

c.     Orders the Second Respondent to pay to the First Claimant the Management
Fees for the month of May 2016 in the amount of RSD 50,225,412;

d.     Orders the Second Respondent to pay simple interest on the amount in (c) at a
rate of 12.25% from 1 June 2016 to 7 July 2016; 12% from 8 July 2016 to 7
September 2017; 11.75% from 8 September 2017 to 9 October 2017; 11.50% from 10
October 2017 to 14 March 2018; and 11.25% since 15 March 2018 and until full
payment of the amount in (c);

e.     Orders the Second Respondent to pay to the First Claimant the Management
Fees for the month of June 2016 in the amount of RSD 50,311,092;

f.     Orders the Second Respondent to pay simple interest on the amount in (e) at a
rate of 12.25% from 1 July 2016 to 7 July 2016; 12% from 8 July 2016 to 7
September 2017; 11.75% from 8 September 2017 to 9 October 2017; 11.50% from 10
October 2017 to 14 March 2018; and 11.25% since 15 March 2018 and until full
payment of the amount in (e);

g.     Order the Claimants to pay to the Respondents GBP 4,868.08 as the balance of
the VAT on Arbitration Costs;

h.     Orders the Claimants to pay to the First Respondent its Legal Costs in the
amount of EUR 374,616;

i.      Orders the Second Respondent to pay to the First Claimant its Legal Costs in the amount of GBP 1,112,511.20; and

j.      Dismisses any other request.

Place of Arbitration: London, England

Date: 11 May 2018


_____
Mr Richard Jacobs QC, Co-Arbitrator

_____
Prof Dr Miodrag V Orlić, Co-Arbitrator

_____
Prof Dr Maxi Scherer, Presiding Arbitrator