# EXHIBIT D

IN THE LONDON COURT OF INTERNATIONAL ARBITRATION

BETWEEN:

(1) HPK Management D.O.O.
(2) HPK Engineering B.V.

<u>Claimants</u>

-and-

(1) The Republic of Serbia
(2) Železara Smederevo D.O.O.

<u>Respondents</u>

_____

**FIRST WITNESS STATEMENT OF**

**PETER KAMARAS**

_____

1. My name is Peter Kamaras and my address is Kosice-Zapad Trieda SNP 441/13 Kosice Slovakia. I am and was during the period relevant to this dispute the managing director of the First Claimant, HPK Management d.o.o. (the "**Service Provider**") and the owner of 67.5% of the Second Claimant, HPK Engineering B.V. (the "**Bidder**"). The Service Provider is the Serbian company that was incorporated and wholly owned by the Bidder for the purposes of providing management services to the Second Respondent, Železara Smederevo d.o.o. (the "**Company**") for its 100% owner, the First Respondent, the Republic of Serbia ("**RoS**") pursuant to the Management and Consultancy Services Agreement entered into on 21 March 2015 (the "**MSA**"). During the period of the MSA, I served, along with John Goodish, as one of the Service Provider's appointees to the Supervisory Board of the Company. The other three members of the Supervisory Board were appointed by RoS.

2. I am also the owner of Pikaro s.r.o. ("**Pikaro**") which is the Slovakian company which became the Company's primary supplier of raw materials and the primary purchaser of its end products. I was a director of Pikaro until 28 May 2015 and since 20 July 2016 but not during the intervening period. [CF 66].

3. I make this statement on behalf of the Service Provider and the Bidder in relation to these proceedings. Insofar as the matters stated in this witness statement are within my own

1

knowledge, they are true; insofar as they are not within my own knowledge, they are true to the best of my information and belief and the sources of that information are provided.

4.  In this witness statement I refer to a number of documents submitted as exhibits to the written submissions of the Claimants and the Respondents. I refer to exhibits submitted by the Claimants with the prefix "[CF__]". I refer to exhibits submitted by the Respondents with the prefix "[RF__]".

**Background**

5.  I received a master's degree in chemistry from Charles University in Prague in 1990. I received a PhD in bioinorganic chemistry from Georgetown University in Washington D.C. in 1994 and did further post-doctoral studies at Johns Hopkins University until 1996. During my PhD studies and following my post-doctoral work, I worked in Kosice, Slovakia with various companies owned by my brother in the business of supplying raw materials to steel companies in Eastern Europe. We were one of the biggest exporters of raw materials from Ukraine in the 1990s. In 2000 US Steel bought the steel mill in Kosice and my brother's company Valcovna Profilov, for which I was chairman of the board, became a main supplier of steel coils processing and logistics services to US Steel in Slovakia. Throughout this period I became very familiar with the steel production supply chain and the steel manufacturing business generally.

6.  The main strategic raw materials for the production of steel are iron, coal, coke and ferroalloys. Iron ore comes in two forms, pellets or sinter fine ore. Sinter fines are cheaper and more efficient but require a functioning sinter plant on site while pellets are less efficient because they require more coke to be used in the production process. Pellets are usually more expensive than sinter ores because they are made of lower quality sinter ore which typically requires additional processes for concentration and pelletisation. Both require substantial amounts of energy. Coke is a form of processed coal that is the principal fuel used to heat the blast furnaces of the plant. Quality coke is very important because it also combines with the sinter inside the blast furnace to keep it from collapsing. Because of the importance of coke to the process, steel plants generally have a facility on site for processing coal into coke, however the Company did not because its coke facility at Lukavac (in what is now Bosnia Hercegovina) was separated from the Company when the former Yugoslavia broke up. Coke therefore had to be supplied externally. For historical and geographical reasons the Company continued to get most of its coke from GIKIL which now ran the Lukavac facility as the only nearby independent coke producer. GIKIL was financed by RAG, a large German company controlled by the German state.

7.  Most iron ores for steel plants in Eastern Europe come from Ukraine and Russia so the logistics are very complex and challenging. During my time working with my brother's companies in the supply of raw materials I managed to form good relationships with all of the most well-known producers of iron ore. Ukrainian businessman Alexander Moroz, for example, was the first and longest serving iron ore executive I met in Ukraine in 1993. He was, and still is, in charge of sales of Poltava Pellets to Eastern Europe including to the Company. I was able to use these relationships effectively over the years in my raw materials supply business related to the Company.

8.  In around April 2011, I formed my own business supplying raw materials for steel production while continuing to work in my brother's businesses. I bought the company Pikaro s.r.o. from my cousin and started to turn it into a raw materials supply business for steel plants, mainly US Steel in Kosice. I maintained a profit sharing arrangement with my brother until May 2015 when we completely divided our business interests and I conducted my raw material supply business solely through Pikaro.

9.  I came to know the Company in 2011 when one of my brother's companies for which I worked at the time, Lamet s.r.o., became one of its raw material suppliers. At that time the Company was owned by US Steel. It was sold back to RoS in February 2012. I was responsible for supplying more than half of the sinter ore to the Company during its time in RoS ownership first with Lamet and then Pikaro when Pikaro took over as supplier in January 2015. In this role I became familiar with the Company and members of the government interested in the Company's business. The Company was very poorly run under RoS ownership. Its top management left when the Company was sold back to RoS by US Steel. It was well known that the Company could not obtain good payment terms for raw materials because it had a very bad reputation for payment on time. Pikaro experienced problems with payment from the Company because of its poor cash flow position and poor management decisions. Alexander Moroz, for example, refused to even deal with the Company because of its payment record in 2014. He also refused to supply the Company with higher quality pellets until the arrangements were put in place with the Service Provider and Pikaro that I discuss below. In addition to a shortage of cash, the people responsible for raw material procurement at the Company simply did not have the knowledge, skills, training or experience to effectively manage the process for obtaining raw materials for the Company. Several lengthy stoppages of production made it unreliable in the market as a buyer of raw materials and a seller of finished products. The plant was also very poorly run from an operational and sales point of view.

10. The management and financial performance of the Company was very poor and it was clear to me that RoS wanted to privatise the Company again as soon as a buyer could be found. I knew of a US steel company called Esmark that I thought might be interested in acquiring the plant. Esmark was run by Jim Bouchard who was an acquaintance of mine. I introduced Jim Bouchard to the Company and RoS and Esmark began to prepare a bid for the privatisation of the Company's business. I assisted with the preparation of Esmark's business plan for the Company to be submitted with its proposals and enlisted the help of a long time contact of mine, Pavol Vrchovinsky, who was a finance expert. I also acted as intermediary between Esmark and RoS in relation to the proposed deal. I had numerous discussions with the then RoS Prime Minister (now President), Alexander Vucic, in this regard. In January 2015, RoS put together a tender process with the intention of privatising the Company to Esmark. This process was run by KPMG.

11. In the end the Esmark deal fell through. Esmark was having financial difficulties in the US and RoS was concerned that its plan was to draw funds out of the Company in order to prop up its US business. The terms proposed by Esmark were also unacceptable to RoS. Esmark proposed to acquire an 80% interest in the Company for $1 leaving RoS with a minority 20% share but offered no role in management or oversight to RoS. The price was acceptable for RoS but the fact that Jim Bouchard wanted complete control over the business was unacceptable to RoS if it was to continue holding an interest.

12. Given the poor state of the Company's business it was widely accepted within RoS that the Company could not continue under current management even if the privatisation to Esmark were to fall through. In early February 2015, when it looked like the Esmark deal may not proceed, I proposed to RoS a "plan B" that could be put in place in case the last ditch negotiations with Esmark failed. Plan B was that I would put together a team to manage the plant on an interim basis while RoS looked for a new suitor for privatisation. In mid-February I was called into a meeting with Prime Minister Vucic and was told that the Esmark deal had fallen through and that RoS was going to go for plan B.

13. The day after the meeting with the Prime Minister I flew to the Netherlands to establish the Bidder as the Company that would make the bid to provide management services pending a further attempt at privatisation. I also secured agreements from John Goodish, the former COO of US Steel Corporation and former vice president of US Steel Europe, Richard Roman, Yves Nassan and Lazar Fruchter to join my effort to manage the Company. This small group had decades of experience and leadership in all of the main aspects of such a project. They had experience with strategic raw materials, logistics, management, production and sales to Italy, France, Germany and Benelux countries as well as

experience with the Company through an existing contract. I also began assembling the team of managers who would manage the plant through contacts I had in the steel industry. I enlisted Pavol Vrchovinsky to help with the financial aspects of the business plan and other experts who eventually became the HPK Management team of approved consultants. Initially, the Bidder was owned 95% by me and 5% by Richard Roman who is my brother in law. I also offered shares to Yves Nassan and Lazar Fruchter. They ran a steel product marketing business out of Antwerp, Belgium called ICT. They were purchasing steel products through their purchasing companies first Global Steel, a BVI company, and then GLS Steel Distributors Ltd, a Cyprus company. They had been involved in the steel trading business for 35 years. Global Steel/GLS Steel Distributors Ltd had an existing contract with the Company for the marketing of steel end products in various countries since 2003. Messrs Nassan and Fruchter agreed around the end of February 2015 to invest in a 20% share of the project to manage the Company pending privatisation but their investment was not actually completed until much later in September 2015 because we were happy to proceed on trust until it could be formalised. John Goodish agreed to take 20% of the share of the project in return for participating in the oversight of the project with focus on management and production.

14. On 20 February 2015 the request for bids for management services was published by the Company on the basis of the decision of RoS as sole shareholder (the "**Tender**"). [CF 1]. The Tender required interested bidders to provide to KPMG Belgrade an initial indicative business plan along with their credentials and a proposed compensation fee. The period for bids was extremely short with submissions due on 6 March 2015. Realistically, only bidders with prior experience with the Company were in a position to make a bid because of the short timetable. Access to the Company's financial and operational data for interested bidders was provided on 23 February 2015. The process only provided for 12 days in which to produce and submit a business plan on the basis of the Company's financial position. There was therefore not enough time to conduct any meaningful due diligence into the accuracy of the financial figures provided by the Company.

15. The Bidder submitted its bid for the Tender on 6 March 2015 including a proposed business plan and compensation fee and a list and CVs of the managers we expected to provide to manage the Company. [CF 67-70]. There were a number of other bids including from Esmark. In the end, our bid was selected.

16. During the tender process, Bojan Bojkovic (at the time, the finance director of the Company) told me that RoS wanted bids for the management work to include an investment in the Company. In the course of discussions with him, I agreed that Pikaro, as

the Company's principle supplier of raw materials, would make an investment of $10 million in the Company by providing credit through extended payment terms for raw materials to the Company. The idea was that Pikaro would use its reputation and expertise in the procurement of raw materials which the Company lacked to obtain much better delivery and payment terms than the Company could obtain and use these to provide credit to the Company. This formed part of the Bidder's bid for the Tender but it was always understood that this credit would be provided by Pikaro as the supplier of raw materials to the Company separate from the Service Provider. During the process, I was convinced to increase the amount of credit to $20 million. This eventually became the basis for the raw materials agreement that was referred to in the MSA and entered into between the Company and Pikaro and which I refer to below. It was of course well known that Pikaro was my company and the raw materials agreement with Pikaro was recognised in the MSA as a related party agreement.

17. I found out that the Bidder's bid was accepted on 17 March 2015. Around this time, I spoke to Prime Minister Vucic and told him that Messrs Goodish, Roman, Nassan and Fruchter intended to invest in the project as well. Nassan and Fruchter were already known to him and the Company through a meeting he had with them in Tel Aviv organised by Israeli businessman Boris Krasny during his official visit to Israel on 29 November 2014. The Company was of course familiar with both of them because Global Steel had a marketing contract with the Company for a long time prior to the MSA tender. An interview aired on state television that evening during which the Prime Minister discussed the interim solution for the Company's management gave the names of the people behind the Bidder including those of Messrs Nassan and Fruchter. [CF 58].

**The MSA**

18. The deadline for negotiating and signing a management services agreement was also very tight. We were informed that our bid was accepted on Tuesday 17 March and we were asked to ensure that the MSA was finalised by Thursday 19 March so that it could be approved by RoS with signing scheduled for the weekend. [CF 63]. The MSA was signed on 21 March 2015. [CF 3].

19. The purpose of the MSA was for RoS to acquire interim management services for the Company until it had been successfully privatised. The goal was privatisation. The management structure for the Company was set up to allow the Service Provider to manage day to day operations under the oversight of RoS through a joint-authority structure whereby decisions and transactions were subject to approval by the Service Provider and RoS representatives. This structure was incorporated into the memorandum

of association of the Company which was changed by RoS to make it consistent with the MSA. [CF 64]. The MSA was to last 3 years unless a successful privatisation was to occur earlier.

20. In order to provide an incentive to the Service Provider to help achieve a successful privatisation, the MSA contained a provision providing that a privatisation bonus would be payable in addition to the monthly management fees in the event of a privatisation. The bonus was to be calculated as 30% of the privatisation acquisition price but with a minimum of $10 million. I recall that we required a minimum bonus to be inserted because it was common in acquisitions of loss making state-owned businesses for the buyer to offer a nominal acquisition price but with promises to make longer term investments in the business for the benefit of the economy. Esmark had made such a bid for example. I do not recall any distinction being made between an asset sale and a share sale for the purposes of calculating the privatisation bonus. I believe everyone was aware that a privatisation could take any one of a number of forms including an asset or a share sale and I cannot think of any commercial reason why the bonus should depend on the form. I therefore would not have agreed to any proposal that a lower bonus should be paid in the event of an asset sale as opposed to a share sale. But the Respondents never suggested this.

21. The Respondents claim that it was agreed at the negotiation meeting for which there is a transcript [RF 17] that a privatisation bonus of 30% of the acquisition price would only be payable in the event of a share sale. This is wrong. I recall that the discussion around the 30% versus $10 million minimum at pages 33 to 35 of the transcript was about the distinction between sale price and capital commitment, i.e. the price paid at closing as opposed to the commitment for future investments into the business. KPMG's concern was that they did not want a bonus payable on both the price paid for the Company and the capital commitment. This can be seen from Boris Milosevic's comment on page 33: "*I'm talking about we cannot have 30% on the equity and 30% on the capital commitment*". We were concerned that the price paid for the Company would be low in favour of a substantial capital commitment and we would get nothing if the privatisation bonus did not apply to the capital commitment. This can be seen from the comment by Mark Harrison (the Service Provider's solicitor) on page 33: "*Someone offers 0, piles of money to invest, and we built a successful company in 3 years and we get nothing*". We were not talking about anything specific distinguishing a share sale from an asset sale at all as it was recognised that the privatisation could take a number of forms. This is reflected in the comment from Mladan Marjanovic (KPMG lawyer representing RoS and the Company) on the top of page 35: "*Basically this relates only to privatisation*

*procedures. Any kind of model or method of privatisation will apply over…*" The solution was to have 30% payable on the acquisition price (regardless of the form of the privatisation) but not on the capital commitment but also to have a minimum bonus of $10 million. This is what was included in the MSA at clause 3.2.9. I and others at the Service Provider were entirely reliant on the English version of the agreement which I understood was the official version and we never really concerned ourselves with the Serbian translation.

22. As to who would be responsible for paying the bonus, my recollection is that it could have been either RoS or the Company. Since the acquisition price could have been paid to either RoS or the Company depending on the form of any privatisation (which was unknown at the time), I believe it was left open for both the Company and RoS to have an obligation to pay it. It wouldn't have made sense to leave the obligation only with the Company because the Company could have been acquired by the purchaser in a share sale. There was a discussion at the negotiation meeting about whether RoS should guarantee the obligations of the Company and it was left dependent on whether such a guarantee would amount to state aid. After obtaining further advice on the question, RoS decided not to provide a governmental guarantee for the Company's payment obligations because issuing such a security instrument would be visible to the IMF and European Commission which would probably consider it illegal state aid. I did not understand that conversation to have been about the primary obligations of RoS.

23. The MSA also provided for a fixed management fee of Eur 340,000 per month and a variable fee dependent on EBITDA performance and reaching certain milestones. The fixed management fee did not cover the costs of the Service Provider and we knew that if this was the only compensation we would suffer large losses. The variable fee if achieved might have allowed us to make a modest profit but to make any significant gain on the MSA we needed to achieve a privatisation.

24. The MSA contained a provision in which the Service Provider agreed to maintain net working capital ("**NWC**") above a certain level. I recall that the only purpose of this was to ensure that the business had sufficient liquidity to keep trading for a number of months if the Service Provider's managers left, or things otherwise went wrong and RoS decided to kick us out and make other arrangements. The level was agreed at $80 million. The financial modelling that Pavol Vrchovinsky was doing at the time indicated to us that, as long as the starting figure was correct, $80 million would have been achievable by implementing the business plan under reasonable market assumptions and that we would have had a buffer.

25. The MSA was scheduled to close on the effective date of the Closing and Takeover Protocol ("**CTP**"). This happened on 22 April 2015. The Closing and Takeover Protocol contained at schedule 5 a calculation of the NWC as of 31 March 2015. It turned out that this was overstated by about £24 million. Had this been understood at the time, I would not have agreed the NWC clause. I deal with this in more detail in paragraph 47 below.

26. The MSA also made reference to the raw materials supply arrangements between the Company and Pikaro which was recognised to be a related party to the Service Provider. The arrangements were the subject of separate contracts negotiated between the Company and Pikaro as I describe below. The frame contract for the supply of raw materials to the Company by Pikaro became effective on 22 April 2015 along with the MSA.

**Management structure and practice of the Company**

27. In the negotiation of the MSA, RoS wanted a right of participation in and oversight over the management of the Company. I encouraged this because I wanted to make sure that RoS was on board with everything we did in order to minimise the possibility of disputes arising. The mechanisms of the Supervisory Board, Officer for Government Relations ("**OFGR**") and KPMG monitoring team were put in place for this purpose. John Goodish and I were on the Supervisory Board representing the Service Provider. The RoS representatives on the Supervisory Board were Bojan Bojkovic (who was the previous executive finance director of the Company), Boris Milosevic and Mr Aleksandar Andonovski. RoS appointed the previous executive director of the Company Ivan Milosevic and Mladjan Marjanovic (a lawyer from KPMG) to the role of OFGR. In practice, Ivan Milosevic acted as OFGR in most cases. The OFGR was one of the directors of the Company and was required to co-sign along with the Service Provider all contracts and other legal acts of the Company.  The other director and CEO under the MSA and the memorandum of association was the Service Provider. The KPMG monitoring team was managed by KPMG partner Boris Milosevic and consisted of six previous senior managers of the Company and several KPMG employees. KPMG was paid a regular consulting fee under a consulting contract with the Company. Boris Bojkovic was paid for his services by KPMG out of the consulting fee. KPMG was reimbursed by the Company for all of its expenses relating to its work for the Company.

28. We began managing the Company following the closing of the MSA in late April 2015. We provided over 40 managers and support staff to act in all aspects of the Company's management many of whom moved their families to Serbia to work for the Company. The

MSA required a minimum of 12 managers so we were always significantly over the required number.

29. We proposed and adopted a policy of having RoS representatives sign off not only on every contract (including the Raw Materials Agreement and other agreements with Pikaro) but also on all purchase orders and payments made by or on behalf of the Company. No payment could leave the Company's bank account without two authorisations: one from the Service Provider and one from the KPMG monitoring team. The Supervisory Board met monthly and signed off on all major decisions related to the Company's business and the privatisation including any changes to the personnel assigned to the Company by the Service Provider. A detailed pack of sales, operation, raw materials and financial information was provided to the Supervisory Board ahead of every board meeting. The Supervisory Board also voted on and approved all related party contracts (including those with Pikaro) which was not a requirement of the MSA but rather a feature of the Supervisory Board procedures which were designed and put in place by John Goodish.

30. We also kept the RoS representatives including the KPMG monitoring team updated daily on operational and financial aspects of the Company's business. KPMG assigned monitors for every aspect of the business including production, acquisition of raw materials, legal, human resources, finance and sales and these monitors were involved in day to day operations. I encouraged RoS monitors to be involved and kept up to date on all of these aspects of the business. In this respect, we went well beyond what was required by the MSA so that RoS could never complain that it was not aware of what we were doing with any aspect of the Company. Ivan Milosevic required the approval of the KPMG monitoring team before he signed off on any documents as OFGR and was generally extremely careful not to do anything significant without the approval of KPMG monitors.

31. I have been asked to comment on certain personnel changes raised by the Respondents in these proceedings. Mr Uwe Heider was an approved Service Provider consultant acting as the Company's sales director. He is an extremely experienced sales manager as can be seen from his C.V. [CF 33].  Mr Heider was effective in his role and knew where and how to place the products of the Company in the market. In May 2015, I decided to replace him with Mr Kelly, a highly experienced steel executive who had held various positions at US Steel including general director of US Steel Serbia d.o.o. which was the previous name of the Company before it was re-purchased by RoS. This was approved by the Supervisory Board. [CF 32]. I felt that in order to realise Mr Heider's vision for the sales department, the sales director should be someone with greater knowledge of the local conditions in

the plant and great energy to take the department forward. An effective sales function depended not only on the knowledge of the market but also, perhaps even more so in the case of the Company, on the knowledge of the capabilities and limitations of production, logistics and personnel.  Mr Kelly played a key role in re-establishing the Company as a reliable supplier of steel on the European market.

32. In September 2015, Mr Kelly became director of innovation and was replaced by Mr Kostadinovic when the sales role was split. [CF 34]. Mr Kostadinovic was responsible for taking forward the Company's increased focus on sales growth in the domestic and former Yugoslav markets which was Mr Kostadinovic's area of expertise. [CF 35]. More strategic aspects such as pricing strategy, finance and distribution were handled by the CEO, Stanislav Barica, and the CFO, Pavol Vrchovinsky.

33. The implication in the Respondents' Statement of Defence at paragraph 23 that these changes somehow indicate that the Service Provider was not providing quality management is false. These were all appropriate changes of personnel reported to the Supervisory Board. Hesteel was also kept informed of personnel changes after January 2016 at the request of RoS.

34. With respect to Mr Grela, he was an experienced steel executive who had held roles at US Steel including general manager of US Steel in Slovakia. He functioned well as the COO until his performance began to drop towards the end of 2015. The main reason for his dismissal was that he failed to communicate with executive management effectively in relation to an initiative to reduce the cost to the Company for hot metal for steel smelting. The other managers communicated by email and in person meetings but Mr Grela was reluctant to do so and I felt he should have been more active in relation to the initiative. I decided to replace him in February 2016 with Mr Kelly as soon as I realised that his work ethic had fallen below the standards that were needed in the challenging environment in which we were operating. The Supervisory Board was informed of these changes and no comments were received from RoS representatives. Mr Song, the leader of the Hesteel group in Serbia, approved of this decision as well. My email of 23 February 2016 was somewhat exaggerated because I was trying to provide comfort that the replacement of Mr Grela would not have any negative impact on the privatisation process. [RF 1]. No complaint was ever made about the staffing decisions implemented by the Service Provider.

**Raw materials**

35. Prior to the Tender, the Company had difficulty procuring raw materials because it had such a poor reputation in the market. The main reasons were lack of experience of raw

materials procurement managers, a bad history of fulfilment of contractual obligations including late payments and cancelling active orders without warning. The Company was therefore unable to secure beneficial payment and delivery terms or high quality materials. As a result it had to pre-pay for raw materials long before they were dispatched from the supplier which heavily restricted its cashflow. The Company was also unable to use its receivables for its end products to finance the procurement of raw materials because factoring of foreign receivables to realise cash before payment or other financing tools required approval of the Serbian government for each invoice to be financed separately. Credit insurance for foreign receivables was not really available in Serbia. Pikaro by contrast was able to use its position in the market to obtain good delivery and payment terms for raw materials and was able to utilise various trade finance instruments available to it as a reputable EU-based company to finance raw materials procurement. Pikaro was also willing to be more flexible with payment arrangements than the Company's previous suppliers. Pikaro did not require any financial instrument or guarantee, not even a standard bill of exchange, to guarantee payment for the delivery of raw materials. Pikaro was, therefore, quite financially exposed to the Company. During previous management, it was standard to either pre-pay for raw materials or open a letter of credit or bank guarantee by the Company, backed by bills of exchange of the Company, a guarantee of the state-owned Serbian Export Credit and Insurance Agency as well as a government guarantee or cash deposit but this was never required by Pikaro.

36. There was only one Raw Materials Agreement as defined in the MSA which was a frame contract entered into between the Company and Pikaro on the date of closing of the MSA (the "**Pikaro Raw Materials Agreement**"). There were also individual sale and purchase contracts for shipments of particular raw materials (the "**Single Contracts**") which were referred to in the Pikaro Raw Materials Agreement and subsequently entered into throughout the period of the MSA. No goods were actually bought or sold under the Pikaro Raw Materials Agreement – this was done under the Single Contracts. Each Single Contract was approved by the Supervisory Board and signed by the OFGR appointed by RoS after having been approved by the KPMG monitoring team. Every purchase order and payment for raw materials was approved in the SAP system by KPMG monitors.

37. The arrangement made between Pikaro and the Company for raw materials was that Pikaro would use its network of raw materials suppliers to supply raw materials to the Company and provide a cash buffer of $20 million by changing delivery and payment terms so payment would be delayed for an average of 60 days from the date the Company would otherwise have to pay for raw materials. This meant that the Company would pay Pikaro 60 days later than it would have been required to pay suppliers if it were to acquire

raw materials from those suppliers directly (as had been the position prior to Pikaro's involvement). As mentioned, the Company would otherwise have been required to pre-pay for raw materials before dispatch or even before transportation was organised, which amounted to pre-payment of up to 60 days before dispatch from the producer. I discussed this with both Bojan Bojkovic during the tender process and Boris Milosevic once the Service Provider began to manage the business and they both agreed that this was the idea behind the 60-day extended payment condition. I do not recall the payment dates in the Single Contracts or the invoices ever being an issue during the entire period of the Pikaro Raw Materials Agreement until I saw it mentioned in the termination notice.

38. With regard to the credit, the Company was to have the benefit of $20 million worth of raw materials on the premises or on order before it paid for them which would allow it to use the cash that it would otherwise have had to allocate to raw materials for other purposes until payment was made. This continuing credit provided by Pikaro had the effect of enhancing the Company's cash flow position by at least $20 million while the arrangements remained in place provided of course that the Company made at least $20 million worth of orders for raw materials from Pikaro. The source and specifics of the $20 million credit was not specified in the MSA or the Pikaro Raw Materials Agreement. The delivery and payment terms of Pikaro towards the Company at any given time made up the credit that was provided which was to be over $20 million provided that sufficient raw materials orders were made to give rise to that level of receivables. It was not a mandatory requirement that there should always be $20 million worth of raw materials unpaid. This would make no sense because it would mean that if the Company slowed its orders, Pikaro would be in breach of contract. Instead Pikaro agreed to allow the Company up to $20 million credit on sales to the Company in the form of 60 day deferred payment condition. If the Company did not make enough purchases to sustain the $20 million credit there was no problem as long as Pikaro was willing to allow the credit to rise up to $20 million on whatever purchases the Company made from it. Pikaro was always willing to provide such credit.

39. Apart from the above, the supply of raw materials by Pikaro was done at arms-length, although as I mention below we were careful to act towards the bottom of the range of transfer pricing parameters advised by E&Y because the Service Provider and Pikaro were related parties. The raw materials arrangements were not exclusive and the Company was free to purchase raw materials from other suppliers.

40. On the end product side, once the MSA and the Pikaro Raw Materials Agreement were in place, we looked at financial security of the payment from customer to the Company and

also looked at options to see how the Company could use its receivables to finance its operations in order to improve the cash flow position further. Under prior management, the Company had large amounts of unpaid and uninsured receivables outstanding for long periods of time. The Company did not have any way to secure most of the receivables. This was very unusual and unacceptable for us because it was putting the Company at great risk of not receiving the payment for the final products. First, we researched the possibility of insuring and discounting receivables directly by the Company in Serbia or in EU. That proved to be difficult if not impossible for foreign receivables or larger volumes of domestic receivables. We considered incorporating a subsidiary of the Company in the EU in order to obtain the credit insurance necessary to discount the receivables. In the end it was determined that the best way was to redirect a part of the existing sales of final products of the Company to its customers through Pikaro. Pikaro would be able to utilize various trade finance instruments as another source for generating additional security and also liquidity from banks and insurance companies. The primary purpose of making the sales of the Company's final products through Pikaro was to mitigate the credit risk by transferring the risk from the Company to the insurance companies and factoring banks. It means that if the final customer does not pay, the factoring bank and its insurance company absorb this loss rather than the Company. The Company, by using Pikaro in this way, was fully insured for financial non-performance of its end product customers. Most of the final clients were clients of the banks we used for factoring anyhow so their risk was very well assessed by the banks. Pikaro, sometimes, combined both security instruments, insurance and factoring, to ensure a higher credit limit for final customer. This increased sales volumes.  The second benefit of factoring the receivables was the possibility to use these receivables as security with banks to enhance the ability of Pikaro to propose better delivery and payment terms to the Company for raw materials. To these ends, the Company and Pikaro entered into a frame contract for the sale of end products dated 27 May 2015. [CF 71].

41. The above was discussed with and approved by the KPMG monitoring team and the end product frame contract (and all the related contracts for the sale of end products to Pikaro) was signed by Ivan Milosevic as OFGR. Again, the arrangement was not exclusive and the Company was not prohibited from selling end products directly to its customers. In practice Pikaro resold about 20% of the Company's end products at the outset of these arrangements rising to about 70% in Q2 2016. It was also easier for the Company to sell in this way because of the quality of service provided by Pikaro and the ease of conducting sales into the EU from an EU-based company. EU customers generally wanted someone else to import the goods and clear the customs in order to avoid possible anti-dumping

duties, extra cost, paperwork and the financing of VAT. In order to implement this arrangement, Pikaro built a finance team and sales team for end product sales as well as the back office capability to process end product sales to many countries including the acquisition of the required import licences and customs clearance.

42. Given the production and delivery times, the Company generally determined its raw materials requirements and made its orders for each quarter in the preceding quarter. The Company's procurement team would solicit offers of terms for the required volumes of raw materials from a number of suppliers including Pikaro and consider them with the KPMG monitoring team. In the vast majority of cases, the terms being offered by Pikaro were the most attractive and so in practice Pikaro supplied almost all of the strategic raw materials to the Company. The KPMG monitoring team reviewed and approved the result of each tender for raw materials, approved each Purchase order, and approved from financial and legal perspective each of the Single Contracts for each of the raw material requirements which were then each separately approved by the Supervisory Board and only then signed by Ivan Milosevic as the OFGR. Examples are at [CF 51 to 54]. The terms of the supply proposed by Pikaro for the Single Contracts including the payment terms were always accepted by the monitoring KPMG team, representatives of the Government in the Supervisory board and, eventually, by the Company. The payment dates varied, however the Company almost always paid significantly late, and generally more than 60 days after loading. The details are addressed in Mr Vrchovinsky's evidence. The contracts, purchase orders and payments were all processed through the Company's SAP electronic system. All payments required the appropriate authorisations from the OFGR or the KPMG monitoring team before the bank would execute them. No complaint was ever raised with regard to the payment terms in the Pikaro invoices as they always complied with the Single Contracts. In any event, the Company generally paid Pikaro for raw materials well after 60 days from the date it would have been required to pre-pay for raw materials supplied direct by other suppliers. If there had been some problem arising out of the invoice payment periods, it would have been easy to correct: if it had been alleged by the RoS, or KPMG, or the OFGR, of the Supervisory board, or anyone else relevant, that Pikaro's practices were not consistent with the Pikaro Raw Materials Agreement in any way we could have made sure that the single contracts and invoice terms were fixed going forward – for example that they specified 60 days from loading. I would have been able to ensure that Pikaro agreed, and this was in substance what the Company was doing anyway in terms of the actual payment periods. But no objection was ever taken. The reality was that the Company, and the RoS representatives in the Company's structure (including KPMG), were happy with the way payment was working towards Pikaro.

43. With regard to pricing, the Service Provider commissioned a draft transfer pricing report from Ernst & Young to provide arms-length pricing ranges for transactions between Pikaro and the Company given that Pikaro was a related company to the Service Provider. [CF 72] This was to ensure that the transactions between Pikaro and the Company for the sale and purchase of raw materials and end products were fair and that the applicable regulations and tax rules were complied with. In proposing price terms for the sale and purchase of raw materials and end products, Pikaro kept at the lower end of the net margin ranges recommended by Ernst & Young and was actually below the lower end for most of 2015. This pricing report was provided to all members of the Supervisory Board.

44. It took a few months for the Company to make sufficient orders from Pikaro to bring the amount of the credit over $20 million. From August 2015, the amount of the credit owing from the Company to Pikaro with respect to raw materials was over $20 million apart from a dip below in November (see Pavol Vrchovinsky's witness statement at paragraph [38 and [CF 168]. This was due to a reduction of orders for raw materials when the Company reduced production to one blast furnace because of the steel market price crisis discussed below.

45. By the end of the first quarter of 2016, Pikaro had effectively ceased to be paid cash by the Company for raw materials as by that time approximately 95% of the Company's payment for raw materials was done by way of set off against the purchase of end products by Pikaro for on-sale (under the frame contract for on-sale) rather than cash payment by the Company. Those receivables became the only security and almost exclusive payment method for Pikaro in the first and second quarters of 2016. Such set off arrangements saved significant amount of the exchange rate losses and bank fees for international transfers as well.

46. The amounts owing from Pikaro to the Company for end products were a mechanism by which the Company secured and paid for raw materials delivery. They did not play any role in the calculation of the credit provided by Pikaro for the purposes of the Raw Materials Agreements. We put in place the raw materials arrangements before the end product arrangements and therefore did not have them in mind when concluding the Pikaro Raw Materials Agreement. The argument of the Respondents that the Company's end product receivables are to be set off against amounts outstanding for raw materials for the purposes of calculating the credit provided by Pikaro under the Pikaro Raw Materials Agreement is wrong and makes no sense. The Company had the same receivables towards its final customers from the sales of end products at a certain level prior to Pikaro's involvement but could not make use of those receivables. After Pikaro's

involvement a significant part of the receivables were held towards Pikaro instead of various customers but the Company benefited through much more favourable terms for raw materials acquisition and far lower credit risk. This is of course why the KPMG monitoring team and RoS representatives on the Supervisory Board approved the arrangements and the transactions. However, these receivables played no role in calculating the raw materials credit which was only to do with raw materials supply.

**The crisis in the global steel market**

47. After we began managing the Company, we discovered that some of the accounting before we took over had not been done properly and the NWC as well as the cash flow position of the Company was not what we had thought it was. We were therefore already experiencing more difficulty than we anticipated with regard to managing the business. The assets of the business (and therefore the NWC) were overstated by about $24 million. This had a knock on effect with regard to the amount of cash that was available to us to use in order to make the plant more efficient and improve the financial performance of the Company. I understand that the chief financial officer, Pavol Vrchovinsky, is providing detailed evidence in this regard. Had we known of these problems at the time of agreeing to the MSA, our modelling would have revealed that we would probably not be able to maintain $80 million. Pavol Vrchovinsky explains this in his evidence. In those circumstances, we would not have agreed to keep NWC over $80 million as in clause 3.1.5.1 of the MSA. It is difficult to say what we would have done instead. One possibility is that we might have agreed a much lower threshold although I doubt whether a lower threshold would have suited RoS because it was concerned about having liquidity to cover a minimum period of time if they decided to kick us out and so it would not really have fit with the purpose of the provision. If we had also known about the unreliability of the figures and the management and accounting practices when the Company was under RoS control that gave rise to it, we wouldn't have agreed a rigid threshold at all because we wouldn't have been able to trust the starting positon or the cooperation from the RoS side. We might for example have been willing to agree to use our best endeavours to maintain NWC over a certain level without accepting any liability if it fell below that level despite those endeavours as happened in this case.

48. In the fourth quarter of 2015, we were hit by a massive and unexpected drop in the global price of steel. This was a crisis for the global steel industry because it meant that the sale price for steel end products had fallen below production and transportation costs. I had never in my long career experienced such a steep fall in end product prices compared to costs. Normally, a steel company will review its business plan annually or quarterly in a

crisis. During the steel price collapse of 2015 we were reviewing the business plan on a daily basis. We tried everything we could within ordinary business measures to prop up the working capital by reducing costs and maximising the end product price. However, it was effectively impossible, even managing the Company optimally, to substantially increase the NWC through the ordinary management of the business without new sources of capital or other extraordinary measures.

49. In fact, the best way to manage the crisis from a financial point of view would have been to suspend production entirely until prices recovered because the Company was losing money on every ton of steel produced. However, this was not politically possible for two reasons. First, RoS had heavily publicised the re-opening of blast furnace 1 in October 2015 just as the price crisis was starting and would not sanction closing it again so soon after opening. Second, the privatisation process with Hesteel was ongoing at that time and Hesteel made clear it wished to purchase a plant with two functioning furnaces. In my discussions with the Prime Minister's Chief of Staff, Ivica Kojic, during this time it was made clear to me that RoS would not permit the suspension of production. I was told directly by the Prime Minister's Chief of Staff to keep the furnaces running because it would be very damaging politically to stop them. Having to keep the blast furnaces going at RoS insistence had a huge negative impact on the business. This is set out in a December 2015 email from John Goodish to Boris Milosevic in which he explains that the government's forcing the Service Provider to run two furnaces put the long term operation in jeopardy. [CF 102]. He also made a similar comment at the Supervisory Board meeting in June 2016 which is recorded in the minutes at point 7.2: "*[J Goodish] reminded that government insisted that two BFs run and it had catastrophic effects on the plant and market*". [CF 132]. We did ultimately have to suspend production in one of the blast furnaces on 28 October 2015 to try to mitigate some of the heavy losses the Company was sustaining. Blast Furnace No. 2 remained suspended until May 2016 although the decision to restart was made in March 2016. I made this decision which was a calculated gamble that we might get away with suspending one furnace but RoS made clear it never would have permitted a full suspension of production as we had recommended.

50. The crisis also had a severe impact on the financial viability of the project for the Service Provider. The fixed portion of the management fee did not cover our expenses with so many managers and their families living in Serbia. The milestone bonuses set out in the MSA which we expected to earn based on our business plan and projections were no longer possible because we could not reach break-even in the pricing environment we were facing. As a result, the Service Provider lost Eur 1.4 million in 2015 and Eur 830,000 in 2016. The Bidder had a loss of Eur 348,000 in 2015 and a loss of Eur 68,000 in 2016. The

total loss for both Claimants is almost Eur 2.7 million and climbing as a result of these proceedings, and of course we have not yet been paid the privatisation bonus which is due.

51. At the end of October or early November I recall having a meeting with the senior members of the Service Provider team to discuss whether we should carry on in the face of the steel market crisis which was making it impossible to run the plant at a profit in order to hit the milestones that would entitle us to earn the variable portion of the management fee under the MSA. The Service Provider was losing money because it was not able to earn the variable portion of the management fee. We assumed that the milestones would not be achievable until 2016 at the earliest. My reasoning for staying was simple: first it was the feeling of responsibility for all those managers who quit their jobs and moved, often with families, to Belgrade. Second was the trust that Prime Minister Vucic had put in me to achieve a successful privatisation. I knew that he invested his political future into this project. He said that numerous times. Third was the privatisation bonus. Hesteel was considered to be almost a done deal as the discussions were quite advanced by then. This was the light at the end of the tunnel for us. It would guarantee the financial success of the deal and was the main reason why I personally vouched for the Company to suppliers in those uncertain times. We all decided to stay and face the storm and expected nothing but support from the KPMG monitoring team and RoS. This support began to erode in late February 2016 as I discuss further below.

52. Throughout this period, we maintained regular and consistent communication with the RoS working group for the privatisation as well as the Supervisory Board and KPMG with regard to the crisis and our efforts to mitigate its effects on the Company. As soon as the NWC dipped below $80 million, John Goodish sent an email to the Supervisory Board to alert them to this fact. [CF 98].The price collapse and its effect on the Company was a topic of discussion at every monthly Supervisory Board meeting and was also discussed with the Working Group including the Prime Minister's Chief of Staff. The business plan was modified and updated to take account of the changing pricing environment and the changes were adopted and approved by the Supervisory Board beginning in September 2015 and then periodically thereafter. Neither RoS nor KPMG required the Service Provider to address the NWC shortfall.

53. Given the importance of the plant in the Serbian economy, its performance and condition was a political issue. Prime Minister Vucic had taken a political gamble by restarting the plant against advice from experts and the decision of the previous government to shut it down. He made it part of his election campaigns during this period and further elections

were expected in the spring of 2016. The Company had accumulated very large debts (some $400 million) to state owned enterprises under previous management. For these reasons and because RoS was trying to privatise the Company, the steel crisis was a major concern for the government. On 23 December 2015 RoS through KPMG commissioned a report on behalf of the Company from World Steel Dynamics into whether the collapse in the steel price could have been anticipated earlier in 2015 and its impact on European steel plants. [CF 73] [CF 8]. This was done in order to protect RoS against negative publicity if necessary for its decision to retain the Service Provider to manage the business and continue with us through and after the crisis. Boris Milosevic and Bojan Bojkovic brought the idea to the Supervisory Board and John Goodish suggested Peter Marcus of World Steel Dynamics, a name very well known for accuracy and conservative views of the steel market. Boris Milosevic commissioned the report on behalf of the Company.

54. The report speaks for itself but I believe it vindicates our position because it makes clear that the steel crisis could not have been foreseen and made it impossible to run a profitable steel plant during this period. It was translated and sent to Minister of the Economy Sertic. I am not aware that RoS or the Company ever made any specific use of the report. I also note that in general experts were actually predicting prices to come back up at various points in 2015. This can be seen from the report of the Deloitte Research Centre, Deloitte CIS issued in August of this year entitled "Hot Rolled Coil Europe Prices Outlook: Long term non-acceptance of falling prices" at page 18. [CF 179].

**The Privatisation**

55. It was clear from the outset of our involvement that the goal of RoS was to privatise the Company. This is why the MSA included a privatisation bonus for the Service Provider that was payable upon a successful privatisation and calculated as a percentage of the price paid by the buyer. In these circumstances, we had every incentive to facilitate a successful privatisation with any potential suitors. In effect, we ultimately wound up performing two jobs: managing the Company day to day and supporting the sale of the business to Hesteel which had made inquiries as early as January 2015 before the MSA was signed. I should stress that we had no express obligation under the MSA to assist with the privatisation at all. This was a matter for RoS. Nevertheless, we proactively supported the privatisation, attended all the meetings with Hesteel to which we were invited and provided all the information to Hesteel that was requested.

56. In May 2015, just after we began managing the Company, the chairman of Hesteel visited the plant together with the governor of Hebei province and met with me and KPMG to discuss the business. They, along with various Chinese central government officials,

returned for several visits in June and July 2015 and appeared extremely serious about acquiring the business. The Service Provider was in charge of providing all technical support for those visits and had to set up a data room for Hesteel to conduct their due diligence. An official privatisation Working Group was formed by RoS which included me, Boris Milosevic, Bojan Bojkovic, Nenad Mijalovic State Secretary of the Ministry of Finance and Zeljko Sertic, the Minister of Economy.  In September 2015 a delegation from RoS including KPMG travelled to China to meet with Hesteel executives and discuss the outline terms of the acquisition of the Company by Hesteel. No one from the Service Provider attended this visit but we provided our Chinese representative, Eric He for translating and for his expertise in the metallurgical industry in China. The deal originally proposed by Hesteel was an acquisition of the shares in the Company from RoS for nominal consideration on the basis that Hesteel would then bear the losses of the Company rather than RoS. This can be seen from point 2 of the Key Issues List sent by Hesteel to the Serbian delegation and copied to me after the visit. [CF 26]. RoS and KPMG tried during these meetings to convince Hesteel to change the structure to a sale of assets rather than shares so as to avoid state aid issues that might arise from any continuity of business after the transaction. [CF 97].

57. In October there were two further visits from Hesteel. In November 2015 there were a further series of meetings between Hesteel and RoS which included KPMG and me and Pavol Vrchovinsky from the Service Provider. The minutes from a meeting on 9 November at page 4 show that the deal by this time had evolved into as asset sale. [CF 60]. The RoS delegation wanted to ensure economic discontinuity between the Company and the Newco that would acquire the assets for state aid reasons. At the meeting Hesteel raised the issue of keeping key managers after taking over the plant in order to ensure a smooth transition. RoS therefore suggested that Hesteel come to an arrangement directly with the Service Provider for the provision of interim management services. This can be seen from page 10 of the minutes of the meetings. [CF 60].

58. In mid-December 2015, Hesteel invited a team of the Company's managers provided by the Service Provider to visit China and discuss possible challenges of running the Company and further cooperation between HPK and Hesteel. I went with John Goodish and Pavol Vrchovinsky. The meeting was productive and the Chairman of Hesteel mentioned it in a letter to Minister Sertic later that month. [CF 61]. John and I reported on the meeting to the Supervisory Board on 18 December. [CF 62]. During this visit I confirmed that the Service Provider would be happy to provide post-closing services to Hesteel but no details were discussed or agreed. The letter from the Chairman of Hesteel demonstrates that we

were effectively promoting the privatisation in our interactions with Hesteel on behalf of the Company:

"*Since the execution of the Framework Agreement until now, the Parties have been maintaining a consistent and close contact, during which the representatives from HBIS had discussions with HPK delegation on 14 and 15 December 2015, which significantly deepened the understanding of each other as well as provided d us with a more comprehensive knowledge towards this Project*".

59. The privatisation agreement was signed on 18 April 2016. On 20 April 2016 we sent Hesteel a proposal for the services and managers we could offer once they took over the plant. [CF 74]. This deal was never signed. Although RoS suggested to Hesteel that it arrange post-closing interim management with the Service Provider at first, I am aware that both Bojan Bojkovic and Boris Milosevic also offered to take on the interim management in place of the Service Provider later in the process on more than five occasions but were turned down because Hesteel preferred that we provide the post-closing interim management. I was told this information by Chairman Wang which was confirmed by Mr Song very shortly before and repeated after a meeting with Hesteel. Bojan Bojkovic, Boris Milosevic and I at the Hyatt hotel on 22 April 2016.

60. We continued to do everything we could to support the privatisation process. On 6 May 2016, the Chinese Ambassador to Serbia came to the plant and met with me. In public comments, the Ambassador mentioned my importance to the project which was reported in the media. [CF 11]. We continued to work with Hesteel on behalf of the Company to answer their questions, receive their input on the plant and to plan the handover process. In May 2016 another large delegation of the Service Provider's managers was invited to China to tour its Tangshan Steel plant. We decided to take only 9 HPK managers but also 3 non HPK managers and 3 heads of the workers unions of the Company. We were there for 5 days. We were introduced to the Chinese style of production and management. I had one brief discussion with chairman Wang about post-closing arrangements between HPK and Hesteel. We discussed only general terms of cooperation post-closing. He said that they will rely on us to support the Hesteel management after they take over the plant and that they trust us. In general, we had to do all the work related to running the plant itself as well as the planning and support for frequent visits of groups as large as 25 experts from Hesteel. We provided them with all technical support, including invitation letters, arranging and often paying for transportation, arranging accommodation, providing them with secretarial and translation services and even office space. We had to accompany Hesteel plant inspections and provide them with all data they requested. RoS had a very

limited budget for the negotiation and provided very little support for these visits. The Service Provider incurred substantial costs in its efforts to support the privatisation of over Eur 200,000 for consulting and interpretation services, travel expenses and promotional expenses for the various public events. We did this in the hopes of making the privatisation a success and receiving the privatisation bonus.

61. The only relationship we had with Hesteel was our support of the privatisation process in our capacities as the Company's managers as described above and the discussions around the arrangements for post-closing services suggested by RoS. Apart from assistance with some procedures in the run up to closing such as the opening of bank accounts and negotiating utilities contracts of which RoS was fully aware, we never acted for Hesteel during the privatisation process. I note the Respondents claim that we appeared at a meeting on the side of Hesteel at a meeting on 28 June 2016, three days after the MSA was purportedly terminated. I believe this meeting was about the utilities contracts for the Hesteel entity that was due to take over the business in a few days. We were closely involved in the process for negotiating and putting those contracts in place as I describe below. We attended this meeting to help finalise those contracts so that the privatisation could close. We never received any payment from Hesteel for any of the assistance provided before or after the termination or the closing. Prior to the termination, I do not recall any complaint from RoS or KPMG that the Service Provider was too close to Hesteel or was in any way breaching any non-competition obligations or had a conflict of interest.

62. In the end, Hesteel did not formally engage us for the provision of post-completion management because by that time, the termination had occurred and we were at odds with RoS. I found out in discussions with Mr Song that Minister Sertic had told Hesteel not to communicate with me and that it would be illegal for them to continue to work with the Service Provider. Hesteel, however still requested our assistance after the closing because of the difficulties they encountered in running the plant and we assisted informally and for no consideration in the hope that Hesteel would engage us going forward. We were never paid for this work. We stopped having any involvement with the plant in late August 2016.

**Utility contracts**

63. At the meeting between me, Bojan Bojkovic, Boris Milosevic and Hesteel on 22 April 2016 at the Hyatt Hotel in Belgrade, we discussed the contracts that would be needed by the Hesteel Newco for utilities such as electricity, natural gas technical gasses, lime and railway transport once it had acquired the Company's assets. Some of the relevant suppliers were owned by RoS. Boris Milosevic and Bojan Bojkovic offered to negotiate

contracts with the relevant suppliers for the supply of services to the Newco. Hesteel Chairman Wang declined their offer and instead asked me to do it. I agreed although to be clear there was no contractual obligation on the Service Provider to do this. [RF 4]. The offer from Boris Milosevic and Bojan Bojkovic was repeated and rejected again.

64. Within the next few days, the Service Provider undertook a market analysis and contacted all suppliers requesting their best offers for the supply of services to the Newco and offering to meet with them to explain the requirements if necessary. [CF 36]. Several of the utility suppliers owned by RoS delayed in responding, did not provide quotations or did not provide their best offers. It was typical of state-owned suppliers to respond to communications and progress negotiations very slowly. In order to push them along, we suggested that RoS get involved because these were RoS owned companies. Following receipt of the quotations, the Service Provider assisted with the negotiation of the contracts between Hesteel and the utility providers. On 17 June 2016 Richard Roman of the Service Provider sent an email to Hesteel reporting on the utility quotations that had been received. [CF 39].

65. In addition to delays on the part of the suppliers, there were delays on the part of Hesteel in relation to the establishment of the Newco with associated bank accounts, powers of attorney etc. and in relation to Hesteel's negotiation strategy to secure the best terms from the suppliers. To establish the Newco Hesteel also had to get certain permissions from its Supervisory Board, the government of Hebei province and the Chinese central government. This took significant time. They also had to get formal permission from RoS to use the word Serbia in the name of the Newco, Hesteel Serbia. That took some time also. We progressed the negotiations of the utilities contracts as quickly and efficiently as we could. The utilities contracts were eventually sufficiently progressed and Hesteel proceeded with the closing of the privatisation.

**Waiver letters**

66. As a condition to closing on the privatisation, Hesteel required waivers from the Company's suppliers to be given in favour of the Newco. The list provided by Hesteel was in Appendix 6 to the privatisation agreement. [CF 41]. Pikaro was on the list but the Service Provider was not. In order to progress the privatisation, I agreed on behalf of the Service Provider and the Company to try to obtain the waiver letters although again there was no obligation on the Service Provider to do this. The draft waiver letter produced by KPMG stated that the supplier waived any claim against the Newco for receivables in relation to the Company. This effectively meant that any suppliers with receivables from the Company on the date of the privatisation would only be able to look to the Company

which at that time would have sold all of its assets and become a shell with over $400 million in debts. It was therefore difficult to persuade the suppliers to provide the waiver letters as they were (quite understandably) requiring payment of their outstanding receivables before signing. This was further complicated because as the privatisation was nearing closing it was very important to preserve cash in order to avoid jeopardising daily operations. I tried to explain this to Boris Milosevic when he was chasing me for the waiver letters. [RF 6]. In the case of Hercules, Bojan Bojkovic had a good relationship with them so I suggested that he obtain that one. [RF 6]. In the run up to the closing of the privatisation, we continued to do all we could to press the suppliers to provide the waiver letters and eventually the waiver letters were delivered to the satisfaction of Hesteel and the privatisation closed. All private companies not owned by RoS (apart from the Service Provider and Pikaro) signed the waiver letters only after all outstanding receivables were paid.

67. With regard to the waiver letters from the Service Provider and Pikaro, they took legal advice on the suggested letter from Allen & Overy. Allen & Overy revised the letter and it was approved by Hesteel. [CF 75]. I also provided the final signed waiver letter in hard copy to Mr Song and Ms Grace at a meeting on 1 July 2016. The Service Provider was not on the list of the companies in Schedule 6 of the privatisation agreement who were required to provide a waiver letter. [CF 41]. I do not know to this day why or at whose instigation the Service Provider was asked to provide one when there were other companies not required to provide letters who held bigger debts than the Service Provider at the time. I am not aware of any other company not on the list but required to provide a waiver letter. Pikaro and the Service Provider did not give any condition for signing the Waiver Letter other than that that their lawyers approved the wording. Unlike many other suppliers, Pikaro was not paid for all of its outstanding receivables before providing a waiver letter. To this day, the Service Provider has not been paid its fixed management fees for May and June 2016 which are claimed in these proceedings.

68. We did everything we could to obtain the waiver letters for the privatisation. I did not make any attempt to delay the provision of the waiver letters in order to put pressure on RoS or the Company at the last minute. As mentioned elsewhere in this statement, I had every incentive to satisfy Hesteel to avoid any question as to our entitlement to the privatisation bonus.

**Providing information to Hesteel and RoS**

69. Throughout the privatisation process, Hesteel required information to be provided about the Company to support their due diligence. The Service Provider provided all the

information requested by Hesteel. The Service Provider's management team led by CEO Stanislav Barica convened regular privatisation coordination meetings of the Company. [CF 44]. Our head of legal, Natasa Tijanic devoted most of her time to supporting the privatisation. She personally helped to resolve a number of the conditions that needed to be satisfied prior to closing. We received no complaints from Hesteel regarding a lack of requested information or the failure to support the process in any way.

70. When he was appointed by RoS to monitor the activities and operations of the Company, Economy Minister Sertic wrote to the Service Provider requesting a list of information to be provided to the government monitoring team as well as the KPMG monitoring team and the Supervisory Board. The KPMG monitoring team and the Supervisory Board already had the information requested because they were so closely involved in the business. Nevertheless, the Service Provider's team began to gather the information to be presented in the way requested by the Minister. We then attended a meeting with the Minister on 30 May 2016 at which the information requests were clarified. The Service Provider provided all the information requested by the Minister. From that point, we also sent all reports that top management received to Minister Sertic and selected members of the Government until we were asked to stop because they did not have sufficient email capacity.

**Transagent bills of exchange**

71. Issuing bills of exchange is a common method of securing the credit provided by a supplier in Serbia. Prior to the involvement of the Service Provider, the Company issued many bills of exchange to suppliers in order to maximise its credit with suppliers and secure more favourable terms. We only proposed the use of bills of exchange in exceptional circumstances where it considered that the benefits outweighed the risks. In all cases, the issuance of bills of exchange was approved by the OFGR because the OFGR's signature was required on the bill itself and the request for registration of the bill at the central registry of RoS. Ivan Milosevic signed as OFGR only if he received "green light" signatures from the responsible KPMG monitoring team, in the case of bills of exchange probably from the financial and legal departments. In conjunction with the preparation of a bill of exchange, the Company would also negotiate with the supplier the terms of a power of attorney specifying the conditions for the exercise of the bill of exchange.

72. Transagent was a supplier of shipping and logistics services. In January 2016 Mr Zvonko Poscic from Transagent called me and offered the Company extended payment terms for their services if they receive bills of exchange from the Company. I referred him to our CFO, Pavol Vrchovinsky. Transagent was willing to provide the Company with extended

payment terms and they gave the Company lower prices with regard to shipping services but required bills of exchange as security for the additional credit extended to the Company. [RF 7]. In early 2016, the Company was experiencing cash flow difficulties and numerous suppliers had overdue receivables which they could have enforced and used to freeze the Company's bank account if not paid. It was determined that the benefits offered by Transagent would help the Company's cash flow position and, given the already sizable outstanding receivables, the risk that the Company's creditors would call in their debts and try to freeze the Company's accounts would not be significantly increased by issuing the bills to Transagent. It was therefore decided that the bills should be issued. The OFGR signature which was never given without KPMG approval shows that the decision was supported by RoS through the KPMG monitoring team.

73. It took some time to prepare the language for the power of attorney because the supplier was based in Croatia rather than Serbia. The bills of exchange were signed and registered at the beginning of June 2016. The list of bills of exchange issued to Transagent as well as the request to register them with the central registry were signed by Ivan Milosevic, the OFGR appointed by RoS. [CF 45]. The signature furthest to the right next to the seal is that of Ivan Milosevic. The other signatures are those of Mr Vrchovinsky (further left) and Mr Barica signing on behalf of the Service Provider. The bills themselves were also signed by the OFGR. [CF 150]]. These bills of exchange were therefore duly authorised by the Company and I believe it was wrong for the Company to have informed Transagent after the purported termination of the MSA that the bills were unauthorised. [RF 8].

**Supply of coke**

74. In general, procuring blast furnace coke for the Company was a complex process because most steel mills produce their own coke but as mentioned above the Company did not operate its own coking plant. There are few semi-independent coke producers in the region from which the Company could acquire coke and those mostly required long term supply contracts in order to manage their own supply logistics. Due to its chemical properties, coke cannot be stored for long periods and must be used relatively fresh from production which complicates the logistics and makes it cost effective to source as close to the plant as possible. For historical reasons, the Company obtained most of its coke from GIKIL, now an independent producer separate from the Company in Lukavac, Bosnia Hercegovina which was financed by German conglomerate RAG.

75. During the privatisation process, it was agreed at the request of Hesteel that the Company should operate two blast furnaces because Hesteel wanted to ensure that both were fully functional. Blast Furnace 2 was operating at the time. Blast furnace 1 was re-started in

October 2015 and this was highly publicised by RoS. Production was suspended at blast furnace 2 on 28 October 2015 because the dramatic drop in steel prices meant all production was loss making but it was not politically possible or acceptable to Hesteel to fully suspend production at both furnaces. In May 2016 after the steel price had recovered blast furnace 2 was restarted. This had the effect of dramatically increasing the Company's requirements for blast furnace coke. We anticipated the need for additional coke and began contracting well in advance for sufficient supplies to operate the two blast furnaces.

76. However, beginning in April 2016, GIKIL began having production and delivery problems which also happened to coincide with the Company's increased requirements for coke. GIKIL was experiencing strikes, problems acquiring coal for the production of coke and logistical problems. The Service Provider took all reasonable steps to maintain the supply of coke. We consistently pressed RAG and GIKIL for delivery and made every effort to maximise deliveries of coke from GIKIL. [CF 47]. I even went to speak personally to the German Ambassador to Serbia to explain to him the seriousness of the situation on 23 June 2016. He called the Ministry of Economy in Germany that very evening and I received a very prompt call from sales person of RAG in the morning on Friday 24 June. We sent a person from the Strategic Raw material department of the Company (not a Service Provider manager) to Lukavac to monitor the situation and he reported regularly on the situation. We kept the KPMG monitoring team and the Supervisory Board informed in relation to the difficulties with GIKIL. We also took steps to obtain supplies of coke from other suppliers in Slovakia, Hungary and the Czech Republic. [CF 48] [RF 16]. We used our contacts at US Steel in Kosice, Slovakia, to convince it to supply the Company with 10,000 tonnes of coke even though it was a competitor of the Company and rejected our initial request. The Respondents in paragraph 48 of the Statement of Defence say that I "blatantly misrepresented" the reality in my email to Minister Sertic on 27 May 2016. [RF 16]. This is wrong. For the reasons above, GIKIL was having difficulties with coke production and delivery. I was merely trying to explain that for this reason it made sense to obtain supplies from other producers.

77. We managed to maintain the supply of coke in order to keep the plant running. Although coke supplies were low, there was enough to maintain production. This can be seen from the Strategic Raw Materials layout report for 24 June 2016 maintained by the Company's raw materials purchasing team. [CF 76]. There was a suspension of production at blast furnace no. 1 for less than 48 hours from 22 to 24 June but this was necessary because one of the casters in the blast furnace needed maintenance. This also allowed coke supplies to build a bit during this period but production was not suspended for lack of

coke. The suspension was planned in advance and the Supervisory Board was kept informed. I understand Stanislav Barica will provide more detailed evidence on this point. In addition to using other sources, we took steps to speed up delivery so that there was sufficient coke to keep the plant running. For example, on 23 June 2016, we amended a shipment of 3900 tonnes of coke from Hungary that was due to be shipped by barge to be shipped by train so it would arrive earlier and ensure there was enough coke to run the plant until the anticipated handover to Hesteel on 30 June. [CF 77]. We also received confirmation on 24 June of six trains of coke to be dispatched to the Company by GIKIL in the coming days. [CF 99].

78. The delivery of raw materials including the additional coke from Hungary referred to above was severely disrupted by the purported termination of the MSA and Pikaro Raw Materials Agreement on Saturday 25 June 2016 which I describe in more detail below in the section of this witness statement dealing with the termination.

79. We never suspended the delivery of coke in order to frustrate the privatisation process or to otherwise put pressure on the Company or RoS. It was always our intention to support the privatisation to closing because this would be to our benefit and consistent with our duty as managers of the Company. We also had every incentive to maximise the deliveries of raw materials to the Company because the adjustments to the price to be paid by Hesteel in the privatisation (and therefore the ultimate amount of the privatisation bonus) were dependent at least in part on the inventories of raw materials held by the Company. I see from the invoice produced by the Respondents in this case, that there was a substantial adjustment in the purchase price paid by Hesteel upwards of about Eur 8 million based on the Company's inventories on 30 June 2016. [CF 78].

**GLS Steel Distributers Ltd.**

80. As mentioned above, when forming the Bidder I offered shares to Yves Nassan and Lazar Fruchter, who were the businessmen behind ICT. They agreed to invest in a 20% share of the project to manage the Company pending privatisation but this did not happen until September 2015. ICT had a marketing services contract through Global Steel with the Company that dated back to when it was owned by US Steel. In mid-2015 the Company and ICT decided that their contract should be replaced with a new contract using a European entity on the side of Global Steel BVI. The reason for this was very simple. Serbia was adopting a new tax law which would place a 30% withholding tax on the payment to Global Steel as it was an offshore company. So the Company would have to pay 30% withholding tax on top of the payment of the commission. In order to avoid this tax, an EU entity was established to be the contracting party on the side of Global Steel. During

negotiation we also improved the financial terms for the Company as we eliminated the higher commission that would have been payable in case of low volumes. Only the lower commission was left in the contract.

81. In late May 2015, following the inception of the MSA, Messrs Nassan and Fruchter had a meeting with the Prime Minister organised by Boris Krasny which I also attended along with the Prime Minister's Chief of Staff Ivica Kojic. The meeting was about the Company, its management and the roles of Messrs Nassan and Fruchter. We told the Prime Minister that they had an interest in the Service Provider but would not be involved in its day to day activities. They would be supplying the Company with marketing services through a separate contract. I reported on this meeting to Bojan Bojkovic and Boris Milosevic afterwards. In July 2015 the Company and GLS Steel Distributers Ltd entered into a contract for the provision of steel marketing services. [CF 57]. This was one of a number of similar contracts the Company had with steel marketing companies. The contract was signed by the OFGR on behalf of RoS but only after it was signed off by appropriate members of the KPMG monitoring team. When entering into any contracts with any related entities we always provided full disclosure and got sign off from the Supervisory Board which is above and beyond the requirements of the MSA. We did not go through this formal process in the case of the GLS Steel Distributers Ltd marketing contract for a number of reasons. First, all the supervisory board members and Ivan Milosevic (not to mention the Prime Minister and his Chief of Staff) were well aware that Messrs Nassan and Fruchter were behind GLS Steel Distributers Ltd and intended to make an investment in the Bidder for the reasons stated above so it wasn't necessary to provide any further disclosure to the Supervisory Board. Just by way of example, I briefed both Bojan Bojkovic and Boris Milosevic about Nassan and Fruchter meeting with the Prime Minister and I had introduced them as part-owners of the Service Provider when they visited the plant on numerous occasions. Second, as explained above, the companies controlled by Messrs Nassan and Fruchter had already had a long standing version of essentially the same contract in place, but with different entity in place and it was not due to expire, so this was not some fresh transaction. Third, at that time Nassan and Fruchter had not yet acquired any shares in the Bidder. Finally, the interest they were going to acquire was a minority interest and therefore did not implicate the control provisions of the MSA.

82. Nevertheless, had we been given notice under the MSA that there was some kind of breach in this regard to be corrected within 120 days or any other reasonable time limit we could easily have provided the supervisory board with the necessary information. Since the OFGR had already signed off, nothing further would have been needed towards him. If for any reason the Supervisory Board did not wish to continue with GLS Steel

Distributers Ltd, we would have replaced it as the provider of marketing services for the relevant countries. When I was asked by Minister Sertic for the names of the investors in the Bidder in an email on 27 May 2016, I provided the information requested. At the Supervisory Board meeting on 13 June 2016, the RoS side was still refusing to approve the payment to GLS Distributers Ltd until RoS had decided what to do. [CF 132]. I heard nothing further about the matter until the termination notice of 25 June 2016 which mentioned related party agreements (but not GLS Steel Distributers Ltd specifically). [CF 14].

**Insurance**

83. The Service Provider obtaining a liability insurance policy was a condition for closing of the MSA. We obtained a policy covering the period 20 April 2015 to 20 April 2016 through Price Forbes in London. [CF 118]]. The insurance was originally placed with Endurance [CF 20] but after Richard Roman reminded Price Forbes that the insurance must be in full compliance with Serbian law, the insurance was placed with Wiener Stadticshe A.D.O. Belgrade, a licenced Serbian insurer. [CF 79]. Wiener Stadtiche is the fourth largest insurer in Serbia as can be seen from the Q1 2017 report of the Serbian National Bank. [CF 80]. The policy was approved by Boris Milosevic on behalf of RoS and accepted in clause 2.4.6 of the CTP. [CF 59] [CF 4]. Although there was no obligation in the MSA to renew the policy, the policy was renewed on substantially the same terms for the period 20 April 2016 to 20 April 2017. [CF 81]. Again the insurer was Wiener Stadticshe A.D.O. Belgrade. [CF 82].

84. There was never any complaint from RoS or KPMG regarding the insurance. There has never been any claim on the policies. The first mention of any issue with the liability policy was in the termination notice where one of the grounds was expiration of the insurance policy. As mentioned above the policy did not expire, it was renewed. I do not recall the renewal ever being provided to the Company as this was not required. If anyone had ever asked we would have sent them the renewal. In any event, had we ever been any notice of any problem with the policy we would have taken steps to fix it. As it was, there was no problem.

**The Termination**

85. In January 2016 Bojan Bojkovic approached me with an idea. He first claimed based on no information that Pikaro had too many receivables from end product customers and was not using them properly. He proposed that Pikaro could transfer $10 million worth of Company receivables to a German company called BMG Trading GMBH so that it could factor the receivables in a similar way to Pikaro using its relationship with ICBC, a Chinese

bank with an office in Frankfurt. He introduced me to the owner of the BMG, who introduced himself as Mr Matić but did not present a business card. He claimed that BMG had a long term relationship with ICBC and were familiar with factoring. Bojan Bojkovic also said that they could buy about 10 thousand tons of the Company's end products and sell them in Germany. It was worth about 5 million USD. I suspected that this was a scam that would just ultimately be for the benefit of Bojan Bojkovic. The terms being offered seemed extortionate as the interest rate for factoring being offered was 40% instead of the 5% Pikaro was getting. I was afraid that the real plan was not to pay for the receivables or material and keep all the money. I asked Pavol Vrchovinsky, chief commercial officer Mr Kostadinović and Richard Roman to travel to Frankfurt, meet with BMG Trading and ICBC bank and investigate further. They found that ICBC in Frankfurt did not have a record of a significant relationship with BMG and that BMG had never done any factoring or trading of steel products. We also checked the companies registers in Germany and Switzerland which revealed that the company was an SPV created six months earlier owned by a Swiss company which was in turn managed by Mr Matic who was Serbian. This all looked very suspicious and I sent an excerpt of the register to Boris Milosevic by email on 1 February raising my concerns. [CF 83]. Boris responded that he did not introduce BMG or ICBC and eventually suggested that BMG be invited to the next supervisory board meeting with ICBC to present their proposals. I agreed but BMG never attended. We proposed that we set up a sales contract as a trial but they were unable to proceed. I did not hear further about it.

86. It was shortly after this incident that the relationship between the Service Provider and KPMG began to decline rapidly. From the documents disclosed by the Respondents in this case, I see that later in February (21 February) KPMG sent an analysis to the Prime Minister regarding the Service Provider's compliance with the MSA. [CF 84]. The analysis argues incorrectly that the credit provided by Pikaro was below the $20 million threshold throughout the period (on the incorrect basis that end product receivables should be taken into account in calculating the credit among others), that the NWC was below $80 million since October 2015 (which by then was well known to everyone from the Supervisory Board meetings, meetings with the Prime Minister's office and the continued involvement of the KPMG monitoring team in all aspects of the business); it also says that the Service Provider had complied with the personnel obligations in the MSA. The report included a table showing what KPMG represented to be the debtor-creditor relationship between the Company and Pikaro including raw materials purchases and sales of end products. The report concluded on the basis of the last line in the table entitled "*total direct and indirect position*" that Pikaro had not been providing the $20 million credit.

What the report failed to mention was that the version of the table first produced by KPMG had labelled that line "*total direct and indirect _financing_*" but Boris Milosevic had accepted in an email exchange with Pavol Vrchovinsky that it should be changed to "*total direct and indirect _position_*" because it was not a reflection of financing provided by Pikaro. [CF 55]. When Pavol Vrchovinsky showed me this email chain I believed it to be a clear acceptance on the part of KPMG that the net position including the end products was not a reflection of the financing provided by Pikaro which was to be calculated only by reference to raw materials. Pavol Vrchovinsky has also done a calculation showing what would happen if Pikaro were taken out of the picture and all receivables were returned to the Company. The answer is that the Company would have immediately lost $28 to $48 million in cash. I offered numerous times to Boris Milosevic for the Company to stop acquiring raw materials and selling end products through Pikaro [CF 100] and for KPMG to officially audit Pikaro so they could see for themselves the benefit that the Company was gaining from the arrangements with Pikaro [CF 101]. These offers were never accepted.

87. The KPMG report sent to the Prime Minister concluded that even though the breaches supposedly identified by KPMG would provide grounds for termination of the MSA, this was inadvisable because removal of the Service Provider might disrupt the privatisation procedure. I was never shown or given a copy of the report. At that time, the focus in our relations with the RoS and the Company was entirely on keeping the Company going to complete the privatisation to Hesteel. Although the privatisation agreement was not signed until April, by January all the key terms had been agreed in principle. At a meeting between the Working Group and Hesteel at KPMG on 25 January it was agreed that the privatisation agreement would be signed on 18 April in order to be fully utilized in the election campaign of the Prime Minister's coalition before the Serbian parliamentary elections which were to be held on 24 April 2016 and the deal would close by the end of June. The discussions around the performance of the Company were all about how we could keep the Company alive and the privatisation on track in the meantime.

88. In mid-February 2016 I resigned from the Working Group. The reason for this was that the Working Group began to discuss secret annexes to the privatisation agreement as a solution to some of the issues in the negotiations, for example, secret compensation from RoS to Hesteel if the business were to be hit in the future with large anti-dumping duties or requirements to reimburse state-aid. Nenad Mijajlovic, the state secretary of the Ministry of Finance stated in the Working Group meeting that these secret solutions were illegal in Serbia.  I was also asked to be sworn to state secrecy for Working Group meetings which I was keen to avoid because this was an additional serious legal obligation that I

could not control. I wanted to avoid any legal problems in Serbia because I knew that this could be used against me in the event that things went wrong so I resigned from the Working Group.

89. In March 2016 RoS began providing further financing to the Company by way of state-backed loans. Between March and June RoS provided around €33 million of additional financing in this way.

90. On 1 April 2016 RoS and the Company served their 90-day notice of termination under clause 8.4 of the MSA which meant that the MSA would terminate at the end of June when the privatisation was expected to close. [CF 9]. At this time we were all working to try to keep the Company running in order to complete the Privatisation. The termination under clause 8.4 meant we were still entitled to the privatisation bonus under clause 8.5. We therefore had every incentive to continue to support the privatisation and we were encouraged by RoS and KPMG to do so.

91. I had several meetings during this period with the Working Group, KPMG and Minister Sertic to discuss the response of RoS to the steel market crisis including a meeting on Saturday, 2 April 2016. The focus of the discussions was always only protection in the face of the steel market crisis for the Prime Minister's government from public criticism and from reprisals by a new government if the government of the Prime Minister were to lose power. In the past, when governments changed in Serbia privatisations undertaken by previous governments were scrutinised and government officials were prosecuted for the decisions they had taken, for example, Mr Kolesar, the Chief of Staff to former Prime Minister Dindic was prosecuted by the current government for bribery in relation to the original privatisation of the Company to US Steel. The government was concerned that it would be criticised for its response to the steel market crisis and its decision not to remove the Service Provider. If it became necessary, the government proposed to protect itself in two ways: first by using the World Steel Dynamics report to show that the crisis could not have been foreseen or controlled, second by the amendment of the MSA to demonstrate that RoS had taken steps to hold the Service Provider accountable for the Company's performance during the crisis. Specific alleged breaches of the MSA were not discussed at these meetings but the proposal was that the MSA should be amended to reduce the privatisation bonus because we had breached the MSA in some way and we had not been able to reach the milestones projected in the business plan. My response was always to deny that there had been any breaches of the MSA and that it was sufficient for the business plan to be changed to reflect the new market conditions and approved by the

Supervisory Board. This was done a number of times during the period and always approved by RoS through its members on the Supervisory Board.

92. With regard to NWC, I was never told that we needed to raise the NWC because we were in breach of the MSA. It was taken as a given that the NWC had fallen below $80 million because of the steel market crisis since November 2015. The emphasis from the RoS side was to continue as we been doing in order to complete the privatisation and protect the government through the World Steel Dynamics report and by agreeing an amendment to the MSA.

93. Following the 2 April meeting, Boris Milosevic sent me a draft "Annex" to the MSA which contained the Respondents' proposals to change the MSA in relation to the raw materials credit and the privatisation bonus. [CF 85]. The Annex proposed to note between the parties that the NWC provision of the MSA and the Raw Materials Agreement had been breached. Tellingly, the MSA Annex proposed to modify the privatisation bonus to tie it to additional credit to be provided by Pikaro by 15 May. The Annex also proposed to state that the credit of $20 million was to be calculated by reference to "net liability" from which the receivables of the Company from Pikaro and advances paid for purchase of raw materials were to be deducted.[1] As set out above, this was not the original understanding and appeared nowhere in the Pikaro Raw Materials Agreement that had been agreed.

94. I took this as a clear attempt to hold the privatisation bonus hostage in the hopes of getting Pikaro to provide additional finance to the Company. In any event, none of this was originally agreed. I also did not believe we were in breach of the MSA. With regard to the credit provided by Pikaro, I believed it was kept above $20 million as long as there were enough orders. The most important proof to me, other than that I trusted Pavol Vrchovinsky's calculations, is the fact that RoS never accepted my repeated offers to allow KPMG to audit Pikaro and did not want Pikaro to transfer its end customer receivables back to the Company. With regard to NWC, I felt that we had been exonerated by the World Steel Dynamics report. We managed the plant very well in extremely difficult circumstances and made huge efforts to support the privatisation for the benefit of RoS. The fact that they had issued a notice of termination on 1 April based on a successful privatisation and which meant that they accepted we should get the contractual privatisation bonus suggested to me that they were aware that this was a try on.

---

[1] The "MSA Annex" also purported to note that the breach of the Pikaro Raw Materials Agreement had been noted for the first time at the Supervisory Board meeting on 20 July 2015 and in all subsequent meetings of the Supervisory Board. This is false as can be seen from the minutes of the 20 July 2015 Supervisory Board meeting [CF 167].

95. In the next few days I discussed the position with the other beneficial owners of the Service Provider numerous times who all agreed that we were not in breach of the MSA and that we were entitled to the bonus. I set out my position in an email to Boris Milosevic on 13 April 2016. [CF 86].

96. The privatisation agreement was signed by RoS on behalf of the Company on 18 April 2016. [CF 10]. This was done at a public ceremony followed by fireworks which I attended along with Prime Minister Vucic and Hesteel Chairman Yu Yong. Since the privatisation had been agreed and RoS had given notice of termination based on the termination, I believed that we were entitled to the privatisation bonus. We issued a pro forma invoice for 30% of the Eur 46 million purchase price. [RF 2]. I continued to make clear to Boris Milosevic that we would not change our position or accept that we had breached the MSA. I asked the Service Provider's senior managers to consider the accomplishments of the Service Provider since taking over the management of the Company in late April 2015 and write them up in a summary so that RoS/KPMG could understand how we had helped the Company. This summary was sent to the Supervisory Board by Stanislav Barica on 6 May 2016. [CF 87].

97. Throughout this period the focus continued to be on making a success of the privatisation. The privatisation agreement required at clause 6.1 that the Company undertook to manage its business in the ordinary and usual course and in the same manner as carried on prior to the date of the agreement as well as not to institute any unusual methods of production, service, sale, lease, management, accounting, or operation.  Hesteel wanted us to carry on with the business as we had done and any deviation would have required their consent. We therefore continued to work hard to manage the Company as best we could in order to keep the privatisation on track. No one from the government mentioned the need to correct the NWC position as this wasn't on anyone's mind. The whole point of the NWC provision of the MSA was to allow RoS to kick us out and make other arrangements if it felt we weren't managing the business well enough to achieve a privatisation. Instead of kicking us out and making other arrangements, RoS continued to push the privatisation process forward and caused the Company to sign the privatisation agreement which required the business to continue to be managed in the same way.

98. If RoS or the Company had served a notice on us requiring us to correct the NWC position in 120 days or face termination of the MSA, we would have tried to do so because our goal was to perform the MSA so that we could claim the privatisation bonus. This is a purely hypothetical question because the message coming through from RoS was the opposite: continue to manage the business as before and cooperate with Hetsteel in order

to complete the privatisation. Given the market conditions it would not have been feasible to enhance the profitability of the Company to bring in the substantial amount of cash every month that would have been required to raise NWC to $80 million. However, there are other things that could have been done. For example, RoS as the main shareholder could have increased its share capital which would have had a direct impact on NWC. The Company could have pledged its assets for a long term loan. The Company could have tried to secure an advanced payment on the privatisation from Hesteel. I understand from Pavol Vrchovinsky that another way to increase the NWC would have been for Pikaro to extend the payment terms for raw materials out over a year so that they became long term payables and therefore not part of the NWC calculation. This would have brought NWC over $80 million. Pikaro would have agreed to do this if the end product payment terms were also extended by the Company to compensate. I understand that Pavol Vrchovinsky is providing additional evidence on these possibilities. Clearly, some of these measures would have required the consent of RoS or Hesteel but such consent might have been given or at least if it wasn't it would have been because RoS chose to allow NWC to fall in favour of other priorities. As it was, we did not feel the need to press any of these options because RoS never gave notice requiring any correction of NWC or even complained about the net working capital position per se and then signed the privatisation agreement prohibiting any change in the way we were managing the Company.

99. During this period from April 2016, there was continuing tension between me and KPMG over their attempts to change the MSA. Although I was angry and occasionally expressed my frustrations in emails, I knew that the only way we were going to be able to claim the privatisation bonus and perhaps provide interim management services to Hesteel after closing was to continue to support the Company and get the privatisation over the line. All the Service Provider personnel continued to work as hard as they could to manage the Company effectively and maintain the working capital at as high a level as possible given the constraints of the business. Pikaro continued to make every effort to meet the Company's requirements for raw materials as it always had despite the difficulties in procurement mentioned above. I am not aware of anyone at the Service Provider or Pikaro attempting to exert pressure on the Company by restricting raw materials supplies or otherwise. It was like there were two worlds between the privatisation signing and closing. One professional where we ran the plant day to day and cooperated very well with RoS representatives and KPMG monitors to have contracts approved and payments made with little tension. There was another world of different interests, politics and attacks coming from RoS and KPMG towards myself. My theory is that the hostile world resulted from personal tensions and the political climate in which I understand both

Minister Sertic and Boris Milosevic were angling to participate in the new government which was being formed following the parliamentary elections. It had nothing to do with our performance nor the result, which was a miracle privatisation and an extension of the life of a dying plant.

100.     My suspicions that RoS and KPMG were simply trying to deprive us of the bonus were heightened in early May 2016. Boris Milosevic stopped payment of an approved invoice from GLS Steel Distributers Ltd which was long overdue by withholding the KPMG monitoring team co-signature for the payment. He said that the payment would not be approved until the MSA Annex had been agreed. [CF 88]. I replied that I did not understand the connection.  Boris Milosevic then raised the issue of Messrs Nassan and Fruchter having interests in both GLS and the Service Provider. As mentioned above everyone including the Prime Minster was aware that they had these interests and in any event, their interests in the Service Provider did not give them any control in relation to the Service Provider. I knew Boris Milosevic was aware of this and so I concluded that his enquiries were merely an attempt to divide the Service Provider's shareholders and have Messrs Nassan and Fruchter pressure me to agree to sign annex to MSA. I refused to engage with his enquiries about GLS because I believed they were not genuine. When I was asked by Minister Sertic for the names of the investors in the Bidder in an email on 27 May 2016, I provided the information requested. I still do not know why Boris Milosevic was raising questions about Global Steel although I can speculate that he might have thought I had some interest in Global Steel. I have never had any interest in ICT, Global Steel or any other entity owned directly or indirectly by Messrs Nassan and/or Fruchter apart from the Bidder The email exchange on this issue also demonstrates that RoS had complete knowledge and control of all aspects of the business of the Company including payments from the Company's account to be exercised when it suited them.

101.     During these exchanges I began to appreciate that elements of the RoS and the RoS elements of the Company's structure, or at least Boris Milosevic, seemed to have developed a problem with me personally. The email from Boris Milosevic of 9 May to Minister Sertic where he appears to target me personally and make light of having a meeting to terminate the arrangements on my birthday confirm this. [CF 88]. I do not know exactly how or why this personal issue arose but my speculation is that someone might have been upset that I stood in the way of the BMG scheme or that Bojan Bojkovic and/or Boris Milosevic wanted to push me out so that they could gain further responsibility and therefore fees for managing the Company from RoS or Hesteel. In any event, it was clear that Boris Milosevic was actively trying to undermine our position throughout the period from April to June. This is confirmed by emails disclosed by the

Respondents demonstrating that behind the scenes Mr Milosevic was orchestrating the correspondence of Minister Sertic and promoting the termination. [CF 89]. Boris Milosevic often took direction from Bojan Bojkovic so I suspected that Bojan Bojkovic's interests were playing a role behind the scenes as well. With the criticisms focusing on me, the Service Provider's managers were free to get on with their excellent work. I tried to ensure that they were not distracted by these exchanges as this was the best way to get the closing of the privatisation done.

102.    On 7 June 2016 we received a draft settlement agreement from KPMG. [CF 27]. The draft agreement confirmed my suspicion that what RoS and KPMG really wanted was a reduction in the privatisation bonus and to separate me and the Service Provider from the Company so that they could continue to make money from the business once Hesteel took over. The draft agreement proposed that the privatisation bonus be reduced to an unspecified fixed amount. It proposed that the amount of the debt from Pikaro to the Company be agreed and that the Service Provider guarantee the payment of the debt before the closing of the Privatisation. Finally, it proposed that the Service Provider, the Bidder and a very widely defined set of related parties vacate the premises on the day of closing and cease operating in the steel sector in the European Economic Area for 2 years. The related parties would have included not only me but members of my family who worked in the steel sector including my brother and others. It would have put me and some members of my family out of business. The draft also relegated the Service Provider to the role of consultant bound to follow the orders of RoS and KPMG with regard to managing the business until closing. This all confirmed to me that this was really about removing any competition for the continuation of management services for the business of the Company and maintaining the positions and revenue for Bojan Bojkovic and Boris Milosevic as much as it was to try to change the bargain with respect to the privatisation bonus. I rejected this approach to settlement in a strongly worded email to Minister Sertic the next day. [CF 28]. No agreement was ever reached and we continued to manage the Company as before as these discussions wore on.

103.    By Friday 24 June, the privatisation had been all but completed. There only remained a few points for completion such as the waiver letters from the Company's creditors and the finalisation of the utilities contracts which were both far advanced. We had completed a number of public events designed to promote the privatisation including the signing event in April 2016, the visit of the Chinese Ambassador on 6 May 2016 and a tour of the plant by Chinese President Xi Jinping on a visit to Serbia on 19 June 2016. The President's tour was organised on the Company's side by the Service Provider in accordance with RoS protocols. [CF 90]. The Service Provider incurred substantial expense on its own account

for these events including marketing, public relations and promotional expenses. We also continued to support the privatisation throughout June 2016. For example, we performed the necessary stock counts and inventories for the closing and helped arrange the necessary independent audits [CF 91], we provided breakdowns of labour costs as requested by Hesteel [CF 92], and we continued to assist in the negotiation of the utilities contracts for Hesteel [CF 93]. We provided Hesteel with all the information that it requested and were in regular contact with them about the running of the plant. As set out in paragraph 77 above, we had ensured that there was sufficient coke in the pipeline to allow the plant to run until the scheduled handover. The utilities contracts for Hesteel were far advanced.  Hesteel was proceeding with closing which was scheduled for the following Thursday. There had been no complaints from RoS that we were intentionally obstructing the privatisation process.

104.    The Respondents claim at paragraph 99 of the Statement of Defence that termination was required because the Service Provider would have refused to co-sign the privatisation closing documents on behalf of the Company which was required under the MSA and the articles of association because it was an asset sale. This is non-sense. The Service Provider had every incentive to complete the privatisation to reduce any challenge to its right to the privatisation bonus and, as described below, was working throughout June to make it happen even though it did not have a legal obligation to do so. It would have been foolish for the Service Provider to put the privatisation bonus in jeopardy by refusing to sign. We all knew that Hesteel was the only game in town and that there were no other options for privatisation. I would have signed the documents personally on behalf of the Service Provider. RoS could also have asked for a power of attorney to allow it to sign the closing documents on behalf of the Company as it had done when the privatisation agreement itself was signed in April. This did not happen.

105.    Pavol Vrchovinsky, the Company's finance director provided by the Service Provider, was due to get married in Slovakia on Saturday 25 June. Several of the Service Provider's senior managers including myself were friends of Pavol Vrchovinsky and were due to be in Slovakia attending the wedding or taking their families back to Slovakia for the summer. We left only the minimum number of managers required to run the plant over the weekend. We were scheduled to return on Sunday evening. This was known to RoS and the KPMG monitoring team.

106.    On that Saturday morning with no prior warning RoS security personnel and the Minister of the Economy, came to the plant with various members of the news media and announced the termination of the Company's relationship with the Service Provider and

Pikaro. Ivan Milosevic, Bojan Bojkovic, Boris Milosevic and others from KPMG also attended. The news was announced in various media outlets shortly thereafter and received substantial publicity. Our mobile telephones registered to the Company, email and other IT connections were disconnected leaving us without any information as to what was happening. We suddenly could not reach the managers we left in the plant to check the status of the plant. The Service Provider's personnel who had been left behind as essential to continued operations and even some Company personnel who were considered loyal to Service Provider managers were not allowed to enter the plant or were detained. I later found out that Ms Jelica Rajkovic (the executive assistant to the CEO and the CFO) was detained, her computer and phone was confiscated and she was locked in a room together with drivers working for the Service Provider. They were all interrogated by RoS personnel who did not identify themselves later that day. Mr Kostadinovic, the Company's Chief Commercial Officer provided by the Service Provider was taken to the Ministry of Economy and put under government pressure to cooperate. Wesley Moyer, a Service Provider production manager, was driven to the plant, interrogated, threatened and forced to sign a new employment contract with the Company and terminate his contract with the Service Provider. He told me after the fact that he felt he had no choice and could not reach us because our phones were not working.

107.    At 12:54 pm on that day I received the termination notice for the MSA by email from Ivan Milosevic [CF 94]. At 2:54 pm Pikaro received the termination notice for the Pikaro Raw Materials Agreement by email from Ivan Milosevic. This was later forwarded to me because it was sent to the wrong email address. [CF 95].

108.    Apart from Service Provider personnel immediately necessary for production who were put under government pressure to cooperate with the Respondents, employees of the Service Provider and Pikaro were forbidden from entering the plant. The Company also stopped the delivery of end products to Pikaro. The delivery of the end products was not possible without employees of Pikaro in the plant and connected to the plant's electronic system.

109.    These actions created severe problems for the plant. The reason is that the plant runs on a constant stream of raw materials supply and end product shipment and the actions of Saturday morning disrupted these processes. The sudden and immediate termination of the MSA and Pikaro arrangements plus the complete lack of communication with us caused confusion and uncertainty. Suppliers and customers were uncertain how their business would be impacted by the terminations as they had previously relied on the Service Provider's personnel and Pikaro. Some suspended delivery to the Company for

fear that they would not be paid. The transportation company DSMS, for example, had a sizable debt for transportation of the raw materials and end products to and from the Company. The Company had no credibility in the market without the Service Provider and Pikaro and this impulsive move made it worse. It was perfectly understandable that the suppliers would balk because their reliance on Pikaro was damaged by the news of the termination and the Company was due to be privatised in the next week leaving an empty shell with large debts so there was no expectation that they would be paid.

110.    I found out in a discussion with RAG that the Company was in contact over the weekend with managers of GIKIL appointed by the government of Bosnia Hercegovina and a meeting had been scheduled to arrange direct deliveries of coke from GiKIL without involving Pikaro. I later learned that the direct deliveries did not work. The Company also tried to arrange for direct sales of end products to end customers but this was impossible because Pikaro held the relevant import licences for the sale of the Company's end products to EU customers and the Company lacked the expertise necessary to produce the required documentation for customs clearance into the EU. The newly introduced EU import licences held by Pikaro could not be reissued in the name of the Company. I found out from Mr Nassan that the Company had contacted him for advice on import licences on Sunday 26 June.

111.    Due to the disruption in supply of raw materials caused by the Respondents' lack of planning and the complete exclusion of the Service Provider from information and the management of the Company, it was forced to shut one of the blast furnaces before the weekend was out. On Monday morning 27 June before I was to travel back to Serbia, I received an email from Ivan Milosevic asking me to designate someone at Pikaro to support the document process for selling end products to customers. I replied that Pikaro would support the Company with raw materials and end product sales to try to avoid further damage. [CF 16]. I was worried that the problems with the plant might jeopardise the privatisation and I wanted to do everything we could to make sure the privatisation closed so the Respondents couldn't challenge our right to the bonus. I therefore instructed Pikaro staff to do what they could to support the production of the Company. I personally spoke to Vadim Vdovichenko, the CEO of DSMS which was a supplier of iron ore pellets to the Company and guaranteed payment in order to restart delivery that had been suspended because of DSMS's concern that it would not be paid. The Service Provider's managers remained locked out of the Company.

112.    I was invited by Prime Minister Vucic to attend an "explanation and solution" meeting in Belgrade with him and the extended Working Group. However, when I tried to re-enter

Serbia later that day at the Hungarian border I was stopped, searched and temporarily denied entry by Serbian security forces. I exchanged text messages with Suzana Vasiljevic, the media advisor to the Prime Minister. [CF 96]. I was permitted to proceed only after the border police spoke directly with the Prime Minister. Ms Vasiljevic indicated that the stop and search order was placed on my passport by the BIA (RoS civilian security information agency) on the instructions of Minister Sertic. This corresponded with what I was told by the customs police officer when he apologized and returned my documents. The security system in my home in Belgrade which was installed after two burglaries earlier in the year was disconnected on Saturday evening. It went back on line just after the closing of the privatisation agreement. The "explanation and solution" meeting with the Prime Minister turned out to be an unproductive negotiation over the level of the privatisation bonus.

113.    Despite this ordeal, I continued to instruct Pikaro staff to restart deliveries of raw materials and end products. It was difficult to get things up and running again quickly because of the need to re-plan the logistics for production and shipment. Even though Pikaro began to re-establish supplier deliveries, disruption in delivery of raw materials necessarily continued for a period after the chaotic weekend. GIKIL, for example did not reply to our emails on Monday at all. Despite the fact that we had prepaid trains to be delivered. Pikaro was taking an enormous risk during this period because it had made advanced orders for raw materials for the Company in the amount of about $78 million for the third quarter 2016. Its contracts with the Company made in relation to these orders contained a clause (required by KPMG) that they would terminate automatically as soon as the closing of the privatisation was notified. Pikaro also did not yet have a contract with Hesteel for the use of those raw materials if closing occurred as expected on 30 June. It was therefore on the hook for these orders with no assurance that they would be paid for by the Company or Hesteel following closing.

114.    Despite this disruption which was mitigated by the support of Pikaro, Hesteel proceeded to close the privatisation on 30 June 2016. This demonstrates that the privatisation was all but achieved before the purported termination on 25 June 2016. Nevertheless, RoS and the Company have refused to pay the privatisation bonus to the Service Provider. They have also refused to pay the fixed portion of the management fee for May and June 2016.

115.    In the circumstances, I believe that the attempted termination of the MSA by RoS and the Company was in bad faith and designed not to help the Company but rather to deprive the Service Provider of the privatisation bonus and perhaps pave the way for RoS-friendly

people to continue to profit from the business after it was privatised. RoS was aware of, and apparently content with, all of the things that the Respondents now complain about. They considered termination in February 2016 but deliberately decided to wait until we had essentially concluded the privatisation before kicking us out of the Company we had worked so hard to save over the previous 15 months.

I believe that the facts stated in this witness statement are true.

Peter Kamaras

16 August 2017

Kosice, Slovakia